UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

VICTORIA PRESTON,

                Plaintiff,

      v.

THE CITY OF ROCHESTER and
MITCHELL LEACH,

                Defendants.

_____

**DECISION AND ORDER**

6:22-CV-06525 EAW

## <u>INTRODUCTION</u>

On February 14, 2021, Rochester Police Department ("RPD") officer Mitchell Leach ("Leach") shot and killed plaintiff Victoria Preston's ("Plaintiff") dog, Zyria, in the living room of Plaintiff's ex-boyfriend's home, while standing within feet of Plaintiff and Plaintiff's one-year-old daughter.  Plaintiff contends that Zyria's death was part of "an epidemic of police killing pet dogs" in the City of Rochester ("City") and has sued Leach and the City (collectively "Defendants") for unlawful seizure in violation of the Fourth Amendment.  (Dkt. 1).

Defendants have moved for summary judgment.  (Dkt. 32).  Defendants have also moved to seal three exhibits submitted in connection with their motion for summary judgment.  (Dkt. 33).  For the reasons below, Defendants' motions are denied.

## BACKGROUND

### I. Factual Background

The incident underlying this lawsuit occurred at 1100 Norton Street, in the City, which was a home owned by Michael Herd, Plaintiff's ex-boyfriend and the father of her one-year-old daughter. (Dkt. 39-1 at ¶ 1). On February 14, 2021, Plaintiff was at 1100 Norton Street with her child, and RPD officers arrived along with child protective services ("CPS") employees. (Dkt. 34 at ¶ 2; Dkt 39-1 at ¶ 2). Zyria was at 1100 Norton Street with Plaintiff when the RPD officers and CPS employees arrived. (Dkt. 34 at ¶ 3; Dkt. 39-1 at ¶ 3). Plaintiff placed Zyria in the bathroom. (Dkt. 34 at ¶ 4; Dkt. 39-1 at ¶ 4).

Zyria escaped from the bathroom. (Dkt. 34 at ¶ 5; Dkt. 39-1 at ¶ 5). Defendants claim that she "charged at the CPS employees, while snarling and barking at them." (Dkt. 34 at ¶ 5). Plaintiff denies this assertion, and has submitted a sworn declaration stating that Zyria ran towards the front door where the CPS workers were, but did not bark, snarl, or growl at the CPS workers. (Dkt. 39-3 at ¶ 19). The CPS employees quickly exited the home. (Dkt. 34 at ¶ 6; Dkt. 39-1 at ¶ 6).

Defendants claim that Zyria then "charged" at Leach and bit his ankle, and that "[t]o get the dog to stop biting him, Officer Leach shot the dog." (Dkt. 34 at ¶ 6). Plaintiff's sworn declaration tells a very different story. According to Plaintiff, Leach ran into the kitchen from the living room, "immediately unholstered his gun and started yelling at Zyria." (Dkt. 39-3 at ¶ 20). "In response, Zyria barked and ran towards Leach," who backed into the living room, where he was standing within feet of Plaintiff and her

daughter.  (*Id*. at ¶¶ 21-22).  Zyria approached Leach inside the living room, and Leach shot at her six times, striking her three times and missing three times.  (*Id*. at ¶ 23).

Plaintiff did not see Zyria bite Leach and did not observe any injury to Leach as a result of the alleged bite.  (*Id*. at ¶ 30).  To Plaintiff's knowledge, Zyria had never attacked or bitten anyone.  (*Id*. at ¶ 31).  Zyria's normal response to strangers was to "run up to them and lick them to play with them."  (*Id*. at ¶ 32).

