UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

VICTORIA PRESTON,

                                        Plaintiff,

- against -

THE CITY OF ROCHESTER, a municipal
entity, POLICE OFFICER MITCHELL
LEACH,

                                        Defendants.

**Case No.: 22-cv-6525 (CDH)**

---

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CITY OF ROCHESTER'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

Elliot Dolby Shields
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS .............................................................................................2

ARGUMENT..................................................................................................................4

    I.    THE CITY'S MOTION IS PROCEDURALLY IMPROPER......................................4

        A.    Fourth Amendment "Standing" Is Not Article III Standing ......................................4

        B.    Even If Properly Brought, the Intertwined Standard Requires Summary Judgment
Treatment ................................................................................................................7

        C.    The City's Motion Is a Veiled Attempt to Relitigate Summary Judgment ................8

    II.    ABANDONMENT IS NOT PRESUMED AND THE CITY CANNOT MEET ITS
BURDEN ...................................................................................................................9

    III.    THE UNDISPUTED RECORD SHOWS PRESTON DID NOT ABANDON
ZYRIA .....................................................................................................................10

        A.    Ms. Preston Was Zyria's Primary and Exclusive Caretaker from Approximately
February 2018 to January 2024...............................................................................10

        B.    Ms. Preston's Breakup with Mr. Hurt Did Not Sever Her Ownership Interest in
Zyria........................................................................................................................11

        C.    Ms. Preston Never Expressed Any Intent to Abandon Zyria..................................11

        D.    The Circumstances of February 14, 2020 Conclusively Refute Abandonment.......12

        E.    *Shelton* Confirms That Even Actual Abandonment Requires Far More Than What
Occurred Here..........................................................................................................13

F.    Temporarily Leaving Property with a Co-Owner Is Not Abandonment; It Creates a Bailment ................................................................................................................. 14

G.    New York Courts Recognize That Companion Animals Are a "Special Category of Property" .................................................................................................................. 17

IV.    N.Y. AGRIC. & MKTS. § 117 IS IRRELEVANT ................................................. 18

V. AT MINIMUM, A FACTUAL DISPUTE PRECLUDES DISMISSAL ........................... 19

CONCLUSION .................................................................................................................. 21

## TABLE OF AUTHORITIES

**Cases**

*Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82 (2d Cir. 2006) ...... 8

*Animal Hospital of Elmont, Inc. v. Gianfrancisco*, 100 Misc. 2d 406 (Dist. Ct. Nassau Cnty. 1979) .................................................................................................................. 13, 14, 15

*Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006) ............................................................. 7

*Atlas Biologicals, Inc. v. Kutrubes*, 50 F.4th 1307 (10th Cir. 2022) ........................................ 7

*Brookins v. Laureano*, No. 22-1478-pr, 2023 WL 6458543 (2d Cir. Oct. 4, 2023) .............. 3, 6

*Brown v. United States*, No. 92-CV-82S, 1994 WL 319015 (W.D.N.Y. June 8, 1994)............ 8

*Byrd v. United States*, 584 U.S. 395 (2018)........................................................................ 3, 6

*Feger v. Warwick Animal Shelter*, 59 A.D.3d 68 (2d Dep't 2008) ......................................... 14

*Hamm v. United States*, 439 F. Supp. 2d 262 (W.D.N.Y. 2006) ................................................ 8

*Hennet v. Allan*, 43 Misc. 3d 542 (Sup. Ct. Albany Cnty. 2014) ............................................ 14

*Hoelzer v. City of Stamford*, 933 F.2d 1131 (2d Cir. 1991)....................................... passim

*Johnson-Schmitt v. Robinson*, 990 F. Supp. 2d 331 (W.D.N.Y. 2013) ............................... 9, 12

*L.B. v. C.C.B.*, 77 Misc. 3d 429 (Sup. Ct. Kings Cnty. 2022) .................................................. 15

*Leconte v. Kyungmi Lee*, 35 Misc. 3d 286 (Civ. Ct. N.Y. Cnty. 2011) .................................. 14

*Lehman v. Lehman*, 591 F. Supp. 1523 (S.D.N.Y. 1984) ......................................................... 13

*London v. Polishook*, 189 F.3d 196 (2d Cir. 1999)....................................................... 4, 8, 16

*People v. Natal*, 75 N.Y.2d 379 (1990) .................................................................................. 13

*Rakas v. Illinois*, 439 U.S. 128 (1978)..................................................................................... 7

*Santos-Zacaria v. Garland*, 598 U.S. 411 (2023)..................................................................... 7

*Shelton v. City of Locust Grove*, No. 24-5076, 2025 WL 3140217 (10th Cir. Nov. 10, 2025) .............................................................................................................. passim

*Travis v. Murray*, 42 Misc. 3d 447 (Sup. Ct. N.Y. Cnty. 2013) ............................................. 14

*United States v. Brown*, 627 F. Supp. 3d 206 (E.D.N.Y. 2022) ............................................ 3, 6

*United States v. Cowan*, 396 F.2d 83 (2d Cir. 1968) ................................................................ 9

*United States v. Easley*, 911 F.3d 1074 (10th Cir. 2018)....................................................... 12

*United States v. Porter*, 66 F.4th 1223 (10th Cir. 2023)........................................................ 12

*United States v. Ross*, 963 F.3d 1056 (11th Cir. 2020) (en banc)............................................ 7

*Valenza v. Valenza*, 67 A.D.2d 879 (1st Dep't 1979) ............................................................. 14

