UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

VICTORIA PRESTON,

**Plaintiff,**

Case No. 22-cv-6525

v.

THE CITY OF ROCHESTER and
MITCHELL LEACH,

**Defendants.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Deposition Upon Oral Examination of:

Victoria S. Preston

| | |
|---|---|
| Location: | City of Rochester Law Department |
| | City Hall, Room 400A |
| | 30 Church Street |
| | Rochester, New York 14614 |
| Date: | December 19, 2023 |
| Time: | 9:30 a.m. |

| | |
|---|---|
| Reported By: | SANDRA C. HEWLETT, RPR |
| | Alliance Court Reporting, Inc. |
| | 109 South Union Street, Suite 400 |
| | Rochester, New York 14607 |



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

A P P E A R A N C E S

Appearing on Behalf of Plaintiff:

Elliot D. Shields, Esq.

Roth & Roth LLP

192 Lexington Avenue, Suite 802

New York, New York    10016

eshields@rothandrothlaw.com


Appearing on Behalf of Defendants:

Peachie L. Jones, Esq.

City of Rochester Law Department

City Hall, Room 400A

30 Church Street

Rochester, New York    14614

peachie.jones@cityofrochester.gov


\*        \*        \*



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

S T I P U L A T I O N S

TUESDAY, DECEMBER 19, 2023;

(Proceedings in the above-titled matter commencing at 9:47 a.m.)

*        *        *

IT IS HEREBY STIPULATED by and between the attorneys for the respective parties that this deposition may be taken by the Defendant at this time pursuant to notice;

IT IS FURTHER STIPULATED, that all objections except as to the form of the questions and responsiveness of the answers, be reserved until the time of the trial;

IT IS FURTHER STIPULATED, that pursuant to Federal Rules of Civil Procedure 30(e)(1) the witness requests to review the transcript and make any corrections to same before any Notary Public;

IT IS FURTHER STIPULATED, that if the original deposition has not been duly signed by the witness and returned to the attorney taking the deposition by the time



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

of trial or any hearing in this cause, a certified transcript of the deposition may be used as though it were the original;

IT IS FURTHER STIPULATED, that the attorneys for the parties are individually responsible for their certified transcript charge, including any expedite or other related production charges;

AND IT IS FURTHER STIPULATED, that the Notary Public, SANDRA C. HEWLETT, RPR, may administer the oath to the witness.

*     *     *

VICTORIA S. PRESTON,

called herein as a witness, first being sworn, testified as follows:

EXAMINATION BY MS. JONES:

Q.   Good morning.

A.   Good morning.

Q.   Welcome to City Hall.   My name is Peachie Jones.   I'm an attorney for the City of Rochester.   So I'm going to ask you some questions today for a deposition in the case Preston versus the City of Rochester.

I'm not sure if you have done a


ALLIANCE COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

deposition before, so I'm going to just set out some basics to help us get through this.

So first off, to make sure -- so you have sworn to tell the truth.   So to make sure you're telling the truth, I want you to hear and understand my entire question.

So will you first tell me if you don't understand my question?

A.    (The witness indicated non-verbally.)

Q.    You have to verbalize it so that the stenographer can write it down.  She can't write down nods of the head.

A.    Okay.  Yes.

Q.    That was going to be something else I was going to say.   Can you verbalize all your answers? So, like I said, the stenographer has to write everything down we say.

A.    (The witness indicated non-verbally.)

Q.    You just nodded your head.

A.    Yes.

Q.    Okay.  Will you tell me if you don't hear all of my questions?

A.    Yes.

Q.    Will you tell me if you don't know



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

the answer to any question?

A.   Yes.

Q.   Will you wait to answer until I have said my entire question?

A.   Yes.

Q.   Again, this is for the stenographer. It is hard to write things down when everyone is talking at once.

So if you don't say anything that you didn't hear or didn't understand my question, I'm going to assume that you heard it and understand it -- and understood it, and therefore, answered truthfully.

Is that fair?

A.   Yes.

Q.   Do you have any questions before we begin?

A.   No.

Q.   Okay.  Do you have any condition, either mental, medical or physical, that would impair your ability to hear questions I'm going to ask you today?

A.   No.

Q.   Do you have any condition that would



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

impair your ability to understand the questions I'm going to ask you today?

A.    No.

Q.    Do you have any condition that would impair your ability to respond to the questions I'm going to ask you today?

A.    No.

Q.    Have you consumed any alcohol in the last 24 hours?

A.    No.

Q.    Have you consumed any illegal drugs in the last 24 hours?

A.    No.

Q.    Have you consumed any medication in the last 24 hours?

A.    No.

Q.    Okay.  Did you review any documents in preparation for today?

A.    Yes.

Q.    What documents did you look at?

A.    I reviewed the video with Elliott.

Q.    When you say "video," what video are you referring to?

A.    The video of what took place on



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

February 14th.

Q.   Okay.

MR. SHIELDS: Speak a little louder, too.

Q.   February 14th of 2020 --

A.   Yeah.

Q.   -- I think was the day of the incident?

A.   Yes.

Q.   Are you referring to the incident that is the basis of the lawsuit --

A.   Uh-huh.

Q.   -- that you brought against the City?

A.   Yes.

Q.   Where did that video come from?

MR. SHIELDS:  Objection.

Q.   Sorry.  So he gets to object to questions.   That just means we have to talk about whether it was a fair question later, but you still have to answer unless he instructs you not to.

So where did the video come from?

A.   It was officer body-cam footage.

Q.   You said a video.

Did you review any paper or documents



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

to refresh your memory for today?

A.    No.

Q.    Did you talk to anyone other than Mr. Shields to refresh your memory in preparation for today?

A.    No.

Q.    Did you speak with anyone besides your attorney about the incident that gave rise to this lawsuit?

A.    No.

Q.    Who have you talked to about the incident in which the dog was shot by RPD officers?

MR. SHIELDS:  Objection.

A.    You said who have I spoke with?

Q.    Yes.

A.    Um, my mother and my sister, my aunt.

Q.    When did you speak to your mother about the --

A.    I have spoken to her a couple times about it.  She was -- not that she was there, but I like called her and stuff when the incident took place.

Q.    Have you talked to your mother about the incident on any other occasions?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

A. Yes.

Q. When were those incidents or times?

A. I don't exactly remember, but it just came up in conversation before.

Q. Okay. What did you -- what did you generally talk about or mention to your mother?

A. Pretty much just the situation in general, what happened.

Q. Did you talk to her about how it affected you at all?

A. Yes.

Q. Did you talk to her about whether or not you were going to bring a lawsuit?

A. No.

Q. What did you -- when did you talk to your sister about the incident?

A. Same as my mother. We just -- just came up in conversations.

Q. Were these conversations closer to the incident or closer to today?

A. Spread out, I would say.

Q. What is your mother's name?

A. Melissa Preston.

Q. What is the name of the sister that



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

you have spoken to about the incident?

A.   Marissa Angora.

Q.   Marissa, M-A-R-I-S-S-A?

A.   Uh-huh.

Q.   Angora.   A-N-G-O-R-A?

A.   Yes.

Q.   Is Melissa spelled with two Ss?

A.   Yes.

Q.   And what is the name of the aunt that you have spoken to about the incident?

A.   April Burgio.

Q.   Can you spell that?

A.   B-U-R-G-I-O.

Q.   What have you mentioned to your aunt about the incident?

A.   Just what took place, how it happened.  The way I was feeling about it.

Q.   What did you tell your aunt about how you were feeling about it?

A.   Just how uncomfortable and unsafe I thought it was and just it was traumatic.

Q.   Can you state your full name for me?

A.   Victoria Susan Preston.

Q.   How do you spell Susan?


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

A.    S-U-S-A-N.

Q.    Have you ever had any other names in adulthood?

A.    No.

Q.    How old are you as of today?

A.    31.

Q.    What is your highest level of education?

A.    Tenth grade.

Q.    Do you currently have paid employment?

A.    No.

Q.    Were you working at the time of the incident in February of 2020?

A.    No.

Q.    What was your source of income in February of 2020?

MR. SHIELDS:  Objection.

A.    Just family and friends helping me.

Q.    Did you have or receive any government benefits?

A.    Food stamps.

Q.    No County services like a -- what's it called?   Not SSI.   That is something else.


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

Sorry.

Any other source of income from like government --

A.    No.

Q.    -- County or -- okay.

What is the name of your ex-boyfriend who is the father of your younger child?

A.    Mike Hurt.

Q.    H-U-R-T?

A.    Yep.

Q.    Do you call him "Mike"?

A.    Yes.

Q.    Is his first name Michael?

A.    Oh, yes.    Michael.    Michael Hurt.

Q.    When did you -- well, how many children do you have?

A.    Two.

Q.    Throughout the deposition, I am going to refer to them as "younger child" and "older child" so it is just easier.

A.    That's fine.

Q.    When did you start your relationship with Michael Hurt?

A.    In 2018.


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

Q.  Do you remember what month?

A.  Or I would actually say it was probably December -- December of like 2017.

Q.  Is that when y'all started dating or --

A.  Yes.

Q.  When did you move in together?

A.  I would think around the same time that we started dating I pretty much moved right in with him.

Q.  Where did you move into?

A.  1100 Norton Street.

Q.  Is 1100 Norton a single- or multi-family property?

A.  Multi-family property.

Q.  Do you remember the apartment y'all moved into?

A.  Originally, it was the upstairs.

Q.  How many apartments are at 1100 Norton?

A.  Three.

Q.  Is there only one on the second floor?

A.  Yes.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

Q.   And there are two on the ground floor?

A.   Yes.

Q.   So you originally were upstairs.

How long did y'all live together in the upstairs apartment of 1100 Norton?

A.   I think maybe like four months.

Q.   Then where did you move?

A.   To the downstairs apartment.

Q.   Okay.

A.   Downstairs back apartment.

Q.   Did you and Michael live in the downstairs rear apartment until the day of this incident in February of 2020?

A.   I couldn't tell you when Michael moved out, but I had left probably two weeks prior to the incident.

Q.   So were you and -- so were you living in the downstairs rear apartment -- I guess my question is did you live anywhere else between the upstairs apartment and the downstairs apartment up until two weeks before this incident?

MR. SHIELDS:  Objection.

A.   I don't think I understand.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

Q.   Yeah.  That wasn't phrased very well.

So you lived upstairs for about four months and then y'all moved downstairs.

And then did you stay there until you moved out?

A.   Yes.

Q.   Was -- scratch that.

Did you ever marry Michael Hurt?

A.   No.

Q.   Did y'all ever become domestic partners?

A.   What would that mean?

Q.   It's a status where you can sign paperwork that says we share all of the finances of our -- in our household.  Like we're sharing a household, but we're just not married.

A.   No.

Q.   Did you have a job at any point that you were dating Michael Hurt?

A.   No.

Q.   Did -- did Michael Hurt have a job while y'all were living at 1100 Norton Street?

A.   Michael pretty much ran his own after-hours maintenance business.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

Q.    Who owned the multi-family property at 1100 Norton?

A.    Michael.

Q.    So he was also getting rental income from the property?

A.    Yes.

Q.    You sounded unsure about that.

Do you know whether he was?

A.    Yes.

Q.    Okay.  Were you also receiving food stamps when you lived at -- or lived with Michael Hurt at 1100 Norton?

A.    Yes.

Q.    The name of the dog that was involved in this situation -- can you remind me the dog's name?

A.    Zyria.

Q.    How do you spell that?

A.    Z-Y-R-I-A.

Q.    When did Zyria come to live with y'all at 1100 Norton?

A.    I don't remember exactly when.

Q.    I'm not asking for a specific day.

Do you have any sort of indication of



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

time, year or month?

MR. SHIELDS: Objection.

A.    Early in 2018.

Q.    Where did Zyria come from?

A.    Mike had told me that he bought her off of somebody.

Q.    Did Mike ever tell you the name of the person that he bought the dog from?

A.    No.

Q.    Had you and Michael Hurt discussed getting a dog prior to his purchase of the dog?

A.    No.

Q.    Did you go with him to pick the dog out?

A.    No.

Q.    Had you had a dog prior to Zyria?

A.    Yes.

Q.    What was the name of that dog?

A.    I've had a few dogs.

Q.    Okay.  What was the name of the dog that you owned most recently to when Zyria lived with y'all.

A.    Chewi.

Q.    Chewi, like C-H-E-W-I?



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

A.    I'm sorry.

You asking me if me and Mike had previously owned a dog?  Or just if I had?

Q.    Both.

So let's start with you and Michael. Had you previously had a dog together?