Two videos from Leach's body worn camera (Dkt. 32-6) are in the record.  The first opens in a kitchen; there is no sound initially.  A police officer and Plaintiff are partially visible.  Approximately 30 seconds into the video, the sound turns on and the CPS workers can be seen.  A dog can be heard barking in the background.  The CPS workers can be heard speaking to someone named "Melissa" about coming to see her house, and Plaintiff says that they can go inspect the house, but they are not taking her child from her. Conversation ensues in which the police officers tell Plaintiff that they are taking her child and she refuses to turn the child over and tells them to call their supervisor.  Leach follows Plaintiff into the living room during this conversation.  The dog continues to bark in the background.

Approximately one minute and 20 seconds into the video, a male voice says "oh, the dog," and Leach begins to move towards the kitchen.  Leach unholsters his gun and yells "hey, back up" as a dog barks.  The dog runs towards Leach and he backs into the living room, and then opens fire, shooting six times.  The dog runs away and hides behind what appears to be a Christmas tree, and then runs into the kitchen as Leach continues to

scream, "back up."  Plaintiff's daughter begins to cry and Plaintiff yells at Leach for shooting the dog, saying, "I would have got her! Are you kidding me?"

Leach reports over his radio that he has shot the dog, and Plaintiff says, "I would have got her, she wouldn't have fucking hurt you."  Leach responds, "she was going to attack us."  Leach continues to speak over the radio while keeping his gun trained on the dog, who is cowering in the kitchen.  Plaintiff cries in the background as Leach reloads his gun and keeps it trained on her dog.  Plaintiff says, "you just shot in the fucking house with a baby standing right here."  Leach then says, "I got bit in the leg."  Plaintiff continues to cry and says, "I'm sure she's fucking dead."  Leach says, "she's still up right now" with his gun still trained on the dog, who has not moved from the kitchen.  Plaintiff's daughter cries.  Leach asks for animal control over the radio.

Plaintiff asks if someone can grab her phone and a male voice replies, "not with the dog in there."  Plaintiff says, "I'm sure she can't move."  A male voice asks how the dog got out, saying "I thought you said you locked it."  Plaintiff replies that she did not say she locked the door, she said the dog was "put away," and that she cannot lock the door. Plaintiff's daughter cries and Leach says, "we're just going to have to wait."   Plaintiff says, "I'm sure there's no protocol for shooting your gun two feet away from a fucking kid."  She tells the police officers that they definitely need to tell their supervisor to come now.  Plaintiff makes additional critical comments regarding Leach's actions.

Approximately four minutes and 40 seconds into the video, Leach shows another police officer his right pant leg, which appears to be torn.  The other police officer says something that the Court is unable to make out.  Plaintiff, carrying her daughter, attempts

- 4 -

to enter the kitchen to retrieve her phone, and the officers tell her to stay in the living room and that she is "not getting anything right now."  Blood can be seen on the floor.  Leach asks the other officer if he is "good here for right now" and the other officer says he is.  Leach exits the home and tells the CPS workers, who are standing in the driveway, not to enter.  The video ends.

The second video is only approximately 20 seconds long.  Leach approaches the CPS workers in the driveway, and one asks "what's going on with her right now?"  One CPS worker then says, "oh my god, it came at you too?"  Leach says, "yeah, I'm good, I got bit in the leg."  A CPS worker says, "I shut its head in the door, I was trying to get out as quick as possible."  Leach says, "you're good, I shot the dog four times and it still was trying to bite me."  The CPS workers say, "oh my god," and one says, "what's going on with her right now?" Leach says, "um," and the video ends.

## II.   **Procedural Background**

Plaintiff commenced this action on November 22, 2022.  (Dkt. 1).  Defendants filed the instant motions for summary judgment and to seal on September 28, 2023, before the close of discovery.  (Dkt. 32; Dkt. 33; Dkt. 34).  Plaintiff opposed both motions, arguing in part that she required additional discovery in order to adequately respond to the motion for summary judgment.  (Dkt. 36; Dkt. 39).  Defendants filed a reply in further support of their motion for summary judgment.  (Dkt. 42).