**Statutes and Rules**

N.Y. Agric. & Mkts. Law § 117 .............................................................................................. 15
N.Y. Agric. & Mkts. Law §§ 331-332...................................................................... 13, 14, 15
N.Y. Dom. Rel. Law § 236(B)(5)(d)(15).......................................................................... 14, 15

## PRELIMINARY STATEMENT

On the eve of trial, Defendants bring a Rule 12(b)(1) motion that is both procedurally improper and substantively meritless. The City characterizes this as an Article III standing issue, but it is not. Whether Ms. Preston had a cognizable Fourth Amendment interest in Zyria is an element of her Fourth Amendment claim—not a jurisdictional question. Fourth Amendment "standing" is "not distinct from the merits and is more properly subsumed under substantive Fourth Amendment doctrine." *Byrd v. United States,* 584 U.S. 395, 138 S. Ct. 1518, 1530 (2018). The Second Circuit has confirmed: "Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim." *Brookins v. Laureano,* No. 22-1478-pr, 2023 WL 6458543 (2d Cir. Oct. 4, 2023); see also *United States v. Brown,* 627 F. Supp. 3d 206, 219 (E.D.N.Y. 2022). Rule 12(b)(1) is therefore the wrong vehicle for this challenge.

Even treating the motion as properly brought, the jurisdictional question is intertwined with the merits of Plaintiff's Fourth Amendment claim, requiring application of a summary judgment standard. *London v. Polishook,* 189 F.3d 196 (2d Cir. 1999); *Hamm v. United States,* 439 F. Supp. 2d 262 (W.D.N.Y. 2006). Under that standard, the City cannot prevail because there are genuine disputes of material fact.

What the City is really attempting is to relitigate the summary judgment motion it already lost, repackaging a merits argument as a jurisdictional one on the eve of trial. The Court should not countenance such tactics.

Substantively, the record is clear. Ms. Preston was Zyria's primary caretaker, never abandoned the dog, and exercised dominion and control on February 14, 2020—the day of the incident. Under the "confluence of intention and action" standard articulated in *Hoelzer v. City of Stamford,*933 F.2d 1131 (2d Cir. 1991), and the principle that abandonment is "not

1

presumed" as established in *Hoelzer,* 933 F.2d at 1138, the motion must be denied as these are fact questions that must be determined by the jury.

## STATEMENT OF FACTS

In or about December 2017, Ms. Preston began dating Michael Hurt, and she and her older daughter moved in with him at 1100 Norton Street, Rochester, New York. Exhibit 1, Preston Dep. at 13:23-14:13. From December 2017 to approximately February 2020, Ms. Preston and her older daughter (and later her younger daughter who was born in 2019) resided at 1100 Norton Street with Michael Hurt; at first they lived in the upstairs apartment, but approximately four months later, they moved into the downstairs rear apartment of 1100 Norton Street in approximately April 2018. Id. at 15:5-16:7.

In early 2018, Mr. Hurt bought the dog involved in this incident, Zyria, from a friend, and she came to live with them at 1100 Norton Street, Rochester, NY. Id. at 17:21-18:7. Zyria was the family dog – she belonged to Ms. Preston, her two children—who were 9 and 1 years old at the time of the incident—and Mr. Hurt. Id. at 47:16-19. Mr. Hurt bought the dog for the family. Id. at 49:7-17; 107:14-108:10. They all took care of Zyria and loved her. Id. at 47:18-22. Ms. Preston was a stay-at-home mother and was the primary caretaker of Zyria; her children also cared for and played with Zyria. Id. at 42:25-45:2.

In approximately January or February 2020, Ms. Preston broke up with Michael Hurt and began moving out of the apartment they shared at 1100 Norton Street, Rochester, New York. Id. at 24:7-14. As of the date of the incident, February 14, 2020, Ms. Preston had "not completely moved out." Id. at 14:4-8. She had left a substantial amount of her personal belongings at 1100 Norton Street, but had not arranged with Mr. Hurt when she would return to retrieve her belongings. Id. at 14:13-24.

2

After she moved out, Ms. Preston maintained her continuous intention to keep and care for Zyria. Preston Decl. ¶¶ 9-15. Ms. Preston did not forfeit her property interest in Zyria, nor did she transfer her ownership in Zyria to Mr. Hurt. Preston Decl. ¶¶ 6-15

On the morning of February 14, 2020, Ms. Preston left the hospital with her one-year-old daughter, who she had brought to the hospital the night before for a medical procedure. She returned to her uncle's home at 485 Avenue D, where she was temporarily living, but her uncle had left for work, and she was locked out of the house. *Id.* at 50:9–13. She called Mr. Hurt and asked if she and the baby could come to 1100 Norton Street for a few hours until her uncle returned. He agreed. *Id.* at 50:14–17.

When Ms. Preston arrived at 1100 Norton Street, Mr. Hurt was home with one of his friends and two women she did not know. The apartment was a mess. *Id.* at 50:18–21; 33:14–21. Ms. Preston called the police to have the others removed. *Id.* at 50:22; 34:4–6. When Mr. Hurt learned she had called the police, he left the apartment. *Id.* at 34:21–24. The police arrived and told the others they had to leave. It took approximately twenty minutes to get everyone out. *Id.* at 50:23–24; 35:21–23.

After everyone left, Ms. Preston began cleaning up the apartment and trying to get her baby to sleep. *Id.* at 51:1–3. She also filmed and took pictures of the house, which she posted to Facebook, to complain about "how much of a scumbag" Mike was. Id. at 51:4-7. Approximately one hour later, two CPS workers and two police officers—Officers Leach and Ortiz—arrived at the apartment. *Id.* at 51:7–10; 51:23–52:13.