A.    No.

Q.    What about a dog that you owned by yourself?

A.    Yes.

Q.    And that was Chewi?

A.    Yes.

Q.    C-H-E-W-I?

A.    Yep.

Q.    When did you have Chewi?

A.    Probably about a year before getting with Michael.

Q.    What happened to Chewi?

A.    I ended up giving her to my aunt.

Q.    Is this the aunt that you mentioned earlier, April Burgio?

A.    Yep.

Q.    When did you give Chewi to Aunt April?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

A.    Right before I had moved in with Mike.

Q.    Why did you decide to give Chewi to your Aunt April?

A.    Just couldn't care for her at the time.

Q.    What kind of dog was she?

A.    A Chihuahua.

Q.    Where did you get Chewi?

A.    She was given to me by a friend for Mother's Day.

Q.    When you say you couldn't care for Chewi, what specifically are you referring to?

A.    Well, at first me and Michael hadn't been together that long so I didn't know about bringing a dog with me.  I wasn't working at the time, so...

Q.    Just the expense?

A.    Yeah.

Q.    Did Chewi have any behavioral problems?

A.    No.

Q.    She wasn't like fighting with your older child or anything?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

A.    No.

Q.    So you had Chewi about a year before you moved in with Michael.

Did you have Chewi for about a year?

A.    Yeah.

Q.    What was the name of the dog you had before Chewi?

A.    Shorty.

Q.    Shorty?

A.    Yes.

Q.    What kind of dog was Shorty?

A.    Pomeranian.

Q.    How long did you have Shorty?

A.    Probably about four to five years.

Q.    Where did you get Shorty from?

A.    It was kind of just a family dog.  It was my mother's dog.  My dog, mother's doing.

Q.    Did you live with your mother when you had Shorty?

A.    Yes.

Q.    Where were you living when you had Chewi?

A.    I believe with my aunt.  Then when I had left, she just kept her for me.



VICTORIA S. PRESTON – BY MS. JONES

Q.    Is Chewi still alive?

A.    Yes.

Q.    When you lived with your Aunt April, were you living within the City of Rochester?

A.    Yes.

Q.    Do you remember the address?

A.    3988 Lake Avenue.

Q.    What was the address of the residence where you lived with your mother and had Shorty?

A.    I couldn't tell you.  I know it was East Rochester, but I couldn't tell you.

Q.    How old was Chewi when you got her as a present?

A.    Newborn.  Well, not newborn, but six weeks.

Q.    So a puppy?

A.    Yeah.

Q.    Did you ever license Chewi in the City of Rochester?

A.    No.

Q.    Did she, Chewi, get her shots?

A.    Yes.

Q.    Do you remember the name of the veterinarian that you took Chewi to?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

A.   No.

Q.   Did you pay for the vet visits?

A.   Yes.

Q.   Did your aunt contribute to the cost of caring for Chewi?

A.   Yes.

Q.   Like buying pet food and stuff?

A.   Yes.   She helped me sometimes.

Q.   Did you reimburse Michael for any cost of when he bought Zyria?

A.   No.

Q.   Did he ask you for it?

A.   No.

Q.   Did you and Michael make any large purchases when y'all were living together?

A.   No.

Q.   You didn't buy like a new bedroom or anything?

A.   No.

Or -- I'm sorry.   There was a truck, but I'm not even sure if he paid for the truck or if he traded the truck for work.

Q.   Okay. Did you contribute financially to the cost of the truck?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

A.   Yes.

Q.   Do you remember any other larger purchases that you and Michael made together during your relationship?

A.   No.

Q.   When did the relationship end?

A.   I would say late January, early February.

Q.   Of what year?

A.   2020.

Q.   Who decided to end the relationship?

A.   Me.

Q.   Is that when you moved out?

A.   Yes.

Q.   Why did you choose to end the relationship with Michael Hurt?

MR. SHIELDS:  Objection.

A.   We just weren't seeing eye-to-eye anymore.

Q.   Where did you go live after you moved out of the apartment at 1100 Norton?

A.   With my uncle.

Q.   What is your uncle's name?

A.   Jeff  Breedlove.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

Q.   Can you spell the last name?

A.   B-R-E-E-D-L-O-V-E.

Q.   Where did your Uncle Jeff Breedlove live?

A.   At 485 Avenue D.

Q.   Is that in the City of Rochester?

A.   Yes.

Q.   This uncle --

A.   It's not my aunt's husband.

Q.   Okay.  Thank you.   Different addresses.

Who else lived with you and your uncle at 485 Avenue D?

MR. SHIELDS:  Objection.

A.   My youngest daughter.

Q.   Where was your older daughter living?

A.   I had sent her to live with my mother in East Rochester while everything was going on.

Q.   When you say "everything" that was going on, what are you referring to?

A.   Just between leaving and my uncle's place wasn't that big and...

Q.   Was your older daughter still attending school in the City of Rochester?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

A.   Yes.

Q.   How long did you end up staying at 485 Avenue D with your uncle?

A.   I would say about a year.

Q.   Did you take the dog, Zyria, with you when you moved out of Michael's place?

A.   No.

Q.   Why not?

A.   It just wasn't something we even discussed at the time.

Q.   Who is the "we," in the "we discussed"?

A.   Me and Mike.

Q.   I didn't mention in -- at the beginning, but sometimes pronouns can be confusing. So if I ask you to clarify who "we" and "her" is, I just don't want to assume who you're referring to.

A.   Okay.

Q.   Did your uncle, Jeff Breedlove, have pets when you lived with him in --

A.   No, he did not.

Q.   Did you get a new pet while you lived with your Uncle Jeff?

A.   No.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

Q.    Did he get any pets?

A.    No.

Q.    Had you completely moved out of the apartment -- the rear apartment at 1100 Norton Street by -- when you returned there on February 14th?

A.    No.  I was not completely moved out.

Q.    What stuff did you still have in the apartment at 1100 Norton?

A.    Pretty much everything.   I only took like major main things when I left.

Q.    Can you tell me some of the things that were still at the 1100 Norton Street apartment as of February 14th?

A.    Clothes, shoes, toiletries, babies belongings.   I pretty much have only taken some clothes and necessities when I left.

Q.    In the intervening time between when you moved out and when you went back there on February 14th, had you and Michael discussed when you were going to come get your belongings?

A.    It had been brought up, but never really picked a day or time or anything like that.

Q.    Did you talk about getting money back



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

that you contributed for the truck in between when you moved out and when you were back there on February 14th?

MR. SHIELDS:  Objection.

A.    No.

Q.    Did you still have a key to the apartment at 1100 Norton Street when you went back there on February 14th?

A.    No.  I actually hadn't had a key.

Q.    During the whole time you lived there?

A.    No.  We didn't really lock the door. I was pretty much always home, so.

Q.    Okay.  So how did you get in when you returned there on February 14th?

A.    Mike was home.  And the door was just open.

Q.    Another follow-up question about when you lived with your aunt.

Is 3988 Lake Avenue a single-family or multi-family?

A.    Multi-family.

Q.    So you and your aunt lived in one of the apartments?



VICTORIA S. PRESTON – BY MS. JONES

A.    Yes.

Q.    Were you renting the apartment with your aunt or was it rented in your aunt's name?

A.    It was rented in my aunt's name.

Q.    How long total did you live with your aunt on Lake Avenue?

A.    Maybe a year.

Q.    Where did you live before moving in with your aunt on Lake Avenue?

A.    I believe -- yeah.  I was staying with my grandmother.

Q.    How long did you live with your grandmother?

A.    I have lived with my grandmother on and off for  my whole life.

Q.    Where did you live with your grandmother?

A.    On Dewey Avenue.

Q.    Did your grandmother have any pets?

A.    Yes.

Q.    What kind of pet did your grandmother have?

A.    She had a dog.

Q.    Any other pets?


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

A.   No.

Q.   What was the dog's name?

A.   Oscar.

Q.   Can you spell that?

A.   O-S-C-A-R.

Q.   Okay.  Can you describe the layout of the apartment, rear apartment at 1100 Norton?

A.   Okay.  So when you would come in the door, you had your kitchen.   Straight ahead was what I would say was the master bedroom.

Q.   Sorry.

The master bedroom is off the kitchen?

A.   Yes.

Q.   Do you see the door to the master bedroom like as soon as you walk --

A.   Yep.

Q.   -- into the door?

A.   Yes.  It is straight across.

Q.   Okay. Sorry to interrupt.   Keep going.

A.   Also off the kitchen was the bathroom.   And then there was an entrance to the living room.   And then off the living room, there



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

31

VICTORIA S. PRESTON – BY MS. JONES

was another bedroom.

Q.    Was there a door to the bedroom that was off the living room?

A.    Yes.

Q.    Did it close?

A.    Yes.

Q.    The master bedroom also had a door?

A.    Yes.

Q.    Did that close?

A.    Yep.

Q.    Were there any other rooms in the apartment?

A.    Two bedrooms and a bathroom and a living room and the kitchen.    No.    That was it.

Q.    Porch?    Balcony?

A.    No.

Q.    Nothing?

There are a lot of enclosed porches in Rochester.

Who lived with you and Michael when y'all were in the rear apartment of 1100 Norton?

A.    My two daughters.

Q.    Mr. Hurt was the father of your younger child?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

A.    Yes.

Q.    Did Mr. Hurt have a dog prior to Zyria?

A.    I don't know.

Q.    What time did you arrive at the rear apartment at 1100 Norton when you went back there on February 14th?

A.    I would say probably about 8 in the morning.

Q.    Why did you go there that day?

A.    My daughter had -- well, mine and Mike's daughter, the youngest, had been at the hospital the night before and when I got discharged in the morning, my uncle had left for work and I couldn't get into his house.  So I called up Mike and asked if me and the baby could come stay there for a couple hours until my uncle got home.

Q.    You said he was still there when you arrived in the morning?

A.    Uh-huh.

MR. SHIELDS:  You have to verbalize your answer.

A.    Yes.

Q.    What did the apartment look like when



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

you arrived in the morning of February 14?

A.   A mess.

Q.   How did the apartment typically look when you lived there with Michael?

A.   I wouldn't say perfect, but it was clean.

Q.   Did you know why it was in such a condition when you arrived on February 14?

A.   Did I know why it was in the condition it was?

Q.   Correct.

A.   I would assume he was parting.

Q.   Was anyone else at the apartment besides Michael when you arrived back there at 8 a.m.-ish on February 14th?

A.   Yes.

Q.   Who was there?

A.   I -- there were people that I did not know.  There was two females and one of his male friends.

Q.   You did recognize the male friend?

A.   I knew of him, yes.

Q.   Did they all leave when you arrived?

A.   No.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

Q.   No?

A.   (The witness indicated non-verbally.)

Q.   How long did they stick around?

A.   I actually called the police to have them removed.

Q.   And then did they leave?

A.   Yes.

Q.   Was Michael still there when you called the police to have everyone else --

A.   Nope.

Q.   Did Michael come back after you had gotten everyone out?

A.   Nope.

Q.   No?

A.   No.

Q.   How did -- where did Michael go?

A.   I don't know. I believe he had warrants or something.  So anytime I called the cops, he would leave.

Q.   So he was there at least when you called the cops to have everyone else kicked out?

A.   Yeah.  Once he found out I called the cops, he left.

Q.   Got it.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

Q.    Did the cops come?

A.    Yes.

Q.    Your older daughter was with your mother at the time?

A.    Yes.

Q.    What else did you do upon arriving at the rear apartment at 1100 Norton besides kicking everyone out?

MR. SHIELDS:  Objection.

A.    You said what else did I do?

Q.    Correct.

A.    Kicked everyone out pretty much and began to pick up the mess and try and get my youngest daughter to sleep.

Q.    Were you concerned at all that your younger daughter might be injured by all of the mess around?

MR. SHIELDS:  Objection.

A.    Yes.  That's why I was cleaning it.

Q.    About how long did it take to get everyone out of the apartment?

A.    I would say maybe 20 minutes.

Q.    Oh.

A.    The cops showed up and pretty much



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

told them it was still my residence and that they had to leave if I didn't want them there.

Q.    Back to Zyria, do you know how much Mr. Hurt paid for the dog?

A.    I do not.

Q.    Was Zyria licensed in the city?

A.    I don't think.

Q.    Did -- did you and Michael ever discuss getting Zyria licensed in the city?

A.    No.

Q.    So why don't you think she was licensed in the city?

MR. SHIELDS:  Objection.

A.    I'm just not sure.  It wasn't something that we talked about.  Mike kind of just handled everything.

Q.    Handled everything about what?

A.    Just in the case of like I was pretty much just a stay-at-home mother and he took care of everything else.

Q.    Okay.  So he took care of the bills and the paperwork and all that stuff?

A.    Uh-huh.

Q.    Okay.  Did Michael tell you he was



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

going to buy a dog prior to him doing so?

A.    No.

Q.    Was the dog already named when Michael bought the dog?

A.    No.

Q.    Who named the dog?

A.    Me and Mike.

Q.    How did that conversation go?

A.    Just said, "We got to pick a name for her."

So we went through and found a name for her.

Q.    I'm sorry.

Who said "We got to pick a name for her"?