Discovery continued, and closed on July 5, 2024.  (Dkt. 12).  After the close of discovery, the Court allowed the parties to file supplemental briefs regarding the motion

- 5 -

for summary judgment.  (Dkt. 44).  Plaintiff filed her supplemental brief on August 29, 2024.  (Dkt. 44).  Defendants did not file a supplemental brief.

## DISCUSSION

### I.    Motion to Seal

#### A.    Legal Standard

At common law, there is a longstanding "right of public access to judicial documents." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006); *see also United States v. Erie Cnty.*, 763 F.3d 235, 238-39 (2d Cir. 2014) ("The notion that the public should have access to the proceedings and documents of courts is integral to our system of government.").  "Before any such common law right can attach, however, a court must first conclude that the documents at issue are indeed 'judicial documents.'" *Lugosch*, 435 F.3d at 119.  "[T]he mere filing of a paper or document . . . is insufficient to render that paper a judicial document." *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) ("*Amodeo I*").  Rather, "the item filed must be relevant to the performance of the judicial function and useful in the judicial process. . . ." *Id.*

"Once the court has determined that the documents are judicial documents and that therefore a common law presumption of access attaches, it must determine the weight of that presumption." *Lugosch*, 435 F.3d at 119.  "The weight afforded to that presumption depends upon 'the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts.'" *Mayer v. Patriot Pickle Inc.*, No. 23-CV-1299-LJV, 2024 WL 162881, at *2 (W.D.N.Y. Jan. 16, 2024) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995) ("*Amodeo*

*II*")).  "Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance."  *Amodeo II*, 71 F.3d at 1049.

"Finally, after determining the weight of the presumption of access, the court must balance competing considerations against it."  *Lugosch*, 435 F.3d at 120 (internal quotation marks and citation omitted).  "Such countervailing factors include but are not limited to the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure."  *Id.* (internal quotation marks and citation omitted).

### B.   Application

Defendants ask the Court to seal three exhibits to their motion for summary judgment: the two videos from Leach's body worn camera, and records obtained from Monroe County CPS pursuant to a judicial subpoena.  (Dkt. 33 at 1).  Defendants acknowledge that the exhibits are judicial documents and that there is a strong presumption of public access, but argue that sealing is appropriate to protect "[t]he privacy interests of Plaintiff, her minor children, the CPS employees, and other third parties."  (Dkt. 33-2 at 3).

Plaintiff opposes Defendants' motion to seal.  (Dkt. 36).  She has submitted a sworn declaration in which she states that the only thing she believes should be sealed are her minor children's names and birthdays, and otherwise urges that the exhibits be publicly filed.  (Dkt. 36-2).

The Court denies Defendants' motion with prejudice as to the body worn camera videos.  The Court has reviewed these videos and finds that any third-party privacy interests—the only relevant consideration because Plaintiff has waived her own—are

insufficient to overcome the strong presumption of public access to these key pieces of evidence. Defendants' arguments to the contrary are conclusory and unavailing. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MC-2542 (VSB), 2023 WL 196134, at *4 (S.D.N.Y. Jan. 17, 2023) ("[I]f a court is to give weight to a party's asserted harms, those harms must be concretely and specifically described.").

The Court denies Defendants' motion to seal without prejudice as to the CPS records. Defendants' motion for summary judgment relies on pages 684, 754-55, and 758 of the CPS records. The Court has reviewed pages 754-55 and 758[1] and they are replete with private information about Plaintiff's minor children (including their medical histories), Plaintiff's mother (including her home address), and Plaintiff's ex-boyfriend (including regarding substance abuse issues). It is not clear to the Court from her declaration that Plaintiff has actually seen the CPS records and appreciates their contents, as she seems to be speculating about what they may contain. (*See* Dkt. 36-2 at ¶ 15 ("[T]he RPD officers should have known it was possible that Zyria could escape from the bathroom. My understanding is the CPS employees' notes should document this.")). The Court is inclined to agree with Defendants that wholesale public disclosure of these documents is not warranted.