The CPS workers informed Ms. Preston that they had a warrant for removal of her children and asked to come inside. *Id.* at 56:10–12. Ms. Preston initially said no because of the dog. One of the CPS workers asked if she could put the dog up, and Ms. Preston put Zyria in the bathroom, then allowed them inside. *Id.* at 56:13–18. While speaking with the CPS workers and officers, Ms. Preston could hear Zyria barking and scratching at the bathroom

3

door trying to get out, but she did not think Zyria would be able to escape because Zyria had never gotten out of the bathroom before. *Id.* at 73:16–18; 73:22–24; 74:10–11. Neither officer checked the bathroom door to ensure that Zyria was secured. *Id.* at 137:10–13.

Within minutes, Zyria escaped from the bathroom and ran into the kitchen, initially running toward the front door. *Id.* at 62:7–8; 65:2–10. The two CPS workers, who were standing near the front door, ran outside through the kitchen door. *Id.* at 65:15–23. Officer Leach yelled at Zyria—either "Hey" or "Stop"—in an aggressive tone, unholstered his firearm, and pointed it at Zyria. *Id.* at 65:25–66:3; 66:25–67:2; 135:22–136:4. Zyria then changed direction and ran toward the living room, toward Officer Leach. *Id.* at 65:25–66:3. Officer Leach retreated into the living room, positioning himself within arm's reach of Ms. Preston, who was holding her one-year-old baby. *Id.* at 64:8–15. He attempted to kick Zyria; when she bit his pant leg, he fired six shots, at least one of which struck and killed Zyria. *Id.* at 80:6–7 (Preston informed Zyria "ripped his pants"); **[kicking and number of shots: cite to [SOURCE — not in Preston Dep.]]**. Zyria was not out of the bathroom for more than five seconds before Officer Leach began firing. *Id.* at 62:10–13; 64:2–4. Ms. Preston repeatedly told the officers to stop and that she would get Zyria, but she was not given any chance to do so. *Id.* at 63:15–18.

## ARGUMENT

### I.   THE CITY'S MOTION IS PROCEDURALLY IMPROPER
#### A.  Fourth Amendment "Standing" Is Not Article III Standing

The City's motion rests on a fundamental legal error: conflating Fourth Amendment "standing" with Article III subject matter jurisdiction. These are separate concepts under binding Supreme Court and Second Circuit precedent.

*Byrd v. United States* held that Fourth Amendment "standing" is "not distinct from the merits" and is "more properly subsumed under substantive Fourth Amendment doctrine." 584 U.S. 395, 410 (2018). Similarly, the Second Circuit authority, has explicitly addressed this

4

issue. In *Brookins v. Laureano,* No. 22-1478-pr, 2023 WL 6458543 (2d Cir. Oct. 4, 2023), the Second Circuit held, "Because Fourth Amendment standing is subsumed under substantive Fourth Amendment doctrine, it is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim." *Id*. at *2 n. 1. This is dispositive. The Second Circuit's pronouncement forecloses Defendants' entire theory Article III standing and demonstrates their Rule 12(b)(1) motion is procedurally improper.

The reasoning has been adopted by courts in this circuit. In *United States v. Brown,* 627 F. Supp. 3d 206 (E.D.N.Y. 2022), the court explained:

> "Courts often analyze the question of whether an individual has a cognizable Fourth Amendment interest as one of "standing." ... However, Fourth Amendment "standing" is "not distinct from the merits and is more properly subsumed under substantive Fourth Amendment doctrine." ... Therefore, the Court need not address whether Defendants lack "standing" before addressing the merits of the Fourth Amendment claims."

*Id*. at 219.

Most recently—and most directly on point—the Tenth Circuit confronted this precise issue in a case involving the police shooting of dogs. In *Shelton v. City of Locust Grove*, No. 24-5076, 2025 WL 3140217 (10th Cir. Nov. 10, 2025), the district court had dismissed the plaintiff's Fourth Amendment claim on "standing" grounds, ruling that the plaintiff had abandoned her ownership interest in the dogs. *Id.* at *1. On appeal, the Tenth Circuit drew a bright line between Article III standing and so-called Fourth Amendment "standing":

> "Article III standing is jurisdictional, but Fourth Amendment standing is not. A party's abandonment of a place or thing runs to the merits of his Fourth Amendment [claim] and not his Article III standing. ... [C]ourts should not "jurisdictionalize" merits considerations."

Id. at *3.

Critically, the *Shelton* court held that the plaintiff retained Article III standing to pursue her Fourth Amendment claim *regardless of whether she had abandoned her dogs*:

> "Her Article III standing remains whether or not she abandoned Sancho and Zeke. That is because Article III standing and so-called Fourth Amendment 'standing' are different. ... [T]he question of whether a party can show a violation of its Fourth Amendment rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing."

*Id.* at *3 (quoting *Atlas Biologicals, Inc. v. Kutrubes*, 50 F.4th 1307, 1325 (10th Cir. 2022);

citing *Rakas v. Illinois*, 439 U.S. 128, 140 (1978)).

The court then identified the binding Supreme Court authority prohibiting the

jurisdictionalization of merits questions:

> "The Supreme Court has cautioned us not to 'jurisdictionalize' merits considerations. See, e.g., *Santos-Zacaria v. Garland*, 598 U.S. 411, 416 (2023). ... And the abandonment question 'does not speak in jurisdictional terms.' *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515 (2006). Thus, 'a party's abandonment of a place or thing runs to the merits of his Fourth Amendment [claim],' *United States v. Ross*, 963 F.3d 1056, 1063–66 (11th Cir. 2020) (en banc), and 'not his Article III standing,' *id.* at 1057."