A.    Mike.

Q.    So you -- so you just threw out suggestions?

A.    Uh-huh.   Yes.

Q.    What kind of dog was Zyria?

A.    I believe she was mix, but I know she was part Pit.

Q.    Had you -- so you had a Pomeranian and a Chihuahua.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

Q.   Had you ever owned a Pit Bull mix?

A.   Yes.

Q.   When did you own a Pit Bull mix?

A.   Back, I would say -- back in like 2013.

Q.   Was this before you owned Shorty?

A.   Yeah.

Q.   What was this Pit Bull mix's name?

A.   I honestly can't remember.

Q.   Did you --

A.   Cierra.   Her name was Cierra.

Q.   Can you spell that?

A.   C-I-E-R-R-A.

Q.   Did you have Cierra when you lived with your mother?

A.   No.

Q.   No.

Okay.   Where did you live when you had Cierra?

A.   Campbell Park.

Q.   Who were you living with at Campbell Park?

A.   My boyfriend at the time.

Q.   Was Cierra your dog or a family dog?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

A.   Family dog.

Q.   How did you or y'all come to acquire Cierra?

A.   My boyfriend at the time had already had her.

Q.   What was the name of this boyfriend?

A.   Adam Boyce.

Q.   How long --

A.   Actually, they had three.   There was actually three dogs.   Three Pit Bulls.   Because there was Apollo.   And then Apollo and Cierra had babies and we kept one of the babies.

Q.   How long did you and Adam have the three -- well, how long did you and Adam have Apollo and Cierra?

A.   As I said, he had Cierra and Apollo when I -- when I met him.

Q.   Okay.   Thank you for clarifying that. So Adam had the two before y'all started dating and then did Apollo and Cierra have the babies after y'all started dating?

A.   Yes.

Q.   What was the name of the baby that you and Adam kept?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

A.    Jughead.

Q.    Can you spell that?

A.    J-U-G-H-E-A-D.

Q.    Where did Apollo and Cierra go after you and Adam stopped dating?

A.    Um, Cierra, I'm not sure.    But Apollo and Jughead actually ended up going to my cousin.

Q.    Who arranged for Apollo and Jughead to go live with your cousin?

A.    Me and Adam.

Q.    Do you know why Adam gave up a dog that he had had before his relationship with you?

A.    He was moving and couldn't take any animals with him.

Q.    Why didn't you take one of the dogs?

A.    Just never discussed.    I believe at the time where I was staying I couldn't have pets.

Q.    You don't know what happened to Cierra?

A.    I know she went to one of his friends, but I didn't have anything to do with them arrangements.

He was struggling to find somebody to take Apollo and Jughead, so I looked into having my



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

cousin take them.

Q.    How old was Zyria when Michael bought her?

A.    I know she wasn't a year yet.    I'm not sure her age.

Q.    Did you or Michael have Zyria trained somewhere?

A.    No.

Q.    Did you or Michael attempt to train Zyria yourself?

A.    Yeah.    I know I did.

Q.    What did you attempt to train Zyria to do?

A.    She knew how to like give her paw. She was toilet-trained.    She knew to sit.    Just basics.

Q.    What commands would Zyria respond to?

A.    "Sit," "stay," "roll over."    Give her paw.

Q.    When you gave these commands to Zyria, would she obey promptly?

MR. SHIELDS:  Objection.

A.    Yeah.

Q.    Did you ever have to repeat commands



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

before she would obey?

A.    Yes.

Q.    Can you describe Zyria around the time of the incident in February of 2020?

MR. SHIELDS:  Objection.

A.    Describe her as how?

Q.    Like her size or color or length?  I guess physically describe her.

MR. SHIELDS:  Objection.

A.    She was white with black spots.    I wouldn't say she was too big.

Q.    Do you know how **tall** she was?

A.    No.

Q.    Do you know how much she weighed?

A.    No.  Never really even knew you could get a dog's height.

Q.    I guess **it's** an approximation.   So you can say -- like when she was on **all** fours, her top of her back would come up to your knees or your ankles or something like that.

Would you describe Zyria as a small, medium or large dog?

A.    Medium.

Q.    Who fed Zyria?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

A.    Mostly me.

Q.    You said that Michael had an after-hours mechanic or repair business?

A.    Maintenance.

Q.    Maintenance.    Thank you.

A.    Yes.

Q.    Was he home during the day then?

A.    Sometimes.

Q.    Did he have a regular schedule?

A.    No.

Q.    No?

A.    No.

Q.    Did Michael's schedule have consistency in terms of the -- during the traditional business week versus the weekends?

A.    No.

Q.    What did you feed Zyria?

A.    Dog food.    House food.

Q.    Were y'all followers of any particular brand?

A.    No.

Q.    Who took the dog to the vet?

A.    I'm not sure if she had ever been to the vet.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

Q.    Who gave Zyria exercise?

A.    Me.

Q.    What did you do for Zyria's exercise?

A.    Play around the house.   Let her out back.   She would run around.   Kids played with her.

Q.    Both your younger and older daughter?

A.    Uh-huh.   Yes.

Q.    Was the backyard enclosed with a fence?

A.    It had a fence, but I wouldn't say it was enclosed.

Q.    Did Zyria ever get out of the backyard and go elsewhere?

A.    No.   She knew not to like -- even if she did, she knew like not to even leave the driveway.

Q.    Did either of your children participate in like feeding or watering the dog?

A.    Yes.  Yes.   My oldest used to like giving her water.

Q.    How did Zyria interact with your kid?

A.    Great.   They would play together. She was protective of the kids.   The baby was just a baby, but my oldest -- she would play with her.   She


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

would try and sit on her and ride her and...

Q. What would Zyria do if you called her name?

A. Come.

Q. Did you have to say "come" for her to come?

A. No.

Q. What would Zyria do if someone she didn't know approached her?

MR. SHIELDS: Objection.

A. Probably bark and try and jump on them.

Q. Did Zyria have the same response whether it was inside the house or outside?

A. Yeah.

Q. Can you describe an experience when this happened? Meaning that someone Zyria didn't know approached her and Zyria ran up on her -- ran up on the person and jumped on them.

MR. SHIELDS: Objection.

A. I mean not really because we never really had any company or visitors, but she would -- pretty much what any dog wants to do. They wants to meet. They bark and jump at you, trying to play



VICTORIA S. PRESTON - BY MS. JONES

with you, sniffing.    Just...

Q.    So are you -- you said you didn't have much company.

So are you assuming this is how Zyria would react or had you actually seen her react this way to someone?

MR. SHIELDS:  Objection.

A.    No.  I seen actually her act that way to somebody.  I'm just saying she was never around many people.

Q.    Do you remember who it was that Zyria reacted in this way to?

MR. SHIELDS:  Objection.

A.    Not exactly.  It was probably family or somebody that came to the house.

Q.    Do you know why Zyria bit Officer Leach instead of jumping on him?

MR. SHIELDS:  Objection.

A.    I didn't know she did bite him.

Q.    Do you know why Zyria ripped Officer Leach's pants instead of licking and jumping up on him?

MR. SHIELDS:  Objection.

A.    Well, for one, he didn't even give



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

her a chance to.

Q.    Are you saying that after she might have played with the pants in her mouth, she would have let go and then maybe jumped on him --

MR. SHIELDS:  Objection.

Q.    -- in a more friendly way?

MR. SHIELDS:  Objection.

A.    I'm saying when she got out of the bathroom, he pretty much just started shooting her. He didn't give her a chance or...

Q.    Didn't give her a chance to jump on him and --

A.    Like meet her, yes.  Let the dog sniff you or introduce yourself to the dog or...

Q.    Who did Zyria belong to?

A.    Our family.  Me, Mike and the kids.

Q.    Why did you describe it as belonging to the family?

MR. SHIELDS:  Objection.

A.    Because we all took care of her and loved her.

Q.    When is the last time you spoke with Michael Hurt?

A.    Last time I spoke to him?


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

Q.   Uh-huh.

A.   Probably about a week ago when I asked him for his phone number.

Q.   You asked Michael Hurt for his phone number?

A.   Yes.

Q.   Were you speaking to him in person?

A.   No.

Q.   How were you talking to Michael Hurt?

A.   I sent him a Facebook message.

Q.   Oh.

Did he give you his phone number?

A.   Yes.

Q.   Have you actually like -- was that the extent of the conversation that you had over Facebook?

A.   Yes.

Q.   When was the last time you spoke to him before that?

A.   I really don't speak to him.  Every now and again I will send him a couple pictures of his daughter and that's about it.

Q.   Do you normally send those pictures over Facebook?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

A.    Yes.

Q.    Why did you ask for his phone number this time around?

A.    Because I knew somebody that had asked me for his phone number.

Q.    What do you think Michael Hurt would say about who owns Zyria?

A.    I think he would say she was a family dog.  He brought her home for me, the kids, himself.

Q.    Did he say that?

A.    No.

Q.    What did he do that gave you the impression that Michael Hurt intended the dog to be for everyone?

A.    He came home with her and said he had gotten us a dog.

Q.    Did you and Michael ever have conversations about whose responsibility it was to care for the dog?

A.    No.

Q.    Now I want to talk about the February 14th, 2020, incident.

Will you tell me briefly what happened?  And then I will interrupt you and ask



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

some follow-up questions and then I will let you continue your narrative and we'll go bit by bit if that is okay with you.

Can you start at the beginning and tell me what happened that day when the CPS workers came over?

MR. SHIELDS:  Objection.

A.   So that morning, I had been discharged with my youngest from the hospital.    And I went to go back home at 485 Avenue D and my uncle had left for work.  So I was locked out of the house.

So I called up Michael and I asked him if me and the baby could come there for a few hours because I was locked out and that I would leave when my uncle got home.  So he said, "Yeah."

I went over there and when I got there, as I said, he had one of his buddies there and two females and the house was just a mess and nasty.  So I started off by calling the police to have people removed.

They came.  They told them they had to leave and everything.

So then after they left that time, as



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

I said, I began picking up the mess and trying to lay the baby down.

In the meantime, I filmed and took pictures of the house, which I had posted on Facebook, pretty much bashing Mike on how much of a scumbag he was.   And shortly thereafter, CPS and the cops showed up to the house.

Q.   How long was "shortly thereafter"?

A.   I think probably about an hour after.

Q.   Did you recognize the CPS workers that showed up?

A.   One of them I did.

Q.   Do you remember that person's name?

A.   Hope.

Q.   Do you know Hope's last name?

A.   No.

Q.   How did you recognize her?

A.   She had been to the house previously.

Q.   You're referring to the rear apartment at 1100 Norton?

A.   Yes.

Q.   How many police officers came with them?

A.   Two.


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

Q.    Well, "them."

You said there were two CPS workers, one of which you recognized?

A.    Uh-huh.

Q.    And then two officers?

A.    Yes.

Q.    Had you -- did you recognize the police officers that came?

A.    No.

Q.    Do you know their names now?

A.    Um, I know one was Leach and the other was Ortiz.  I don't know their first names.

Q.    How do you know their names now?

A.    Leach I remember.  And then Ortiz I know because of the video.

Q.    Had any other CPS workers been to the 1100 Norton apartment before, in addition to Hope?

A.    Not that I remember.  That was the only one I really remembered.

Q.    Did you talk to any other CPS workers besides  Hope?

A.    I talked to the one that was there with her that day.

Q.    Oh.  That's  fair.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

Q.    Had you talked to any other CPS workers prior to the February 14th, 2020, incident?

MR. SHIELDS:  Objection.

A.    I don't think so.  I think it was Hope that came to the house beforehand.

Q.    Had Hope been inside the apartment at 1100 Norton prior to the February 14th incident?

A.    No.

Q.    Did Hope know that you had -- that y'all had a dog at 1100 Norton?

A.    Yes.

Q.    Was the dog outside when Hope would visit?

A.    No.  Not that I remember.  I mean she might have been out there one of the times that Hope came, but...

Q.    Do you know how Hope would have known y'all had a dog if she didn't come inside the apartment?

A.    She was told.

Q.    Who told Hope that y'all had a dog?

A.    I believe me and Michael both told her.

Q.    Did she ever -- did she, being Hope,



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

ever ask you to put the dog away so she could come inside?

A.    That day she did.

Q.    Did she, Hope, ask you to put the dog away so she could come inside on prior times she came to the house?

A.    No.

Q.    Had she even asked to come in on prior occasions?

A.    I believe so.

Q.    Why didn't Hope come in on prior occasions?

MR. SHIELDS:  Objection.

A.    Because there was no need for her to.

Q.    I'm a little confused.  I thought you said she asked to come inside, but she didn't come inside?

A.    Uh-huh.  Yeah.

Q.    So y'all just asked her to stay outside?

A.    Yes.

Q.    Or -- okay.  It is not like she changed her mind and said, "I'm coming inside. Never mind.  I'm staying outside"?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

A.    No.

Q.    Okay.   Where would the dog be when you would speak to Hope when she would come to the apartment?

A.    In the house.

Q.    Would you put Zyria inside a specific room or would Zyria just be running about?

A.    She would just be running about.

Q.    Did Zyria ever bark when Hope was at the house?

A.    Yes.

Q.    Did the dog ever do anything else to indicate her presence when Hope would visit the apartment?

MR. SHIELDS:  Objection.

A.    No.

Q.    Did the dog ever come up to the door, say hello, any of that?

MR. SHIELDS:  Objection.