But the vast majority of the information in the portions of the CPS records at issue is completely irrelevant to the issues before the Court, and the portions that are relevant do not contain sensitive information regarding third parties. The documents could easily be

---

[1]     As discussed further below, the copy of the CPS records in the Court's possession does not contain a page numbered 684.

redacted to display only the relatively few portions relevant to Leach's shooting of Zyria, and Defendants have not demonstrated that sealing the documents in their entirety is warranted.

Accordingly, the Court denies Defendants' motion to seal the CPS records without prejudice. Defendants shall file within 14 days of this Decision and Order a renewed motion to seal these records, in which they include a proposed redacted version thereof.

## II.   **Motion for Summary Judgment**

### A.   **Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, it finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "The moving party bears the burden of showing the absence of a genuine dispute as to any material fact[.]" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## B.   No Further Discovery is Needed

As an initial matter, the Court addresses Plaintiff's argument, made pursuant to Federal Rule of Civil Procedure 56(d), that Defendants' motion should be denied as premature. (*See* Dkt. 39 at 17-21). Rule 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> > (1) defer considering the motion or deny it;
> >
> > (2) allow time to obtain affidavits or declarations or to take discovery; or
> >
> > (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). The Court will assume for the sake of argument that Plaintiff adequately demonstrated in the first instance that she could not present facts essential to justify her opposition to Defendants' motion at the time it was originally filed. Plaintiff

was nevertheless able to continue taking discovery while the Court deferred its consideration of the pending motion, and was allowed to file supplemental opposition papers after discovery closed.  Plaintiff did not demonstrate in her supplemental opposition papers that any additional discovery was necessary.   Accordingly, the Court will not deny Defendants' motion on the basis of Rule 56(d).

### C.    Genuine Issues of Material Fact Preclude Summary Judgment

The Court turns to the merits of Defendants' request for summary judgment. Defendants argue that it was objectively reasonable for Leach to shoot Zyria, because she had "charged two people seconds before biting him."  (Dkt. 32-1 at 7-11).  Alternatively, Defendants argue that Leach is entitled to qualified immunity because it was objectively reasonable for him to believe that he was acting lawfully.  (*Id*. at 11-12).  And finally, Defendants argue that because there was no underlying constitutional violation, there can be no municipal liability.  (*Id*. at 12).  The Court considers each of these arguments below.

### 1.    Reasonableness of Leach's Actions

"The Fourth Amendment prohibits unreasonable searches and seizures." *United States v. Amerson*, 483 F.3d 73, 77 (2d Cir. 2007).  "[T]he unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment." *Carroll v. Cnty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013).  In assessing reasonableness, a court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion and determine whether the totality of the

circumstances justified the particular sort of seizure." *Id*. (quotation and alterations omitted).

Killing a person's pet dog is "a severe intrusion given the emotional attachment between a dog and an owner." *Id*.; *see also Ray v. Roane*, 948 F.3d 222, 227 (4th Cir. 2020) ("private interests in dogs—and family pets especially—are highly significant since dogs have aptly been labeled Man's Best Friend, and certainly the bond between a dog owner and his pet can be strong and enduring" (quotations omitted)). As such, "when a dog is seized—and especially, as here, where it is killed, not merely injured or detained— the intrusion on the owner weighs heavily in favor of finding the seizure unreasonable[.]" *Matteson v. Hall*, No. 18-CV-6772, 2019 WL 2192502, at *7 (W.D.N.Y. May 21, 2019) (quotation omitted and collecting cases).