*Id.* at *3.

The procedural posture in *Shelton* maps directly onto this case. In *Shelton*, defendants

argued that the plaintiff lacked standing because she had abandoned her dogs. The Tenth

Circuit rejected the premise that abandonment is jurisdictional—holding unequivocally that

even if abandonment occurred, Article III standing survived because the plaintiff alleged an

injury to a possessory interest. Here, the City makes the identical argument: that Ms. Preston

abandoned Zyria, and that this deprives the Court of subject matter jurisdiction. *Shelton*

forecloses that theory. The abandonment question is a merits question, not a jurisdictional

one, and a Rule 12(b)(1) motion is the wrong procedural vehicle to litigate it.

Moreover, *Shelton* is an *a fortiori* case for Ms. Preston. In *Shelton*, the plaintiff

*verbally declared her dogs to be strays and told police officers to take them*—and the Tenth

Circuit still held she had Article III standing. *Id.* at *1, *3. Here, Ms. Preston never made any

statement relinquishing her ownership interest in Zyria—not to Mr. Hurt, not to CPS workers,

not to Officers Leach or Ortiz, not to anyone. If a plaintiff who expressly told officers to take her dogs retains Article III standing, then a plaintiff who never said or did anything to relinquish ownership *a fortiori* retains Article III standing. The City's 12(b)(1) motion fails as a matter of law.

The City's theory attempts to do precisely what *Shelton*, *Santos-Zacaria*, and *Arbaugh* warn against: transmogrifying a substantive Fourth Amendment question into a jurisdictional one. This Court should reject that attempt and deny the motion on procedural grounds alone.

## B. Even If Properly Brought, the Intertwined Standard Requires Summary Judgment Treatment

Should the Court entertain the City's jurisdictional argument despite its fundamental mischaracterization, "the court should use the standard applicable to a motion for summary judgment in deciding the jurisdictional facts." *Lenzi v. L.L. Bean, Inc.*, No. 23-CV-06117-FPG, 2023 WL 8237484, at *1 (W.D.N.Y. Nov. 28, 2023), *citing London v. Polishook*, 189 F.3d 196, 198-99 (2d Cir. 1999); see also *Brown v. United States*, No. 92-CV-82S, 1994 WL 319015, at *4 (W.D.N.Y. June 8, 1994).

Here, jurisdiction is intertwined with the merits. To prevail on the Fourth Amendment Seizure of Zyria claim, Plaintiff must prove by a preponderance of the evidence that:

1. Zyria was Plaintiffs' property.

2. Officer Leach intentionally fired the shot(s).

3. The shooting constituted a "seizure" of Zyria.

4. The seizure was objectively *unreasonable* under the Fourth Amendment.

Whether Ms. Preston abandoned Zyria directly impacts whether she retained a cognizable Fourth Amendment interest in the dog—the first element that Plaintiff must prove at trial. These questions cannot be separated. Resolving the "abandonment" question requires fact-finding by the jury that goes to the heart of her substantive Fourth Amendment claim.

7

The principle has been applied in this District. In *Hamm v. United States,* 439 F. Supp. 2d 262 (W.D.N.Y. 2006), the court applied the *London* standard and required summary judgment-level review of intertwined jurisdictional questions. See also *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.,* 436 F.3d 82, 88 (2d Cir. 2006) (noting that where jurisdictional facts are disputed, the district court may resolve them on summary judgment or after an evidentiary hearing).

Under this standard, the City cannot prevail. As detailed below, Ms. Preston's sworn declaration, her deposition testimony, and her documented actions on February 14, 2020, create genuine and material disputes of fact regarding her intent, her dominion and control over Zyria, and her status as the dog's primary caretaker. Dismissal is therefore barred by *London.* Under *London,* this Court 'should dismiss such a claim for lack of jurisdiction only if there are no triable issues of fact.' 189 F.3d at 196. Here, there are multiple such issues that require resolution by the jury.

## C.  The City's Motion Is a Veiled Attempt to Relitigate Summary Judgment

The City's true motivation is transparent: it lost its motion for summary judgment and now seeks to repackage a merits argument as a jurisdictional one in a last-ditch effort to avoid trial. The Court should not permit this procedural gamesmanship.

The question of whether Ms. Preston abandoned Zyria is fundamentally a factual dispute—one properly reserved for the jury. The abandonment inquiry requires assessment of Ms. Preston's subjective intent, her course of conduct, her ongoing relationship with Zyria, and the circumstances under which she left the dog with her Mr. Hurt. These are classic jury questions, not jurisdictional questions that permit resolution on a motion to dismiss.

Ms. Preston's sworn declaration and deposition testimony directly attest to her intent not to abandon Zyria and her continuous expectation of returning to care for her. These sworn statements create triable issues of fact that preclude dismissal under Rule 12(b)(1).

8

II.   **ABANDONMENT IS NOT PRESUMED AND THE CITY CANNOT MEET ITS BURDEN**

Even if the Court were to entertain the City's substantive argument on the merits, abandonment is not presumed in Fourth Amendment jurisprudence. The burden rests squarely with the City to prove that Ms. Preston actually abandoned Zyria.