A.    No.

Q.    Why did the CPS workers come to your house that day?

MR. SHIELDS:  Objection.

A.    The day of February 14th?



VICTORIA S. PRESTON - BY MS. JONES

Q.    Yes.

A.    They apparently had a warrant for removal of my children.

Q.    Did you see the warrant?

A.    No.

Q.    Can you pick it up from there?    What happened after CPS workers and RPD officers showed up?

A.    Um, I answered the door.    They told me what they were there for.    They asked if they could come inside to speak with me.

At first, I told them no, because, you know, of the dog and things like that.

And one of them had asked me if -- about putting the dog up.    So I said, "Yeah."

And I went and I put her away in the bathroom.    And then I allowed them to come in.

Q.    Then what happened?

A.    And then we were -- they were pretty much just telling me that they were there to take the kids and that they had a warrant.    And this -- I was obviously arguing with them and wouldn't let them take my children.

Q.    Do you remember who specifically


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

asked you to put the dog away?

A.    I don't exactly remember. I think Hope did.

Q.    Why did you put the dog in the bathroom?

A.    I felt like that was the most secure room.

Q.    Why was it more -- why was the bathroom more secure than say the master bedroom that was also off the bedroom?

A.    The master bedroom didn't have a door handle.

Q.    Why did you choose the bathroom over the back bedroom off the living room?

A.    Because the back bedroom, too, had something with the door frame.  Mike had to fix it or something.

Q.    Did the issue with the back bedroom door frame prevent the door from closing?

A.    It just -- there was a lot of wiggle room.

Q.    Had you -- prior to this occasion had you ever secured Zyria in the bathroom before?

A.    Yes.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

Q.    For how long had you kept Zyria in the bathroom before?

MR. SHIELDS:  Objection.

A.    She had probably been in there before -- I mean not for -- I would say at least an hour.   She had spent about an hour in there before.

Q.    Did Zyria have a bed in the apartment?

A.    Yes.

Q.    Where was the bed?   Or sorry.

Where was Zyria's bed?

A.    In the kitchen.

Q.    Did -- where were her food and water bowls?

A.    The kitchen.

Q.    Had Zyria escaped the bathroom before?

A.    No.

Q.    How many times had you put Zyria in the bathroom?

A.    I couldn't tell you.

Q.    More than five?

A.    Probably.

Q.    Do you think you put Zyria in the



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

bathroom as many as 20 times?

A.    No.

Q.    On other occasions that you put Zyria in the bathroom, did she bang up against the door?

A.    No.  She would -- she would most of the time actually go sleep in the bathtub.

Q.    Hmm.

She can get into the bathroom -- excuse me.

She can get into the bathtub on her own?

MR. SHIELDS:  Objection.

A.    Into the bathtub?

Q.    Yeah.

A.    Yes.

Q.    What did Zyria do this time when you put her in the bathroom?

A.    At first she was fine.

Q.    And then did she remain fine in the bathroom?

A.    I mean I know she started barking.

Q.    Did she ever do more than just bark?

A.    Not that I remember.

Q.    Did she ever beat up against the


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

door?

A.  Not that I remember.  That wasn't really what my focus was on.

Q.  So what do you remember Zyria doing when she was in the bathroom?

A.  I would say she was quiet for a bit and then she started barking.

Q.  Were you worried at any point that Zyria would get out of the bathroom?

A.  I wasn't.

Q.  Why weren't you worried that Zyria might get out of the bathroom?

A.  Because she never had before.

Q.  So I'm hoping you could reconcile two things for me.  She hadn't gotten out of the bathroom before, but you also said that you weren't really paying attention or focusing on Zyria.

So which one was it?  Or is it both?

MR. SHIELDS:  Objection.

A.  What do you mean?

Q.  So were you noticing that she was barking and just didn't think she would get out of the bathroom?  Or were you just not paying attention to what she was doing?


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

MR. SHIELDS:  Objection.

A.    No.  I knew she was barking, but I didn't think she would get out of the bathroom. Obviously, she is going to bark.   She hears people in the house.

Q.    That was going to be another one of my questions.

Why was she barking on this occasion when normally she would just be fine and go to sleep?

A.    I believe just because of the -- the -- she could just sense there was a lot of tension.   I mean there was yelling and -- it wasn't like there was a bunch of people hanging out having a bunch of quiet conversation.  I think just all of the excitement and stuff.

Q.    Was Zyria barking when you came home and the other people were there at the 1100 Norton apartment?

A.    Yes.

Q.    Why was she barking when you first came home -- I'm sorry -- came back to the 1100 Norton apartment?

A.    That is kind of how she greeted you.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

She would bark and come up and jump on you.

Q.    Let's pick up.   You let them in. They explained they had a warrant.    You were arguing with them.   You wouldn't let them take your kids.

And then what happened after that?

A.    At some point during that Zyria had gotten out of the bathroom.

Q.    Okay.

A.    And I honestly have no -- I really don't remember what happened, but she probably wasn't out of the bathroom five seconds before the officers started shooting.

Q.    Did you hear Zyria get out of the bathroom?

A.    Uh-uh.

Q.    How did you realize that Zyria had gotten out of the bathroom?

A.    They started yelling.

Q.    Who is the "they"?

A.    CPS workers and the cops.

Q.    What were the CPS workers and cops saying as they were yelling?

A.    Just about the dog had gotten out.

Q.    Where were you when Zyria got out of



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

the bathroom?

A.    Standing in the living room.

Q.    Could you see the door to the bathroom from where you were standing in the living room?

A.    No.

Q.    What did you do -- what happened next?   Zyria got out.   They were yelling the dog had gotten out.

What happened after that?

A.    The officer started shooting at her.

Q.    What did you do when the CPS workers and cops were yelling?

A.    I pretty much kept trying to tell them to stop and I would get her.

Q.    Did you do anything?

A.    No.  I wasn't given any chance.

Q.    Sorry.

I guess I'm wondering like did you start moving towards the bathroom?

A.    Yeah. I was going to get her.   I was trying to get her.

Q.    And why didn't or couldn't you get her?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

A.    Like I said, she wasn't out of the bathroom maybe five seconds before the officers started shooting.

Q.    Were you surprised that Zyria had gotten out of the bathroom?

A.    Yes.

Q.    Where was the officer in relation to you when he discharged his firearm?

A.    He was standing, I would say, within arm's reach of me in the living room while I was holding my child.

Q.    Was he in front of you, to the left of you, the right of you?  Like --

A.    I believe he was to the left of me.

Q.    Was he directly to your left or slightly in front of you?  Or slightly behind you?

A.    I honestly couldn't tell you.  I just know he was right there.

Q.    Did you yell any commands to Zyria?

A.    I don't think so.  I can't remember.

Q.    Why didn't you yell a command to Zyria?

A.    As I said before, I wasn't really given the opportunity to do anything.



VICTORIA S. PRESTON - BY MS. JONES

Q. Did you see Zyria when she ran out of the bathroom and was in the kitchen?

A. Yeah. I seen her.

Q. What was she doing when you saw her?

A. I would say running.

Q. What direction was she running?

A. Towards the door at first.

Q. Towards which door?

A. Front door.

Q. You saw Zyria.

She was running towards the front door?

A. Yep.

Q. Where were the CPS workers?

A. Standing over by the front door.

Q. What -- so did you see the CPS workers respond to Zyria?

MR. SHIELDS: Objection.

A. Not really. I know they ran outside.

Q. Did you see them go outside?

A. Yeah. I watched them run out the door, yes.

Q. What did you see that happened next?

A. I believe the officer had yelled to



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

the dog and that's when she had ran towards the living room.  And he started shooting.

Q.    So I'm trying to orient myself to space.

So I thought you said initially when you were in  the living room, you couldn't see the door to the  bathroom from where you were standing?

A.    I couldn't see the door.

Q.    But you could see the other part of the kitchen from where you were standing?

A.    Uh-huh.  Because the way the doorway was, there was walls right here.   Then there was a doorway.  And the bathroom door was behind the wall (indicating  throughout).

Q.    Okay.

A.    So where I was standing, I couldn't see the door, but I could see the entrance into the...

Q.    Into  the  kitchen?

A.    Kitchen,  yeah.

Q.    What did the cop yell at the dog so that Zyria ran towards the living room?

MR. SHIELDS:  Objection.

A.    I believe he yelled either "Hey" or



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

"Stop" or something along them lines.

Q.    Did you hear Zyria make any noises?

A.    She was probably barking, but I don't remember.

Q.    I was going to say why did you say "probably"?

You just don't remember for sure?

A.    Yes.

Q.    Did you talk with the CPS workers after they left the apartment to get away from the dog?

A.    Yes.

Q.    Did they talk to you about why they left the apartment after Zyria got out of the bathroom?

A.    No.

Q.    Do you remember -- sorry.

I will just say -- what else was Zyria doing when she was running towards the living room, besides probably barking?

A.    Nothing that I remember.

Q.    Do you remember what she looked like? "She," being Zyria.

A.    What she looked like?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

Q.    Yes.

MR. SHIELDS:  Objection.

Q.    Was her tongue out?  Did she look happy?  Did she look hungry?  I mean anything.

MR. SHIELDS:  Objection.

A.    No.  I would just say she looked regular.

Q.    Do you think the CPS workers thought that Zyria might get out of the bathroom?

A.    I'm sorry?

Q.    Do you think the CPS workers were ever worried that Zyria might get out of the bathroom?

MR. SHIELDS:  Objection.

A.    I don't know.  They never expressed any concern.

Q.    What about the cops?  Or the RPD officers?  Do you think they were worried that Zyria would get out of the bathroom?

A.    Same as the CPS workers.  They never expressed any concerns.

Q.    Is that a "yes" or a "no"?

MR. SHIELDS:  Objection.

Q.    If they never expressed any concerns,



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

do you take that as they weren't worried?

A.     I would take that as if they weren't worried.   If they were worried, they should have said something.

Q.     Okay.   I am going to hand you this.

MS. JONES:   And I have another copy for you, Elliott.

Q.     So have you seen this document before?   It's five pages, but I printed it back and front for you.

Have you seen this document before?

A.     Yes.

Q.     I guess it looks slightly different. There are numbers at the top that just shows it has been submitted to the Court.

But the rest of it, hopefully, is the same.

Can you tell me what this document is?

A.     What it is?

Q.     Yes.   Or what you understand it to be.

A.     I would say my side of the story.

Q.     So I want to ask you a few questions



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

about some of the things that are written in this document.

So I will point you to a specific paragraph and then I will just ask you to explain some things.

So first I have a question about paragraphs 10 and 12.   So it is on page 2.

If you just want to read paragraphs 10 and then paragraphs 12 and then I will ask you some questions.

A.    Okay.

Q.    So I just want you to explain to me what you mean by "I objected to them taking my daughter."

Because you say that in both paragraphs 10 and 12.

A.    Yeah.  I told them that I wasn't letting them take my child.

Q.    Can you tell me how you were feeling during your conversation with the CPS workers?

A.    Upset, frustrated.    Every feeling probably besides happy.  I was irritated.    I was annoyed.  I was frustrated.    Stressed out.

Q.    Were you hoping that the CPS workers


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

would -- would leave without taking your younger child?

A.   Yes.

Q.   In the body-worn camera you mention something about asking them to go to a different house and look at it or inquire about it.

Can you tell me what house you were referring to?

MR. SHIELDS:  Objection.

A.   I -- no, I can't because I don't remember that.

Q.   I believe you asked them to go check out a house in East Rochester?

A.   Probably my mother's where my oldest daughter was staying.

Q.   Do you know the nature of the concerns that led CPS to become involved in your household?

MR. SHIELDS:  Objection.

A.   Yes.

Q.   What were they?

A.   I honestly believe most of them were against Michael, but I do know -- as far as me, there was some concerns in there about my youngest



VICTORIA S. PRESTON - BY MS. JONES

not being vaccinated and them missing doctors appointments and school.

Q.   So the youngest not being vaccinated and the older one missing school?

A.   Yeah.

Q.   And the doctor's appointments, did that apply to the younger child or older child?

A.   Both of them.

Q.   What were the concerns about Michael?

A.   I believe there was domestic violence concerns with -- with him against me.  Drugs.  Yeah. A lot of -- pretty much drugs and domestic violence.

Q.   Earlier you said that you and Michael weren't seeing eye-to-eye.

Was the not seeing eye-to-eye in relationship to his --

A.   Drug use.

Q.   Okay. All right.   Paragraph 13.

A.   Okay.

Q.   So I'm concerned about the "even more upset" part.

A.   Okay.

Q.   Can you quantify how much more upset you got after they told you they were going to take



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

your daughter?  "They" being the police officers?

MR. SHIELDS:  Objection.

A.    Well, like it says, he threatened to forcibly take her and he told me she was going to pepper spray me if I didn't give her up.  And to me that's -- yeah.  That made me upset.  Because you're here apparently because of the safety of my child and you're threatening to do something unsafe with my child in my arms.  And you're threatening to pepper-spray me.  So yeah.  That was highly frustrating and pissed me off even more.