But on the other hand, ensuring officer safety is a significant governmental interest. *Carroll*, 712 F.3d at 651. Accordingly, "in some circumstances, it is reasonable for an officer to shoot a dog that he believes poses a threat to his safety or the safety of the community." *Id*. "Though an officer need not wait to be mauled or attacked before employing force in self-defense, the officer may not utilize deadly force against a dog unless there is an actual basis to believe that the dog posed an imminent threat." *Azurdia v. City of New York*, No. 18-CV-04189-ARR-PK, 2019 WL 1406647, at *8 (E.D.N.Y. Mar. 28, 2019) (quotation omitted). Relevant factors in ascertaining reasonableness include the context in which the officer encountered the dog, the dog's behavior and temperament, the dog's breed, whether the owner was available and willing to assert control over the dog, whether non-lethal means were available to control the dog, and whether there was time to

- 12 -

find an alternative solution to control the dog.  *See Matteson*, 2019 WL 2192502, at *8; *see also Strong v. Perrone*, No. 17-CV-6183-FPG, 2020 WL 1445877, at *3 (W.D.N.Y. Mar. 25, 2020).

Defendants argue that "multiple factors" indicate that Zyria, a pit bull, was aggressive, and that she "exceeded the imminent harm threshold when [she] bit Officer Leach, thereby actually inflicting harm on him."  (Dkt. 32-1 at 8).  According to Defendants, "[a]ny/every reasonable jury would agree that it was objectively reasonable for Officer Leach to shoot a dog that less than five seconds before had chased and tried to bite two CPS workers—even while its head was caught in a door—and that then bit and latched onto his ankle[.]"  (Dkt. 32-1 at 10 (internal quotation omitted)).

Defendants' arguments ignore the standard applicable on a motion for summary judgment and resolve disputed issues of fact in the light most favorable to them.  A reasonable juror would not be constrained to find, on the record before the Court, that Zyria chased and tried to bite the CPS workers.  Plaintiff has stated under penalty of perjury that Zynia was a friendly dog[2] and that she did not bark, snarl, or growl at the CPS workers after escaping from the bathroom.  (*See* Dkt. 39-2 at ¶¶ 19, 31-32).  The Court must assume that a jury would believe this testimony.  While it is undisputed that the CPS workers were

---

[2]      In reply, Defendants cite page 684 of the CPS records, which they claim shows that Plaintiff's ex-boyfriend "said that the dog had previously 'tried to eat' a CPS employee that had arrived at his house."  (Dkt. 42 at 11).  Defendants have made no argument as to why this hearsay statement by Plaintiff's ex-boyfriend is admissible evidence.  Further, the copy of the CPS records in the Court's possession does not contain a page numbered 684, but instead goes from page 672 to page 699.  In any event, it would still be an issue for a jury to weigh the credibility of Plaintiff's and her ex-boyfriend's statements regarding Zyria's history of aggression.

scared of Zyria and quickly exited the house, a jury could easily conclude that this behavior was an overreaction to a non-aggressive dog. *See Strong*, 2020 WL 1445877, at *6 ("being startled by [a dog's] presence does not provide [an officer] with carte blanch" and a jury can conclude, under appropriate circumstances, that an officer "hastily and unnecessarily shot a dog that was not showing signs of aggression"). The body worn camera footage does not show Zyria attempting to bite the CPS workers, nor can she be heard or seen barking, growling, or snarling at them.

As to Leach's assertion that Zyria bit him, the record is decidedly mixed. Plaintiff—who was in the living room and witnessed the incident—has stated under penalty of perjury that she did not see Zyria bite Leach and that she had never known Zyria to bite or attack anyone. (Dkt. 39-2 at ¶¶ 30-31). Defendants inexplicably assert in a footnote and without citation to authority or further elaboration that Plaintiff's testimony "does not create an issue of fact." (Dkt. 42 at 8 n.2). *Robinson v. Pezzat*, 818 F.3d 1 (D.C. Cir. 2016), a case that Defendants themselves cite, persuasively holds to the contrary. In *Robinson*, the D.C. Circuit reversed the district court's grant of summary judgment to a police officer who claimed that the plaintiff's dog had bitten her on the foot before she shot the dog. 818 F.3d at 8. The court explained that there was a genuine issue of material fact, because the plaintiff had testified that her dog was lying on the floor of the bathroom when the officer opened the door and did not get up until after the officer fired her gun. *Id*. at *10. The court explicitly rejected the argument (seemingly asserted by Defendants here) that the plaintiff's testimony standing alone was insufficient to create a genuine dispute. *Id*. at *10-11.