The controlling test comes from the Second Circuit's decision in *Hoelzer v. City of Stamford,* 933 F.2d 1131 (2d Cir. 1991), which established that abandonment of property requires a "confluence of intention and action" by the owner. *Id*. at 1138. Before possessory rights will be relinquished, the law demands "proof both of an owner's intent to abandon the property and of some affirmative act or omission demonstrating that intention." *Id.* The court further held: "The abandonment of property is the relinquishing of all title, possession, or claim to or of it—a virtual intentional throwing away of it. It is not presumed." *Id*. quoting *United States v. Cowan,* 396 F.2d 83, 87 (2d Cir. 1968).

This standard is well established in this District. In *Johnson-Schmitt v. Robinson,* 990 F. Supp. 2d 331 (W.D.N.Y. 2013), this Court applied the *Hoelzer* standard in a case involving the seizure of dogs. The court confirmed that abandonment requires proof of both intent to abandon and an affirmative act demonstrating that intention, and that abandonment is not presumed. *Id.* at 343-344 (quoting *Hoelzer,* 933 F.2d at 1138). While the court in *Johnson-Schmitt* found abandonment on those particular facts—where the plaintiff had physically transferred dogs to a third party and expressly stated she had "given" the dogs away—the legal standard it applied squarely supports Ms. Preston, who took no such affirmative steps. Notably, the City itself relies on both Hoelzer and Johnson-Schmitt in its motion. But these authorities establish the very standard that defeats the City's argument: abandonment is "not presumed," and requires proof of both subjective intent and an affirmative act of relinquishment. The City's remaining cases—involving defendants who explicitly disclaimed

9

ownership of contraband to law enforcement agents or left property in vacated hotel rooms—bear no factual resemblance to this case and are inapposite.

The burden of proof rests with the party asserting abandonment. *Hoelzer,* 933 F.2d at 1138. Courts must "take into consideration all relevant facts, especially those pertaining to conduct of the parties." *Id.* Temporary separation from property, especially in a family or trusted setting, does not constitute the affirmative conduct required to establish abandonment.

The City cannot meet its burden of proving abandonment. Ms. Preston intended to return for Zyria. She acted consistently with that intention. She never made a statement to anyone indicating an intent to abandon the dog. She did not transfer ownership. She did not relinquish control. She simply left Zyria temporarily for approximately two weeks with Mr. Hurt in the home they had shared with her two children for over two years—a scenario that does not trigger abandonment.

## III. THE UNDISPUTED RECORD SHOWS PRESTON DID NOT ABANDON ZYRIA

### A. Ms. Preston Was Zyria's Primary and Exclusive Caretaker from Approximately February 2018 to January 2024

The record establishes without dispute that Ms. Preston was Zyria's primary caretaker from early 2018, when Mr. Hurt bought Zyria from a friend and brought her home to 1100 Norton Street, until the day Officer Leach shot and killed her on February 14, 2020. Exhibit 1, Preston Dep. at 17:21–18:7. Zyria was the family dog—she belonged to Ms. Preston, her two children (ages 9 and 1 at the time of the incident), and Mr. Hurt. *Id.* at 47:16–19. Mr. Hurt bought Zyria for the family. *Id.* at 49:7–17; 107:14–108:10. They all took care of Zyria and loved her. *Id.* at 47:18–22.

Ms. Preston was a stay-at-home mother and, as such, was the person who provided day-to-day care for Zyria. *Id.* at 42:25–45:2. Her children also cared for and played with Zyria. *Id.* This was not sporadic or incidental caregiving. It was the continuous, daily exercise of dominion and responsibility over the animal for approximately two years—from early

10

2018 through February 2020. This sustained, hands-on caregiving demonstrates Ms. Preston's intent to retain Zyria as her companion animal, her exercise of dominion and control, and her deep emotional bond with the dog. Primary caretaker status cuts strongly against any suggestion of abandonment.

### B. Ms. Preston's Breakup with Mr. Hurt Did Not Sever Her Ownership Interest in Zyria

In approximately January or February 2020, Ms. Preston broke up with Mr. Hurt and began moving out of the apartment they shared at 1100 Norton Street. *Id.* at 24:7–14. But as of the date of the incident—February 14, 2020—Ms. Preston had "not completely moved out." *Id.* at 14:4–8. She had left a substantial amount of her personal belongings at 1100 Norton Street. *Id.* at 14:13–24. This is critical: Ms. Preston was in the middle of an incomplete transition, not at the end of a completed departure.

The City's abandonment theory requires an inference that by beginning to move out of a shared apartment, Ms. Preston forfeited her property interest in the family dog. The law does not support that inference. A person who leaves belongings behind at a shared residence, who has not completed the process of moving, and who has made no affirmative statement or act relinquishing a companion animal has not abandoned the animal. Under the Second Circuit's "confluence of intention and action" standard, abandonment requires both an intent to relinquish *and* an affirmative act of relinquishment. *Hoelzer v. City of Stamford*, 933 F.2d 1131, 1138 (2d Cir. 1991). Neither is present here.

Ms. Preston maintained her continuous intention to keep and care for Zyria. Preston Decl. ¶¶ 9-15. She did not forfeit her property interest in Zyria, nor did she transfer ownership to Mr. Hurt. Preston Decl. ¶¶ 9-15.

### C. Ms. Preston Never Expressed Any Intent to Abandon Zyria

There is no statement, no writing, no utterance, and no conduct by Ms. Preston indicating an intent to relinquish Zyria. She never told Mr. Hurt she was leaving the dog

11

permanently. She never told anyone that Zyria was no longer hers. She never indicated that someone else could take the dog or do with her as they pleased. She never made a verbal disclaimer of ownership or declared Zyria a stray.