Q.    Paragraph 15, if you can read that and let me know when you're done.

A.    Okay.

Q.    So it said that you could hear Zyria barking and scratching at the door trying to get out of the bathroom.

Did you interpret Zyria's actions as trying to get out of the bathroom?

A.    Yes.

Q.    Did you think she would be able to get out of the bathroom?

A.    No.

Q.    Did you ever check the door to --



VICTORIA S. PRESTON - BY MS. JONES

or -- did you ever do anything to make sure that she wouldn't get out of the bathroom?

A.   No.

Q.   And why not?

MR. SHIELDS:  Objection.

A.   I didn't think I needed to.

Q.   Why didn't you think you needed to?

MR. SHIELDS:  Objection.

A.   Because she had never gotten out of the bathroom before.

Q.   Earlier I don't think you mentioned the scratching at the bathroom door.

Was Zyria scratching at the bathroom door?

A.   I had said I don't remember.  I know she was barking.  But as I said, that wasn't my main focus.

Q.   That's fair.  I'm just trying to get at what you remember.

So you don't remember the scratching at the door.

Okay.  That is all of the questions on that for now.  You can just flip it over.

A.   (The witness complied.)



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

Q.    Thank you.

Had you known that the CPS workers were going to come to the 1100 Norton apartment that day?

A.    No.

Q.    How did you feel when you first saw the CPS and -- workers and officers?

MR. SHIELDS:  Objection.

A.    I was kind of just like "What now?"

Q.    Can you expound upon that?    I'm not sure if that was a negative or positive feeling.

MR. SHIELDS:  Objection.

A.    When I seen they were at my house?

Q.    Yes.

A.    It wasn't negative or positive.    It was just kind of like "What do they want?"

Q.    So you said that the officer that shot the dog was to your left when you were standing in the living room.

How far were you from the entrance from the living room into the kitchen?

MR. SHIELDS:  Objection.

A.    How far in the living room were we from the kitchen?


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

Q.   Yes.

A.   I would say you could have walked to the kitchen probably in like four or five steps.

Q.   Earlier you said you were first alerted to the fact that Zyria had escaped the bathroom because somebody started yelling that the dog got out?

A.   Yes.

Q.   Could you see that the bathroom door had opened from where you were standing in the living room?

A.   No.  I couldn't see the door.

Q.   Sure.  Sorry.

So could you see like light from the bathroom or anything like that?

A.   No.

Q.   Did you hear Zyria's paws, P-A-W-S, on the kitchen floor?

A.   Yeah.

Q.   You could?

A.   Yes.

Q.   But you didn't notice the paws when she first got out?

MR. SHIELDS:  Objection.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

A.    I'm confused.

Q.    So I'm trying to figure out what or how you first realized that Zyria got out of the bathroom.

A.    Because they all started screaming.

Q.    Okay.

A.    Before they started screaming, I didn't know she got out.

Q.    So I'm assuming that they realized the dog got out because they heard the dog's paws, P-A-W-S, on the floor.

So I'm wondering if you also heard the dog's paws on the floor before they started shouting that the dog had gotten out?

MR. SHIELDS:  Objection.

A.    They knew she had gotten out because they were standing there where the door was.

Q.    Oh.  Okay.  Who is the "they" in that sentence?  "They were standing there"?

A.    The CPS workers.

Q.    What did the CPS workers yell out when Zyria got out?

A.    I don't know exactly what they were saying.  They were just yelling.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

Q.    You said you were planning to get Zyria.

What were you planning to do?

A.    If they would have let me, I would have just grabbed her by her collar and I could have taken her outside.   Put her back in the bathroom.

Q.    Could you have done that while holding your younger child?

A.    Yes.

Q.    Have you done that before?

A.    Yeah.

Or I could have set my child down and got her.

Q.    How long would it have taken you to put the younger child down?

A.    If I had chosen to put her down, it would have took two seconds to set her on the couch. But I probably wouldn't have laid her down there.    I probably would have just bent down and got the dog while I was holding her.

Q.    Why did you -- why do you describe it as "yelling"?   That the officers and CPS workers were "yelling" at Zyria?

MR. SHIELDS:  Objection.



VICTORIA S. PRESTON - BY MS. JONES

A.     Because that's what they were doing. It's not like they were speaking in a normal tone. They were yelling.

Q.     So you described it as yelling based on their tone?

A.     Yeah.

Q.     Were you still -- sorry.

Was the officer that shot the dog still to your left when he shot the dog?

A.     Yes.

Q.     Which way were you facing when the officer shot the dog?

A.     Forward. Looking into the kitchen.

Q.     What did you do while the officer discharged his firearm?

A.     I was yelling at him.

Q.     Anything else?

A.     I don't believe so.

Q.     Did you move or turn?

A.     Yeah.

Q.     Where did you -- what movements did you make?

A.     I believe I just stepped away from him because I had my child in my hands.



VICTORIA S. PRESTON – BY MS. JONES

Q.   Which direction did you step?

A.   I think to the right.   And back.

Q.   How close did Zyria get to the officer that shot the dog?

A.   I don't know exactly.   I know I was told she apparently ripped his pants, so.

Q.   Who told you that?

A.   You, for one.

Q.   Did anyone else tell you that the dog might have ripped his pants?

MR. SHIELDS:  Objection.

Don't answer that.   It's privileged.

Q.   Did anyone other than your attorney and me tell you that the dog ripped the officer's pants?

A.   Yes.

Q.   Who was that?

A.   I believe -- I don't actually remember if he was telling me or if I heard them telling them, like -- his -- his people and CPS workers.

Q.   "He" being the officer that shot the dog?

A.   Yes.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

Q.   When did the officer say or tell someone that the dog ripped his pants?

A.   I know it was after he had shot her.

Q.   Do you -- well, how soon after he shot the dog did he say that the dog ripped his pants?

A.   I don't know.

Q.   I mean was this 10 seconds later or 20 minutes later?

A.   Might have been like ten minutes later.   When he was telling his people what had happened.

Q.   Did you ever look at the officer's pants to see if they were ripped?

A.   No.

Q.   Did you see the interaction between Zyria and the officer?

MR. SHIELDS:  Objection.

A.   Not really.   I said it all happened so fast.

Q.   Did Zyria get close enough to the officer that Zyria could have ripped his pants?

A.   I didn't think she did, but apparently.



VICTORIA S. PRESTON - BY MS. JONES

Q.   I have another question about the document.

If you want to flip it over and read paragraph 30 I think it is.   Let me make sure.   Yes. 30.

A.   Okay.

Q.   What did you mean by you did not observe Zyria biting Leach?

MR. SHIELDS:  Objection.

A.   What I just told you.  I didn't even think she got close enough for -- for one, she didn't bite him as far as I know.

And as I said, I didn't even think she got close enough to him to rip his pants, but apparently, she did.   So no, I did not observe it.

Q.   Did you ever look at the officer's leg to see if he may have had an injury?

A.   Nope.

Q.   Sorry.   That was also in paragraph 30.   "I did not observe an injury."

So you're saying you didn't look?

A.   Yeah.

Q.   In paragraph 23, it's at the top-ish of page 3, you say that the officer shot Zyria six



VICTORIA S. PRESTON - BY MS. JONES

Q.    times?

A.    Yes.

Q.    How do you know it was six times?

A.    Because I heard them talking about it.

Q.    How do you know that he only --

A.    I actually thought it was more because -- they say six times, but I actually picked up one of the bullets that they must have missed, so.

Q.    When did you pick up a bullet that you thought they missed?

A.    After everything was all said and done and they left.

Q.    Did you -- what did you do after finding that bullet?

A.    I actually still have it somewhere.

Q.    Did you tell anyone that you found a bullet?

A.    No.    This was after everybody had left.

Q.    You didn't call and --

A.    No.

Q.    Did you tell Michael you found a



VICTORIA S. PRESTON – BY MS. JONES

bullet?

A.   No.  I didn't speak with Mike.

Q.   Where was the bullet that you found after they had left?

A.   I believe it was in the living room. Underneath the Christmas tree.

Q.   And why do you think it -- the bullet belonged to the RPD officer?

A.   Because there had never been a firearm shot in my house before.

Q.   Have you ever discharged a firearm before?

A.   No.

Q.   How did you recognize it as a bullet?

A.   Because I've seen a bullet before.

Q.   When have you seen a bullet before?

A.   I don't know exactly when.  But I have seen them on TV.  I have seen them in books. I've seen guns.  I've just never discharged one.

Q.   Have you ever been to a shooting range?

A.   No.

Q.   Did you inspect Zyria after she was --



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

A.   No.

Q.   -- shot?

A.   No.

Q.   What happened to Zyria after she was shot?

A.   I believe they had Animal Control come get her.

Q.   Okay.  Can I ask you about paragraph 28?  Actually, I will ask you about 27 first.

A.   Okay.

Q.   So 27.  The last -- or I should say the second sentence says "The RPD officers should have known it was possible Zyria could escape from the bathroom."

Why do you think the officers should have known that Zyria could get out?

A.   Honestly, because anything is possible.

Q.   Do you think the officers should have known that Zyria could get out?

A.   I think they should look at it as anything is possible.

Q.   All right.   Paragraph 28?



VICTORIA S. PRESTON – BY MS. JONES

A.     Okay.

Q.     Do you think that the officers made a plan for how to deal with Zyria if she got out of the bathroom?

A.     Do I think that they should have?

Q.     Yes.

A.     Yeah.

Q.     Why is that?

A.     Because you should have a plan.    Or if they felt any kind of way, they should have said something.   Or instead of asking me to put her up, they could have asked to put her outside.    You knew she was locked up.   You knew she was in there barking.   So yeah.   If anything, they should have had a plan for if she did get out.

Q.     Did you have a plan for what would happen if Zyria got out of the bathroom?

A.     My plan would have been I would have gotten her.

Q.     Is that what you had planned to do in case she -- in case she, Zyria, got out of the bathroom?

A.     Yeah.

Q.     Why didn't you put Zyria outside?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

Prior to the CPS workers and the police officers coming inside.

A.   I don't know.  Because whoever asked me to -- they had just said, "Could you put her up?"

Or I think they actually might have said, "Can't you just put her in one of the rooms?"

Or something.   So that's what I did.

Q.   How do you know that the officers didn't make any plans for what to do if Zyria got out of the bathroom?

A.   Because obviously if they had -- what was their plan?  Just to start shooting her?  Because that's what they did.

If they had a plan in place, then why didn't they go with their plan?   What was their plan?   She gets out, shoot?

Q.   What if their plan was to exit the door to the apartment?

MR. SHIELDS:  Objection.

A.   They never made any attempt to.

Q.   What if they thought --

A.   She got out and they shot.

Q.   What if they thought they were too far away from the door?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

MR. SHIELDS: Objection.

Q. Should they have made another plan in the interim time?

A. I don't know.

If they had a plan in place, it is something that should have been discussed between all of us so if she got out, we all knew what the plan was.

Q. When you say "all of us," you mean you, the CPS workers and the police officers?

A. Yes.

Q. Did the CPS make a plan with the RPD officers on how they were going to remove your younger child from the home?

MR. SHIELDS: Objection.

A. I don't know.

Q. Do you -- you think they should have made a plan on how to do that?

MR. SHIELDS: Objection.

A. I don't know if they did make a plan or not.

Q. Yeah.

But do you think they should have made a plan how to do that?



VICTORIA S. PRESTON – BY MS. JONES

MR. SHIELDS:  Objection.

A.    I don't know how to answer that.

Q.    You don't have an opinion on how CPS workers carry out their duty?

MR. SHIELDS: Objection.   I think this is harassing, irrelevant.

A.    No.

Q.    I'm sorry.

No?

A.    No.

Q.    Okay.

A.    Whatever they did was never discussed with me, so.

Q.    Sure.

I was just asking if you had an opinion one way or another about whether they should have made a plan or how they should go about removing children.

You said you didn't really have an opinion.   So unless you want to amend or add to that answer --

A.    No.

Q.    Okay.  Had Zyria ever attacked a CPS worker prior to the February 14 incident?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

A.   No.

Q.   Were you aware that Michael Hurt told a CPS worker that -- excuse me.  Scratch that.

Were you aware that Michael Hurt had told Hope that Zyria had tried to attack a different CPS worker that came to the house?

A.   Not until recently I would say.

Q.   Who told you that happened?

MR. SHIELDS:  Objection.

A.   I know he had told -- I didn't know who it was he told, but -- I do know they had told one of the CPS workers at one time that the dog had tried to eat somebody or something.

Q.   Do you remember when Michael told one of the CPS workers that the dog had tried to eat somebody?

A.   No.

Q.   Was it before or after this February 14th incident that Michael told somebody that?

A.   Before.

Q.   When did you find out that Michael had told somebody that the dog had tried to eat somebody else?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

MR. SHIELDS:  Objection.

A.    I don't understand what you're saying.

Q.    Sure.

So Michael told a CPS worker that the dog had tried to eat somebody.  That was before this February incident.

But when did you find out that Michael had told the CPS worker that the dog had tried to eat somebody?