Further, Plaintiff's testimony is not the only evidence calling into question Leach's assertion that Zyria bit him. The body worn camera footage also shows that when Plaintiff protested that she would have controlled Zyria if she had been given the opportunity and that Zyria would not have hurt the officers or the CPS workers, Leach said "she *was going to* attack us," not that she actually had attacked. In a statement given directly after the incident, a CPS worker reported seeing that Leach's pant leg was torn, but not seeing any actual injury to his leg. (*See* Dkt. 32-5 at 2 ("When the officer came out I noticed his right bottom pant leg was ripped which he told me the dog bit him. I was not injured during this incident.")). And Leach has not presented any corroborating evidence of the claimed bite, such as a photograph or doctor's records. "A jury must examine these discrepancies regarding the critical moments leading up to [Leach's] shooting of [Zyria] and weigh the relative credibility of the witnesses." *Strong*, 2020 WL 1445877, at *5; *see also Douglas v. Portuondo*, 232 F. Supp. 2d 106, 115 (S.D.N.Y. 2002) ("The determination of how much weight to accord eyewitness testimony given that witness' opportunity to observe the events at issue and in light of any circumstantial evidence that corroborates or refutes such testimony is a matter of credibility.").

The reasonableness of a Fourth Amendment seizure is a fact-intensive inquiry, and Defendants' motion fails to address a number of factors that a jury could consider in making its assessment. Instead, Defendants' motion is premised on their contention that Zyria charged and tried to attack the CPS workers and then attacked Leach. Because a reasonable jury could find different facts, for the reasons set forth above, Defendants' motion must be denied.

### 2.   Qualified Immunity

Defendants argue in the alternative that Leach is entitled to qualified immunity. (*See* Dkt. 32-1 at 11-12).  "Qualified immunity protects government officials from civil damages liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (quotation omitted).  In determining whether a defendant is entitled to qualified immunity, the Court "must consider whether: (1) the official violated a statutory or constitutional right, and (2) the right was clearly established at the time of the challenged conduct." *Id.* (quotation and alterations omitted).  The defendant claiming qualified immunity bears the burden of showing that he is entitled to it. *Bacon v. Phelps*, 961 F.3d 533, 542 (2d Cir. 2020).

Defendants argue that Leach is entitled to qualified immunity "because clearly established law does not prohibit shooting a dog that is biting an officer." (Dkt. 32-1 at 12).  But as the Court has explained above, there is a genuine issue of material fact regarding whether Zyria bit Leach, or otherwise could reasonably have been perceived to pose a danger.  Defendants' qualified immunity argument, like their merits argument, requires the Court to resolve credibility disputes in their favor.  It accordingly also fails.

### 3.   Municipal Liability

Finally, Defendants argue that the Court should grant summary judgment to the City.  The sole argument advanced by Defendants on this issue is that there can be no municipal liability without an underlying constitutional violation. (Dkt. 32-1 at 12).  This

- 16 -

argument fails, because the Court has determined that Plaintiff's claim against Leach must go to a jury.  Thus, the City has not shown that it is entitled to summary judgment.

**CONCLUSION**

For the foregoing reasons, the Court denies Defendants' motion for summary judgment.  (Dkt. 32).  The Court denies Defendants' motion to seal (Dkt. 33) with prejudice as to the body worn camera videos and without prejudice as to the CPS records.  Defendants are directed to file a renewed motion to seal the CPS records, including a proposed redacted version thereof, within 14 days of entry of this Decision and Order.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:  September 23, 2024
        Rochester, New York