The contrast with *Shelton v. City of Locust Grove*, No. 24-5076, 2025 WL 3140217 (10th Cir. Nov. 10, 2025), is instructive. In *Shelton*, the Tenth Circuit upheld an abandonment finding where the plaintiff was given a choice between receiving a ticket or declaring her dogs strays, and she "advised that she was abandoning the dogs," after which the officers "loaded Sancho and Zeke into the animal control truck." *Id.* at *1–2. The court emphasized the plaintiff's objective words and acts: she verbally declared the dogs strays, she allowed officers to take them, and she took no action to reclaim the dogs in the nine days before one of them returned on its own after it was shot by an officer. *Id.* at *5–6.

None of those circumstances exists here. Ms. Preston never declared Zyria a stray. She never told anyone to take Zyria. She never relinquished physical custody of Zyria to any person or agency. She was never presented with a choice between a penalty and abandonment. Indeed, no one—not Mr. Hurt, not CPS, not Officers Leach or Ortiz—ever asked Ms. Preston whether she was abandoning Zyria, because there was never any reason to believe she was.

In the absence of any affirmative statement or conduct evidencing an intent to abandon, the law presumes the continuation of Ms. Preston's ownership interest. *See Hoelzer*, 933 F.2d at 1138.

### D. The Circumstances of February 14, 2020 Conclusively Refute Abandonment

The events of February 14, 2020 do not merely fail to support the City's abandonment theory—they affirmatively refute it. On that morning, Ms. Preston was discharged from the hospital with her youngest daughter, found herself locked out of her uncle's apartment where

12

she was temporarily living, and called Mr. Hurt to ask if she and the baby could come to 1100 Norton Street. *Id.* at 50:9–17. Mr. Hurt agreed, and Ms. Preston went to the apartment. *Id.*

When Ms. Preston arrived, she took steps to manage the household—calling the police to remove Mr. Hurt's friends who would not leave, cleaning up the apartment, and trying to get her baby to sleep. *Id.* at 50:18–24; 51:1–3. Approximately one hour later, two CPS workers arrived with Officers Leach and Ortiz. *Id.* at 51:7–13; 52:12–13. When the CPS workers asked to come inside, Ms. Preston's first concern was for Zyria: she initially said no because of the dog. *Id.* at 56:13–15. One of the CPS workers asked if she could put the dog up, and Ms. Preston secured Zyria in the bathroom before allowing them inside. *Id.* at 56:15–18.

These actions—returning to the apartment where Zyria was, exercising authority over the household, and affirmatively securing Zyria in the bathroom—are the acts of an owner exercising dominion and control over her property. They are the opposite of abandonment.

When Zyria escaped from the bathroom minutes later, Ms. Preston attempted to tell the officers to stop and that she would get Zyria. *Id.* at 63:15–18. She was not given any chance to do so. *Id.* at 63:18. Officer Leach fired within seconds, while standing within arm's reach of Ms. Preston as she held her one-year-old baby. *Id.* at 62:10–13; 64:8–12.

A person who secures her dog in a bathroom to protect visitors, who can hear the dog barking and scratching to get out (*id.* at 73:16–18), and who immediately tries to intervene when the dog escapes has not abandoned that dog. This is an owner exercising the full measure of her possessory interest. The City's abandonment theory is irreconcilable with the undisputed facts.

### E. *Shelton* Confirms That Even Actual Abandonment Requires Far More Than What Occurred Here

Even on the merits, the abandonment standard articulated in *Shelton* demonstrates that Ms. Preston's conduct falls far short of what is required to establish relinquishment. The

Tenth Circuit, applying precedent consistent with the Second Circuit's *Hoelzer* framework, held that abandonment is "an objective inquiry based on words spoken, acts done, and other objective facts." *Shelton*, 2025 WL 3140217, at *4 (quoting *United States v. Porter*, 66 F.4th 1223, 1226 (10th Cir. 2023)). The court further explained that "abandonment occurs if either (1) the owner subjectively intended to relinquish ownership of the property or (2) the owner lacks an objectively reasonable expectation of privacy in the property." *Id.* (quoting *United States v. Easley*, 911 F.3d 1074, 1083 (10th Cir. 2018)).

In *Shelton*, the court found abandonment because the plaintiff told officers to take her dogs, verbally declared them strays, and took no steps to reclaim them for nine days. *Id.* at *5–6. In *Johnson-Schmitt v. Robinson*, 990 F. Supp. 2d 331, 335 (W.D.N.Y. 2013), the court found abandonment where the plaintiff physically transferred her dogs to another person and stated that she "gave" them away.

Ms. Preston's conduct bears no resemblance to either scenario. She never verbally disclaimed ownership. She never physically transferred Zyria to anyone. She never told anyone to take Zyria. She was in the process of moving out of a shared apartment—not abandoning her property. She was literally present in the apartment with Zyria on the day of the incident, exercising dominion and control by securing the dog in the bathroom. Under any objective standard, this is not abandonment. If the plaintiff in *Shelton*—who verbally told officers to take her dogs—could plausibly have been found not to have abandoned (and the Tenth Circuit analyzed the question at length before affirming on distinct facts), then Ms. Preston—who did and said nothing to relinquish Zyria—cannot have abandoned as a matter of law.

F.  **Temporarily Leaving Property with a Co-Owner Is Not Abandonment; It Creates a Bailment**

The fundamental distinction between abandonment and temporary transfer of physical custody is well- established in property law. When Ms. Preston began moving out of 1100

Norton Street in approximately January or February 2020 and Zyria remained at the apartment with Mr. Hurt, Ms. Preston did not abandon the dog. Under New York law, leaving property in another's custody creates a bailment—not an abandonment. The owner retains her property interest.