MR. SHIELDS:  Objection.

A.    When did I find out that he had told somebody?

Q.    Yes.

A.    I don't know.  It was a while later.

Q.    Was it before or after the February 14th incident?

A.    It was after that.

Q.    Or --

A.    Yeah.  It was after that.

Q.    And who told you that Michael had told somebody about the dog trying to eat someone?

MR. SHIELDS:  Objection.

To the extent that is privileged,


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

don't answer.

A.    I'm so confused.

Q.    Was it --

A.    No.  I'm confused with you guys.   He keeps saying "Objection."

Don't answer it?   Or should I answer it?

Q.    Did someone other than your attorney tell you that Michael had told the CPS worker that the dog had tried to eat somebody?

A.    No.

Q.    Okay.

MR. SHIELDS:  I will object to that question because I think it still asks for privileged communication. So I think that should be stricken.   I move to strike that question and answer.

Q.    Do you -- do you -- did you ask Michael about the incident in which the dog had tried to eat somebody?

A.    No.  I -- I don't think he was being serious -- like serious about it.

Q.    Why do you think Michael wasn't being serious when he said that?



VICTORIA S. PRESTON - BY MS. JONES

A.    Because I had -- for one, I had never witnessed it and he used to like joke with people all of the time about that.   Like "Oh, she'll eat you."

Q.    Who did Michael tell in a joking manner that Zyria might eat them?

A.    I'm not exactly sure.   I just know like he would tell his friends like "Oh, don't do that."   You know?   "She might eat ya."

Q.    Have you gotten a dog since Zyria?

A.    No.

Q.    Do you remember smoking on the day of the incident?

MR. SHIELDS:  Objection.

A.    Say it again?

Q.    I'm sorry.   I didn't hear what you said.

A.    You said do I remember smoking?

Q.    Yes.

A.    Yeah.

Q.    I was going to ask what were you smoking?

A.    Cigarettes.

Q.    Do you still smoke?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

A.    Yep.

Q.    So for the record, they can't see the box of cigarettes on the table.   It's obvious to us but not the record.

A.    Yeah.

Q.    Do you typically smoke inside?

MR. SHIELDS: Objection.   This is harassing and irrelevant.

A.    I -- at 1100 Norton I did.

Q.    How much did you smoke while you lived at 1100 Norton?

MR. SHIELDS: I'm going to object -- all right.   I will direct her not --

A.    Can I ask --

MR. SHIELDS: I will direct her not to answer these questions because they're irrelevant and harassing pursuant to Rule 30D.  I will call the Court and ask for a ruling.

MS. JONES: Can you certify that question?

Q.    Do you remember -- well, did you open a window when you were smoking at 1100 Norton?

MR. SHIELDS: Same objection and



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

directing her not to answer the question.

Q.    Do you remember if you opened the window when you were smoking at 1100 Norton?

MR. SHIELDS:  Same objection.  Still directing her --

A.    Yeah, I -- I remember being in a room with the window open.

Q.    Why did you sue the City after this incident?

A.    I'm sorry?

Q.    Why did you sue the City after this incident?

A.    Because I feel what they did was wrong.

Q.    Why did you decide to sue as opposed to doing something else?

MR. SHIELDS:  Objection.

A.    Something else like what?

Q.    Call a City Council member? Call the Mayor? Call the Police Chief?  Write a letter?

A.    No.  I tried that.  I tried to make a complaint the day of the incident and they pretty much told me "Screw you."

Q.    Who did you make a complaint to?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

A.   I tried to speak to the Sergeant, whoever the Sergeant was at the time.

Q.   When did you talk to the Sergeant? Like while he was on-site?

A.   Uh-huh.

MR. SHIELDS:   Yes?

A.   Yes.

Q.   Can you tell me what you told the Sergeant?

A.   That I was unhappy with the way his officer handled the situation and I couldn't believe that he would discharge his firearm the way he did with me standing right next to him, holding my one-year-old child.

Q.   And what did the officer say in response?

A.   I don't exactly remember his words, but like I said, it was pretty much "Screw you.  I don't want to hear it."

Q.   Did you say anything else to indicate that this was a formal complaint?   Or you wanted it taken seriously?   Or anything like that?

A.   No.

Q.   Did you consider contacting someone



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

else in the Police Department?

A.    Nope.

Q.    Why not?

A.    I don't know.  Because I don't typically know how to handle these situations.

Q.    Did you talk to Michael about the situation?

A.    Nope.

Q.    Would you have felt that what the officers did was wrong if they had discharged their firearm at an intruder into your apartment?

MR. SHIELDS:  Objection.

A.    Yes.  Because it was still unsafe to do so with me standing next to him, holding my one-year-old child.

Q.    Why was it unsafe to discharge a firearm when you were holding -- or what did you say?  Because of your proximity to the child?

A.    Because anything could have happened. A bullet could have hit the wall and came back and hit me or my child.   What if the dog came running towards me and he turned towards me and fired and missed?  A lot of things could have happened. Obviously one of the bullets ricocheted off



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

something because of the bullet I found.

Q.    Where was Zyria when Zyria was shot by the officer?

A.    When she was shot?

Q.    Yes.

A.    Which time?   She was running throughout the house and he was just shooting his gun.

Q.    When did you decide to sue the City about this incident?

A.    About two years ago.   A year and a half ago.

Q.    So how -- how far after the incident did you decide to sue the Police Department?

A.    How long after the incident?

Q.    Yes.

A.    I would say probably six months to a year.

Q.    Okay.   I have a few more questions about the document.  So this is paragraph 24.

A.    Uh-huh.

Q.    You called it one of the most terrifying experiences of your life.

Can you tell me why it was one of the



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

most terrifying experiences of your life?

A.    Because it was very traumatic.    I -- like I said, I had never heard -- I never even heard a gunshot.  My child was right there.    It was already a traumatic experience.

Q.    Why was it already a traumatic experience?

A.    Because of CPS being there and trying to take my children.

Q.    When you say you never heard a gunshot, do you mean you never heard a gunshot in person?

A.    Yeah.

Q.    Actually, on second thought, have you ever heard a gunshot in person?

MR. SHIELDS:  Objection.

Q.    Like not on TV or in movies or something. Prior to this incident.

MR. SHIELDS:  Objection.

A.    Not that I -- not that I know of.

Q.    I also wasn't sure if you meant that you just hadn't heard a gunshot in like close range.

Because sometimes, you know, in the neighborhood you're like "Oh, I heard a gun go off,"



VICTORIA S. PRESTON - BY MS. JONES

but it was 100 yards away or something.

But you're saying prior to this you have never heard a gunshot in person?

MR. SHIELDS: Objection.

Q. If you know.

A. Not that I know of. You know, how like -- you'll hear something. I wonder if it was a gunshot or fireworks.

Q. Yes, I got it.

Did you see the officer discharge his firearm?

A. Yes.

Q. How could you tell that he had discharged the firearm?

A. How could I tell he shot his gun?

Q. Yes.

A. The noise and I seen him.

Q. What did you see?

A. Him standing there with his gun.

Q. So is it the noise to you that indicates that he has shot the gun?

A. Yeah.

Q. Are there any other visual cues that indicate he has shot the gun?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

A.    Like I said, I was standing right next to him.  I watched him stand there and pull the trigger and heard the gun go off.

Q.    You also saw him pull the trigger?

A.    Uh-huh.

Q.    Paragraph 23 -- I said 23 and I meant 33.  So sorry.

A.    Okay.

Q.    Why did you describe this as a terrible situation?

MR. SHIELDS:  Objection.    Can you just read the sentence so it is clear for the record?

THE WITNESS:    Me?

MR. SHIELDS:  Objection.    Somebody. It says "Before Leach shot and killed Zyria, this was already a terrible situation."

That wasn't clear from your question.

Q.    Why did you think this was a terrible situation?

MR. SHIELDS:  And I'm going to object to the question.

A.    I said this was already a terrible



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

situation because obviously nobody wants to have their kids taken, so.

Q.    Anything else about the situation that made it terrible other than the removal?

MR. SHIELDS:  Objection.

A.    Yeah.  I was confused on that.    Out of the whole thing or?

Q.    Yes.

So what made the initial situation terrible other than it was an attempted removal of your child?

A.    It was a terrible situation because of having my children taken.

Q.    And then what was it that Officer Leach did to make the already horrible situation much, much worse?

A.    He killed my dog.  He put me and my daughter, as I feel, in danger.

Q.    What, if there is anything else?

A.    That was pretty much it.

MS. JONES:  I would like to take a break.

(The proceedings recessed at 12:16 p.m.)

(The proceedings reconvened at 1:20 p.m.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

appearances as before noted.)

VICTORIA S. PRESTON, resumes;

CONTINUING EXAMINATION BY MS. JONES:

Q.    I just want to follow up on a few questions that I asked you earlier.    Some things that aren't clear in my notes.

So earlier you mentioned that when you were talking with the CPS workers -- you said something along the lines of it wasn't a casual conversation or like a normal conversation you would have with somebody.

Do you remember saying something along those lines?

MR. SHIELDS:  Objection.

A.    No.

Q.    No?  Okay.

How would you describe the conversation that you had with CPS workers when you -- or when they came to your apartment at 1100 Norton?

MR. SHIELDS:  Objection.

A.    How would I describe our conversations?

Q.    Yes.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

A.    On the day of February 14th?

Q.    Yes.

MR. SHIELDS:  Same objection.

A.    Pretty much just how they were saying they were going to take the kids and I was objecting to it.

Q.    Were you happy about it?

A.    No.

Q.    How would you say your tone was when you were talking with the CPS workers?

MR. SHIELDS:  Objection.

A.    Not pleasant.

Q.    Would you describe your communications with the CPS workers as yelling?

A.    At times.

Q.    And why would you describe it as yelling?

A.    Because I raised my voice.

Q.    So when you say "raised" your voice, are you referring to volume?  Or tone?  Or both?

MR. SHIELDS:  Objection.

A.    Volume.

Q.    Did you ever take Zyria over to any of your family members' houses?



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

A.    No.

Q.    Why not?

A.    Because there was no need to.

Q.    You didn't like have a family barbecue and bring the kids and the dog?

A.    No.

Q.    You still have your jacket on.

Is it too cold in here for you?

A.    I'm always cold.

Q.    It was very hot earlier so I turned it down and I think I made it too cold.

I'm going to pull up a body-worn camera video and ask you some questions about it. Give me one second as I navigate to it.  I will turn it sideways.

Can you see that?

A.    Uh-huh.

Q.    So for the record, this is a body-worn camera video from Officer Ortiz, that was one of the officers there.  It is the one that ends in 004.  I'm going to move ahead and go to about 20 minutes into the video.  Specifically the 2015 mark if I can get there.

Okay.  It looks like it will start at



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

2013.  That is about as close as I can get.  I will push play.

Actually, can you see where the screen is frozen right now?  Where you are in the apartment?

A.    Uh-huh.

Q.    Where are you right now?

A.    I couldn't tell you -- you which way it was facing.  I would assume I was facing towards the kitchen.  I know I'm in the living room right there.

Q.    Right.  I just wanted to know where in the living room.  That's fine.

I will go back to about 2010 and I will push play.  You're in the living room.  You will hear voices that are coming from the kitchen and then they're going to start talking to you and you're going to answer.  I just want to ask you some questions about that.  I will push play.  Here we go.

(The video was played.)

Q.    All right.  I pushed pause at --

MR. SHIELDS:  You hit stop.

Q.    I hit stop.  That is what happens



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

when you're sideways.  I hit stop.

I don't know how long that will play. Maybe ten seconds.

So the officers were discussing who owned the dog; is that fair?

A.    Yes.

Q.    Then they asked you if you owned the dog?

A.    Uh-huh.

Q.    What did you hear what your response was?

A.    I said, "I suppose."

Q.    So when I watch this video, that doesn't sound very confident to me.  Like you're not sure.

How do you interpret your response here?

A.    Because as you said, there -- there was nothing discussed about us getting a dog or anything like that.  I said, "I suppose" because he brought her home and said that it was our family dog.

And seeing as I was the one that always cared for her, yeah, I would suppose she was



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

my dog, too.

Now if it was I went out and got the dog and all that, I would have said, "Yes."

But he is the one that went out and got the dog and brought her home and said it was our family dog.

Like I said, I was the one that cared for her pretty much all of the time.  So yeah, she was my dog.

Q.    Were you unsure at all if the dog -- correction.

Were you unsure if you were a part owner of the dog at this point in time?

A.    No.

Q.    Why didn't you just say "yes"?

MR. SHIELDS:  Objection.

A.    I don't know.

Q.    Okay.  The next question of -- it's not on the video.

Has anyone prior to -- prior to the February 14th incident asked you to secure the dog somewhere in the apartment?

A.    No.

Q.    Never on any occasion did someone ask



VICTORIA S. PRESTON - BY MS. JONES

you to put the dog away because --

MR. SHIELDS: Objection.

Q.    -- for any reason?

A.    No.

Q.    You said earlier that you had put Zyria in the bathroom on maybe five occasions.

What or why did you put Zyria in the bathroom on those occasions?