The S.D.N.Y. addressed this precise scenario in *Lehman v. Lehman*, 591 F. Supp. 1523 (S.D.N.Y. 1984). In *Lehman*, a husband left valuable artwork in his wife's possession when the couple separated. The court held: "When Mr. Lehman left the artwork in his wife's possession at the time of their separation, his wife became a bailee of the property." *Id.* at 1527. The husband retained full ownership. The wife's possession did not extinguish his property interest; to the contrary, the wife's refusal to return the artwork constituted conversion. *Id.* at 1527–28. Critically, the *Lehman* court held that the bailment continued for years—through failed negotiations, expired separation agreements, and intermittent litigation—without any suggestion that the husband's property interest had been extinguished by the passage of time or by the fact that the items remained in his estranged wife's physical custody. *Id.* at 1525–27.

The parallel to Ms. Preston's situation is direct. Like the husband in *Lehman*, Ms. Preston left property—Zyria and various other personal belongings—in the possession of the person she had been living with when the relationship ended. Like the husband in *Lehman*, Ms. Preston did not complete the process of retrieving all of her belongings; as of February 14, 2020, she had "not completely moved out" and had left a substantial amount of personal property at 1100 Norton Street. Preston Dep. at 14:4–8; 14:13–24. Under *Lehman*, Mr. Hurt's physical custody of Zyria created a bailment. Ms. Preston's ownership interest survived intact.

New York's highest court has confirmed this principle. In *People v. Natal*, 75 N.Y.2d 379 (1990), the Court of Appeals held that a person "retained a property interest in his

15

personal effects when he surrendered them" to another, and that those items were "held as bailments, to be safeguarded." *Id.* at 383. If the owner retains a property interest by surrendering personal effects to another person for safekeeping, then *a fortiori*, an owner retains a property interest in a companion animal that remains in a shared family home with a co-caretaker during an incomplete move-out.

New York's statutory framework governing animals reinforces this conclusion. Under Agriculture and Markets Law § 331, an animal is "deemed to be abandoned" only under specific, prescribed circumstances—namely, when placed in the custody of a veterinarian, boarding kennel, or similar custodian, and the owner fails to retrieve the animal after proper notice by registered mail. Agric. & Mkts. Law § 331. In *Animal Hospital of Elmont, Inc. v. Gianfrancisco*, 100 Misc.2d 406, 418 N.Y.S.2d 992 (Dist. Ct. Nassau Co. 1979), the court strictly enforced these requirements, holding that even when a dog owner was unable to pay veterinary bills and failed to retrieve the animal, the owner retained his property interest because the veterinary hospital failed to comply with the statutory notice procedures. *Id.* at 408–10. The court found the veterinary hospital liable for the loss of the dog—a Great Dane puppy that the hospital had delivered to the ASPCA, where it was euthanized within 48 hours. *Id.* at 410. If an owner who fails to pay veterinary bills and fails to retrieve an animal from a boarding facility retains a property interest absent strict compliance with statutory abandonment procedures, then Ms. Preston—who never placed Zyria with any third-party custodian, never failed to retrieve the animal after notice, and never expressed any intent to relinquish her interest—*a fortiori* retained her property interest in Zyria.

In sum, leaving a companion animal in the physical care of a co-caretaker in a shared family home, during an incomplete move-out, with no expression of intent to relinquish ownership, is the antithesis of abandonment. Under *Lehman*, it creates a bailment. Under *Natal*, the owner retains a property interest. Under § 331 and *Animal Hospital of Elmont*, an

16

animal cannot be deemed abandoned absent strict statutory procedures that were never initiated here. Ms. Preston's deep, day-to-day caregiving relationship with Zyria confirms her continuing possessory interest. The City's theory that Ms. Preston abandoned Zyria by beginning to move out of a shared apartment is legally and factually baseless.

### G. New York Courts Recognize That Companion Animals Are a "Special Category of Property"

New York law treats companion animals differently from ordinary chattels. They are recognized as a "special category of property" deserving heightened protection and special consideration in ownership disputes. See *Feger v. Warwick Animal Shelter,* 59 A.D.3d 68 (2d Dep't 2008) ("Companion animals are a special category of property and are afforded many protections under the law.").

In *Leconte v. Kyungmi Lee,* 35 Misc. 3d 286, 935 N.Y.S.2d 842 (Civ. Ct. N.Y. Co. 2011), the owner of a dog left the animal with an ex-girlfriend for a two-week dog-sitting arrangement. When the ex-girlfriend refused to return the dog, the owner sued. The court held that the owner's "possessory right was superior" and rejected the defense of abandonment. The court's key holding: "Abandonment is not a defense." *Id*. at 288, *citing Valenza v. Valenza,* 67 A.D.2d 879 (1st Dep't 1979). The two-week timeframe in *Leconte* is directly on point with Ms. Preston's situation.

In *Travis v. Murray,* 42 Misc. 3d 447 (Sup. Ct. N.Y. Co. 2013), the court recognized that a companion animal is "decidedly more than a piece of property, marital or otherwise." *Id*. at 456. The court rejected a "strict property analysis" and acknowledged the special nature of the human-animal bond. *Id*.

The principle was further developed in *Hennet v. Allan,* 43 Misc. 3d 542 (Sup. Ct. Albany Co. 2014), where an unmarried couple separated and disputed ownership of their dog. The court held that pets are a "special category of property." *Id*. at 547. Critically, the court denied summary judgment despite one party's argument that the other had abandoned the

17

dog, because factual disputes existed regarding care, intent, and ownership. Abandonment was not presumed from departure. *Id*. at 548.