A.    Probably because of having company.

Q.    So on those occasions did you decide yourself to put --

A.    Yes.

Q.    -- Zyria in the bathroom?

Earlier you described reasons why you chose the bathroom as opposed to other rooms.

Do those reasons also apply to why you would choose to put Zyria in the bathroom and not somewhere else?

MR. SHIELDS: Objection.

A.    Yes.

Q.    So we talked a lot about the officer who shot the dog, who was Officer Leach.

But I wanted to ask you about the other officer who was there.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

What did the other officer do when Zyria got out of the bathroom?

A. To be honest with you, I really wasn't paying too much attention to her -- to either officer early.

Q. Did the officer do anything when officer -- sorry.  I will use their name.

Officer Leach shot the dog and --

A. To be honest, I don't remember -- Leach I remember because of the whole incident.  But I honestly thought it was two guys -- two -- two male officers --

Q. Yeah.

A. -- until just recently.

Like I didn't really pay the other officer any -- any attention.

Q. The other officer that came with Officer Leach was also a guy.  His name was Officer Ortiz.

A. I thought it was a female.

Q. His first name --

MR. SHIELDS: Is Alexis.

Q. -- might be used in -- for some women, but he's a guy.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

A.    Okay.

Q.    So Officer Ortiz, the other officer, what did he do when Officer Leach shot the dog?

A.    I couldn't tell you.

Q.    Do you not remember?  Or you don't remember seeing it?

A.    I don't remember.

Q.    So I have another question for you about this video.   Same one from Officer Ortiz. 004.   This one --

MR. SHIELDS: I'm sorry.   Can you say which video that is?

MS. JONES: Officer Ortiz.   004.

MR. SHIELDS:  The same one?

MS. JONES: Yes.   So I have navigated it to approximately the -- this is not very precise.   I'm sorry.

So I think it's at 10:39 -- sorry -- 10 minutes 39 seconds into the video.   Time stamp is 14:40.   I'm actually going to turn off the volume because I don't care about the volume.

And I just want you to tell me what you're doing here.   I will push play for a


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

second.   You will see Officer Leach right here and I want you to describe what you're doing.

A.   I can't really see to be honest with you.

Q.   I think I pushed play.   Yeah.   It's playing.

MR. SHIELDS:   No.

(The video was played.)

MR. SHIELDS:   No.   It's weird.

A.   I was probably trying to calm myself down.

Q.   It's only a little bit of time before it stops.   I stopped at 11 minutes in.

A.   I see myself like (indicating).

Q.   So to me it looks like you were smoking here.

Can you tell if you're smoking here?

A.   How does it look like I'm smoking?   I don't even see a cigarette in my hand.

Q.   Okay.   Do you remember smoking after the dog was shot?

A.   Yeah.   I probably did.

Q.   Is that a stress response for you?



VICTORIA S. PRESTON – BY MS. JONES

MR. SHIELDS:  Objection.

A.    No.  I smoke whether I'm stressed or not.

Q.    What about that video gave you the impression that you were trying to calm yourself down?

A.    Because it looks like I'm talking to myself and that I'm going like this (indicating), like just...

Q.    Well --

A.    Could you play it again actually?

Q.    Yes.  I will play it with sound because I don't remember you saying anything, but maybe I just wasn't paying attention.

Right now I have it at 10 minutes and 37 seconds into the video.  I will play it again.

(The video was played.)

A.    Yep.  Actually, I do have a cigarette in my hand.  Yep.  I was smoking.  Yeah.

Q.    Okay.  I think that is as long as we played it before.  I stopped at 11 minutes and 22 seconds.

I didn't hear you say anything to yourself, but do you think that maybe you were



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

talking to yourself to calm yourself?

A.   I see the cigarette in my hand.  Yes. I was smoking.

Q.   I thought you said that you were trying to talk to yourself or calm yourself down or something?

A.   Yes.  Before I just said in the video I didn't see a cigarette in my hand.  I was probably talking to myself and trying to calm myself down.

But now I see I have a cigarette in my hand and I say yes, I was smoking and...

Q.   Okay.  So I froze it at 11:22.

Is this typically the window you would open when you were smoking inside?

A.   No.  Typically, we would smoke in my bedroom and open my bedroom window.

Q.   That is all for now on that one.

The next questions are on a different video.  Let me pull that one up.  Okay.

So this is one of Officer Leach's body-worn camera videos.   This one ends in 005.   I have navigated to 2 minutes and 15 seconds into the video.  Time stamp says 14:32.   So this is right after the dog got shot.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

Y'all are still in the living room. I think you will see the dog back in the background. But you're going to say some things and then Officer Leach will say some things and I just want to ask you about what you say and what he says.

The sound is up and, of course, I can play it again if you would like.

(The video was played.)

Q. Oh, that was way further than I wanted.

(The video was played.)

Q. Okay. I needed to -- to rewind again. We'll try this again. We're at like 2:04 and I will push play.

(The video was played.)

Q. I think that was it.

So in the video you said a few things about why you were unhappy with Officer Leach's actions.

You mentioned -- what did you mention?

A. Him shooting his gun with my baby in the house.

Q. Uh-huh.


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

I think you said something about the dog -- that the dog would have licked you or something like that?

A.   Uh-huh.

Q.   Did you hear what Officer Leach said after that?

A.   He said that the dog bit him in the leg.

Q.   Did you hear that on the day of the incident?

A.   Not that I recall.   I only remember getting told that his pants got ripped.

Q.   Okay.  That's all I have on that one. I think that is all of the videos.  I will just close that.   I will resume my other questions.

Did you tell Michael Hurt that the dog had been shot and died?

A.   I did not.

Q.   Do you know when Michael Hurt found out that the dog had been shot and died?

A.   Nope.

Q.   Did you see Michael Hurt later that day --

A.   No.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

Q.   -- February 14th?

A.   Every time you called the police, Michael disappeared.

Q.   He didn't come back to the apartment?

A.   Nope.  He wasn't there through any of it.

Q.   How long were you at the residence of 1100 Norton that day?

A.   Since about -- like I said, 8 -- 8 o'clock in the morning.

Q.   When did you leave that -- well, did you leave later that day?

A.   Right after the situation took place, I got picked up.

Q.   Do you have any idea when Michael Hurt found out that the dog died?

A.   No, I do not.

MS. JONES:  Excuse me one second.   I left something on the printer.

(There was a pause in the proceedings.)

Q.   Did you ever -- well, during the time that you and Michael were residing at the apartment at 1100 Norton, did you ever spend the night or spend multiple nights elsewhere during that time



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

period?

MR. SHIELDS:  Objection.

A.    Yes.

Q.    When you spent the night elsewhere, was it generally a single night or multiple nights?

MR. SHIELDS:  Objection.

A.    Depended on the situation.

Q.    Okay.  So could it have been both?

A.    Yep.  Sometimes I would go stay at a friend's house for a night or sometimes me and him fight and I would go stay at my aunt's for a week, two weeks.

Q.    When you would go stay at your aunt's house, which aunt are you referring to?

A.    April.

Q.    April?

A.    Uh-huh.

Q.    When you would stay at your aunt's house for a week or whatnot, would you take the kids with you?

A.    Yes.

Q.    Both of them?

A.    Yes.

Q.    Did you ever take Zyria with you when



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

you would spend the night at -- spend time at your Aunt April's house?

A.    No.  I would not take Zyria with me.

Q.    Why was that?

A.    Because at the time my aunt couldn't have dogs at the place she was at.

Q.    Do you know how many times during the period in which you stayed with Michael at 1100 Norton Street you would spend time elsewhere or spend the night elsewhere?

MR. SHIELDS:  Objection.

A.    Maybe two, three times.

Q.    Was the dog ever in the room when police would respond to 1100 Norton?

MR. SHIELDS:  Objection.

A.    Was the dog ever in what room?

Q.    Like the room where you and the police officers might have been.

MR. SHIELDS:  Objection.

A.    The police officers had never been in the house.

Q.    Hmm.

Did Zyria ever come up to the door when officers would come to 1100 Norton?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

MR. SHIELDS:  Objection.

A.    I couldn't tell you if she did or not.  If I called the police for any reason and they showed up, I would step outside.  So I don't know what she was doing in the house.

Q.    Do you remember -- did you smoke before the officers arrived -- before the CPS workers and officers arrived on the day of February 14th?

MR. SHIELDS:  Objection.

A.    Had I smoked?

Q.    Yeah.  That day at 1100 --

A.    Yes.

Q.    -- Norton.

A.    Probably.

Q.    How were you impacted by this incident?

MR. SHIELDS:  Objection.

A.    I'm sorry?

Q.    How were you impacted by this incident?

MR. SHIELDS:  Objection.

A.    As I was saying, it was traumatic.  I never heard a gunshot before.  It leaves me



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

wondering about situations, if I want to call the police or not. I have flashbacks about it.

My oldest daughter, you know, still to this day asks about the dog. It was hurtful. They made a bad situation even worse.

Q. This seems like mainly emotional or mental or psychological damages.

Did you lose or have any damages to any physical property because of the incident?

A. Me personally? No.

Q. Okay. Are you aware of other property damage from the incident?

A. Yeah. There were bullet holes in my walls.

Q. When you say "in my walls," you mean 1100 Norton?

A. Yes.

Q. Anything else?

A. Not that I can think of.

Q. Has Michael Hurt talked to you about the damage that was from the bullet holes?

A. No.

Q. He hasn't asked you to repair it or something like that?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

A.    No.  He don't own the home anymore.

Q.    Do you know when Michael Hurt lost ownership or no longer owned the property at 1100 Norton?

A.    I do not.

Q.    When did you find out that he no longer  owned 1100 Norton?

A.    I knew when we were together that he was at risk  of losing it.

Q.    Do you know when he actually lost the property?

A.    No, I don't.

Q.    Why was he at risk of losing the property at  1100 Norton?

A.    Unpaid taxes.

Q.    Did the unpaid taxes contribute to why you decided to move out of the property at 1100 Norton?

A.    No.

Q.    Did you have any expenses or costs from burying or cremating Zyria?

A.    No.

I was never even spoken to or contacted or anything about the situation after it


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

happened.

Q.   Who did you expect to contact you?

A.   They never told me where they were taking her or -- or anything.

Q.   Are -- so they never told you. Who is the "they"?

A.   Police.

Q.   Did they ask your permission to take the dog?

A.   Not that I remember.

Q.   Do you remember signing any paperwork?

A.   I did not.   Not that I don't remember.  I did not sign any.

Q.   Were you expecting to get the dog back after the officers had done whatever they needed to do with the dog?

MR. SHIELDS:  Objection.

A.   To be honest with you, I have no clue.   I had never been through anything like that, so I didn't know what took place or how it took place or any -- I -- I had no clue about any of it.

Q.   Have you been diagnosed with any illnesses or conditions following this incident?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

MR. SHIELDS:  Objection.

A.    No.  I don't think so.

Q.    Have you seen any medical professionals to receive care following this incident?

MR. SHIELDS:  Objection.

A.    No.

Q.    Has anyone suggested that maybe you should talk to a professional because of the emotional effects you're experiencing?

MR. SHIELDS:  Objection.

A.    Actually, yes.

Q.    Who suggested that you speak to a professional?

A.    My aunt.  April.

Q.    Aunt April.  Okay.

When did your Aunt April suggest that maybe you should talk to a professional?

A.    On one occasion when I was speaking to her about it.

Q.    When was that conversation?

A.    I couldn't tell you.  I don't remember.

Q.    So we're in 2023.  This happened in



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

2020.

Do you know if that conversation was in 2020?

A.   Yeah.  It was probably shortly after the incident.

Q.   Did your Aunt April indicate specifically why she felt that you should talk to a professional?

A.   Not really.   She was -- I was venting to her about it and she said, you know, if anything -- "Why don't you seek therapy?"

Q.   Did you ever seek therapy?

A.   No.

Q.   What does your aunt do for a job?

A.   She does not work.

Q.   Does she have a background in mental health or therapy or anything like that?

A.   No.

Q.   Even though you haven't been formally diagnosed, do you believe you're suffering from any specific conditions because of the incident?

A.   Yes.

Q.   Okay.  What conditions or illnesses are those?


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

A.    I would say anxiety.    Depression.

Q.    Any others?

A.    That's what I remember.

Q.    How does the anxiety manifest itself?

A.    This -- as I was saying, like I -- I think twice now about, you know, calling the cops about situations and -- because it makes me anxious. I don't want to call the cops.    And then if something worse ends up happening or...

Q.    Are you still experiencing this anxiety that you described?

A.    Yeah.    At times.

Q.    Are your feelings of anxiety as strong as they were in the weeks after the incident?

A.    No.

Q.    How often right now do you have these feelings of anxiety?

A.    Pretty much anytime I see cops.

Q.    Oh.

How do you feel when you see cops in general?

MR. SHIELDS:  Objection.

A.    Frustrated, irritated.    It's like cops are supposed to be there to help you, but every



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

time you call them for help, they just go screw something up even more.