This principle is embodied in statutory law. New York's Domestic Relations Law § 236(B)(5)(d)(15), enacted in 2021, explicitly recognizes that "[f]or many families, pets are the equivalent of children." The statute amended the divorce statute to require courts to determine companion animal ownership based on each party's role in providing care, food, and veterinary attention—not on possession or technical ownership. The Legislature's determination is clear: companion animals occupy a unique status in New York law.

More recently, in *L.B. v. C.C.B.,* 77 Misc. 3d 429 (Sup. Ct. Kings Co. 2022), decided after the 2021 amendments to the Domestic Relations Law, the court applied the statutory "best interest of companion animal" standard. Even where a husband moved out of the marital home while the dogs remained with the wife, the court did not treat the departure as an abandonment by the husband. Both parties retained custody interests that had to be determined based on the animal's welfare and the parties' respective relationships to the animal. *See id*. at 438-439.

The City's effort to characterize Zyria as fungible property—equivalent to garbage left at a curb or a coat abandoned in a restaurant—is fundamentally at odds with New York's evolved recognition of companion animals' special status. When one partner moves out of a shared home during a separation and a companion animal remains, that does not constitute abandonment by the departing partner. It is a custody dispute in which both parties retain an interest. Here, Ms. Preston had not completed her move from the shared apartment, was present at 1100 Norton Street on the day of the incident, and never indicated any intent to sever her relationship with Zyria. The argument for abandonment is even weaker.

IV. **N.Y. AGRIC. & MKTS. § 117 IS IRRELEVANT**

The City argues that New York's statutory abandonment standards, particularly those found in Agriculture and Markets Law § 117, establish a baseline for determining when an

18

animal is deemed 'abandoned.' This argument conflates statutory animal control procedures with Fourth Amendment constitutional protections.

The statutory provisions provide procedural mechanisms by which shelters and animal control agencies can deem an animal abandoned and take title to it after a defined holding period and notice process. However, these statutes do not override Fourth Amendment protections. A Fourth Amendment violation occurs the moment an unlawful seizure takes place—long before any statutory abandonment determination could be made.

In *Animal Hospital of Elmont, Inc. v. Gianfrancisco,* 100 Misc. 2d 406 (Dist. Ct. Nassau Co. 1979), the court held that the strict statutory notice and holding requirements for deeming a dog 'abandoned' under §§ 331-332 must be strictly complied with. Critically, the court held that an owner's inability to immediately retrieve a dog did not extinguish the owner's property interest—only strict compliance with statutory procedures could do so. Zyria was never subjected to any statutory abandonment process. Zyria was seized without statutory process, without legal authority, and without constitutional justification.

The statutory framework is therefore irrelevant to the Fourth Amendment analysis and does not support dismissal.

## V. AT MINIMUM, A FACTUAL DISPUTE PRECLUDES DISMISSAL

Even if this Court harbored doubts regarding the merits, the resolution of those doubts is foreclosed by the existence of genuine disputes of material fact. Under the principle established in *London v. Polishook,* this Court 'should dismiss such a claim for lack of jurisdiction only if there are no triable issues of fact.' 189 F.3d at 196. Here, there are multiple triable issues that must be determined by the jury.

First, there is a dispute regarding Ms. Preston's intent. She has submitted a sworn declaration stating her intention to retain Zyria as her companion animal and her expectation of returning to care for the dog. Deposition testimony corroborates this. The City may present

19

contrary evidence at trial, but at this stage, the affidavit and testimony establish a genuine dispute.

Second, there is a dispute regarding Ms. Preston's actions on February 14, 2020. Ms. Preston was present at 1100 Norton Street with Zyria on the day of the incident, exercised dominion and control by securing Zyria in the bathroom, and attempted to intervene when the dog escaped. These actions are consistent with ongoing ownership, not abandonment. A jury could reasonably infer from her actions and the setting that abandonment was not intended.

Third, Ms. Preston's status as Zyria's primary caretaker for approximately two years is undisputed and supports a finding that she retained a Fourth Amendment interest in the dog. The City cannot credibly argue that someone who provided day-to-day care as a stay-at-home mother and maintained a deep bond with the family dog abandoned that animal by beginning to move out of a shared apartment.

Fourth, Ms. Preston had only recently begun moving out of 1100 Norton Street and had not completed the move as of the date of the incident. She still had personal belongings at the apartment. The brief period between the breakup and the incident, combined with the incomplete nature of her departure, creates a factual dispute regarding abandonment that cannot be resolved on this motion.

Finally, in *Shelton v. City of Locust Grove,* the court distinguished cases in which abandonment was found only where the owner made an 'affirmative denial of ownership'— verbally telling police the animals in question were strays or explicitly disclaiming ownership. Ms. Preston never made any statement of abandonment to anyone. This absence of affirmative denial, combined with her contrary actions and declarations, establishes a triable issue.

Under *Hoelzer's* principle that abandonment is not presumed, and under *London's* mandate that factual disputes preclude dismissal, the City's motion must fail.

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully submits that this Court must deny the City's Rule 12(b)(1) motion in its entirety.

Respectfully submitted,

Dated: February 25, 2026

New York, New York

_____~//s//~_____
Elliot Dolby Shields
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016
Phone: (212) 425 1020
Fax: (212) 532 3801
E-mail: eshields@RothandRothLaw.com

21