Q. So I interpret that as slightly different than how you described your anxiety.

But do you consider the two to be related?

A. Yeah.

Q. Okay. Okay. Can you describe the depression that you have been experiencing?

A. It's upsetting. Like I said, my oldest daughter, she still asks about the dog and I never told her exactly what happened. So she brings it up and it brings back feelings and memories and...

Q. What does your older daughter ask about?

A. "What happened to the dog?"

Q. Has she asked to visit the dog or see the dog?

A. Yeah. Because like I said, I never told her what happened. I told her that we ended up giving the dog to a family friend. So she's asked before, you know, "Well, can't you call up the friend and we go see her?"



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

Now, like -- I can have a dog.  "Why don't you see if we can get her back?"

Q.    Can you describe a little bit more about how the depression felt for you?

A.    What do you mean how the depression felt for me?

Q.    Like how it -- how it manifested. So -- hmm.  Depression often manifests itself in different ways.  Some people, it's "I'm very sad." Sometimes for people it's "I don't feel like doing things."  For others, it's just like "I want to sleep all day."

A.    Yeah.

Q.    Other people "I'm angry at the world."

A.    Outbursts and sleeping a lot and --

Q.    How often did you have outbursts?

A.    I'm sorry?

Q.    Actually, are you still experiencing the depression?

A.    Yeah.

Q.    Okay.  So how often do you have outbursts now?

A.    I wouldn't say as often.   Pretty much



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

if the situation gets brought up, it brings on old feelings, old memories.

Q.   When you say "outbursts," what emotions are --

A.   I never said "outbursts."   You did.

Q.   Oh.  Oh.  I thought you said "outbursts."

Okay.  So how would you describe -- okay.  So in your words, what is happening or how would you describe what is going on when I said "outbursts"?

MR. SHIELDS:  Objection.

A.   I don't understand.

Q.   So I said the word "outbursts" and I got the impression that you were agreeing with me or saying "Yes, I experience it."

So is there -- like what is that particular behavior or whatnot that you felt might be described as an outburst?

MR. SHIELDS:  Objection.

A.   Like flashbacks and stuff like that.

Q.   How often do you have or -- how often do you have flashbacks now?

A.   Pretty much anytime I see police or



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

the situation gets brought up.

Q.    How often were you having flashbacks closer to the incident?

A.    A couple times a week.

Q.    How did flashbacks affect your day-to-day life closer to the incident?

A.    Couldn't sleep.   Didn't really care to eat.   Couldn't sleep.   Wanted to sleep.    Crying.

Q.    Why didn't you see a therapist to address these anxiety and depression symptoms that you have mentioned?

A.    Because I don't like going to therapists.

Q.    Did you consider seeing a physician or another type of medical professional?

A.    No.   No.

Q.    Why not?

MR. SHIELDS:  Objection.

A.    I don't know.

(There was a pause in the proceedings.)

Q.    So you mentioned some of your symptoms.

Why do you attribute those to this particular incident?



VICTORIA S. PRESTON – BY MS. JONES

A.   Because it wasn't happening before.

Q.   Did you see a primary care provider in the one or two years after this incident?

A.   No.

Q.   So I guess then you didn't mention the incident to a primary care provider?

A.   No.

Q.   So in your Complaint it mentioned mental and emotional injuries from the incident.

Are there any other mental, emotional injuries that you have experienced that we haven't talked about?

A.   That's all I remember right now.

Q.   Did you keep a journal or diary in 2020?

A.   No.

Q.   Did you keep a journal or diary in 2020 or at any time up to the present?

A.   Nope.

Q.   What, if anything, would help you remember how this incident may have affected you mentally and/or emotionally?

MR. SHIELDS:  Objection.

A.   I don't think I understand.


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

Q.    So I asked you earlier about other mental or emotional injuries you had and you said that's all you can remember right now.

So I'm wondering what, if anything, can help you remember other mental, emotional injuries that you have experienced in the intervening time period?

MR. SHIELDS:  Objection.

A.    Nothing that I can think of.

Q.    Did you lose any money because of the incident?

A.    No.  Not that I can think of.

Q.    Did anyone else other than Aunt April talk to you or suggest that you might want to see a professional?

A.    No.

Q.    Did any of your family members mention or remark that you had changed or were different after the incident?

A.    Not that I recall.

Q.    Is there anything else that you haven't mentioned already that you used to be able to do that you can no longer do because of the incident?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

A.    Not that I recall.

Q.    Who would you say knows you best?

MR. SHIELDS:  Objection.

A.    My aunt.

Q.    April?

A.    Uh-huh.

Q.    Would Aunt April be able to speak to how you may have changed since the incident?

MR. SHIELDS:  Objection.

A.    I couldn't say.   That's on her.

Q.    Did you have either of your children see a professional for how they may have been --

A.    No.

Q.    -- affected by the incident?

A.    No.

Q.    Have you ever been bitten by a dog?

A.    No.

Q.    Okay.  Any of the --

(There was a pause in the proceedings.)

Q.    I'm sorry.   I just want your undivided attention.

Is there anything that you have said during the deposition before and after lunch that you would like to correct or change?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

A.    No.

Q.    Anything you would like to add to any of your answers that you gave earlier today?

THE WITNESS:  Should I?   Should I bring up about the Facebook post I found?

MR. SHIELDS:  If there is something you would like to correct.

A.    Um, well, when we were talking about like the time frame of me leaving, remember I said it had to be -- been like late January or early February or whatever?

I actually just seen on my Facebook memories that I had posted December 19th of 2019 -- I had put up a post asking if anybody had a place I could stay for a couple weeks until I found something more permanent.

So that must have been pretty much the time that I left, is around December 19th of 2019.

Q.    Did you leave because the CPS investigation had been opened regarding you and Michael?

A.    No.

Q.    Okay.  I think that's -- oh.  One



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MR. SHIELDS

more question.

Do you consider yourself to read at a slow, average or fast pace?

MR. SHIELDS:  Objection.

A.    Fast.

MS. JONES:  Okay.    That's all I have for now.

MR. SHIELDS: Okay.    I just have a few follow-up questions.

(There was a discussion off the record.)

EXAMINATION BY MR. SHIELDS:

Q.    My first follow-up question is, is one of the reasons that you haven't gotten a new dog since the incident because of how traumatic seeing Zyria shot and killed right in front of you was in this incident?

MS. JONES:  Objection.

A.    Actually, yes.  I -- I don't want to end up getting another dog and something end up happening to her.

Q.    Back to the incident itself, when Zyria got out of the bathroom, do you remember Officer Leach yelling at Zyria?

A.    Yes.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MR. SHIELDS

Q.   Do you remember Officer Leach pointing his gun at Zyria?

A.   Yes.

Q.   Before he yelled at Zyria, did he try to use any sort of calm language to deter Zyria from running at him?

A.   No.

Actually, at the time Zyria was in the kitchen and he -- he -- he yelled to her.  Like so who is to say she might not even have came to him if he hadn't yelled to her.

Q.   Do you remember Officer Leach walking closer to Zyria -- entering the kitchen and walking closer to Zyria --

A.   I don't remember him ever entering the kitchen.  He -- he may have, you know, stepped forward or something, but I don't remember him ever entering the kitchen.

Q.   Were the words that Officer Leach used -- would you describe them as aggressive towards Zyria after she exited the bathroom?

A.   The words he used?  No.  But the tone, yes.

Q.   Okay.  And how about his body



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MR. SHIELDS

language when he was pointing the gun at Zyria? Would you describe that as aggressive?

A.    Yes.

Q.    Other than speaking and acting aggressively towards Zyria, did he do anything else towards Zyria after she exited the bathroom?  Before he shot Zyria.

A.    Not that I recall.

Q.    Did either Officer Ortiz or Officer Leach ever check the bathroom door to ensure that Zyria was secured in the bathroom?

A.    No.

Q.    Earlier you said that after the incident you spoke with the Sergeant at the scene and informed him that you wanted to make a complaint against Officer Leach; is that right?

A.    Yes.

Q.    What was -- well, withdraw that.

Do you remember any of the words that the Sergeant responded to you when you told him that you wanted to make a complaint?

A.    I don't remember his exact words, but they were pretty much like "Screw you."

I'm not -- I don't remember his exact



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

words, but they were just pretty much along the lines of like "Screw you.  I ain't making a complaint."

Q.    So he didn't -- as far as you know, he wasn't allowing you to make a complaint at that time?

A.    Yes.

MS. JONES:  Objection.

Q.    And at any point did Officer Leach or Officer Ortiz say anything about the dog when they were in the apartment after Zyria had been put in the bathroom before Zyria got out of the bathroom?

A.    Could you say that again?

Q.    Sure.

Did -- did Officer Leach or Officer Ortiz speak with you about Zyria for any reason between the time they entered the house and when Zyria got out of the bathroom?

A.    No.

(There was a discussion off the record.)

MR. SHIELDS: Those are all any questions.

RE-EXAMINATION BY MS. JONES:

Q.    How old was your younger child at



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON - BY MS. JONES

the --

MR. SHIELDS: No.  No.  You can't ask follow-up questions that don't directly relate to the questions that I asked. That's not a permitted --

MS. JONES: Yes, it is.

MR. SHIELDS: No, it's not.

MS. JONES:  It --

MR. SHIELDS:  It is direct examination and then it's cross-examination and then it's redirect.    And it's narrowed by the questions -- you can only ask her questions that are responsive to questions that I just asked.    You can't ask all new questions.   You -- you stopped your questioning.

MS. JONES:  This is not trial.

MR. SHIELDS: That -- the rules state that questioning proceeds in the exact same manner as they proceed at trial.  So yes, that is how it works.

Q.   How old was your younger child at the time of this incident?

MR. SHIELDS:  Objection.



VICTORIA S. PRESTON - BY MS. JONES

Don't answer that.

Q.    How old was your --

MR. SHIELDS:  You can't -- you can't ask that question.

First of all, I will let you ask that one question.   And the answer is she was one years old.

But you can't ask questions that are outside of the scope of the questions that I just finished asking.

Q.    How old was your child at the time of the incident?

A.    One.

Q.    Did you actually ask the officer -- did you actually use the word "complaint" when you were talking to the Sergeant?

A.    Yeah.

Q.    You did?

A.    Because he told -- Leach told me if I wasn't happy with his actions, I could file a complaint.

Q.    That's what Officer Leach said?

A.    Uh-huh.

Q.    But -- so when you talked to the



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

VICTORIA S. PRESTON – BY MS. JONES

Sergeant to make the complaint, did you actually say "I'd like to make a complaint"?

    A.    Uh-huh.   Yes.

    MS. JONES: Okay.  I'm done.

    (TIME: 2:19 p.m.)

    *    *    *



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

142

W I T N E S S

| Name | Examination by | Page |
| --- | --- | --- |
| Victoria S. Preston | Ms. Jones | 4-135 |
| " | " | Mr. Shields | 135-138 |
| " | " | Ms. Jones | 138-141 |

\*        \*        \*



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

E X H I B I T S

Exhibit          Description                    Marked ID'ed

------------------------------------------------

(No Exhibits Marked)

\*        \*        \*

EXHIBITS  PREVIOUSLY  MARKED

Exhibit          Description                      Page

------------------------------------------------

(No Previously Marked Exhibits Presented)

\*        \*        \*

D O C U M E N T   R E Q U E S T S

Request                                        Page

------------------------------------------------

(No Documents Requested)

\*        \*        \*



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

C E R T I F I E D   Q U E S T I O N S

Question                                                          Page

-------------------------------------------------------------

How much did you smoke while you lived at
1100 Norton?                                                      94

*       *       *



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

A C K N O W L E D G M E N T

I, Victoria S. Preston, declare, swear and aver that I have read my testimony contained herein and that my answers are true and correct, with any exceptions noted on the errata sheet, under penalty of perjury.

_____

Victoria  S.  Preston

I certify that this transcript was signed in my presence by Victoria S. Preston on the _____ day of _____, 2024.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office of Rochester, New York on this _____ day of _____, 2024.

_____

Notary Public

_____

My Commission Expires:



ALLIANCE COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

**146**

E R R A T A   S H E E T

Witness: Victoria S. Preston
Deposition Date:    December 19, 2023

| Pg # | Line # | Change | Clarification |
|------|--------|--------|---------------|
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |
|      |        |        |               |



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

C E R T I F I C A T I O N

STATE OF NEW YORK:
COUNTY OF MONROE:

I, SANDRA C. HEWLETT, RPR, do hereby certify that the foregoing testimony was duly sworn to; that I reported in machine shorthand the foregoing pages of the above-styled cause, and that they were produced by computer-aided transcription (CAT) under my personal supervision and constitute a true and accurate record of the testimony in this proceeding;

I further certify that the witness does request to review the transcript;

I further certify that I am not an attorney or counsel of any parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action;

WITNESS my hand in the City of Rochester, County of Monroe, State of New York.

SANDRA C. HEWLETT, RPR
Freelance Court Reporter and
Notary Public No. 01HE5057286
in and for Monroe County, New York



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920