UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

VICTORIA PRESTON,

Plaintiff,

- against -

THE CITY OF ROCHESTER, a municipal entity,
POLICE OFFICER MITCHELL LEACH,

Defendants.

**Case No.: 22-cv-6525 (CDH)**

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION IN LIMINE FOR QUALIFIED IMMUNITY**

Elliot Dolby Shields
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016

## TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................ii

INTRODUCTION ...................................................................................................................... 1

ARGUMENT.............................................................................................................................. 1

I. THE STATEMENT DEFENDANTS IDENTIFY IS NOT A JUDICIAL ADMISSION ......... 1

II. EVEN IF THE STATEMENT WERE A JUDICIAL ADMISSION, QUALIFIED IMMUNITY REQUIRES JURY RESOLUTION OF DISPUTED FACTS ........................................... 2

III. THE DEMPSEY JURY ALREADY RESOLVED THIS EXACT QUESTION AGAINST THE CITY ................................................................................................................. 4

IV. OFFICER LEACH HAD ABUNDANT OPPORTUNITY TO USE LESS-LETHAL ALTERNATIVES................................................................................................... 5

V. THE APARTMENT WAS FILLED WITH OBJECTS LEACH COULD HAVE USED AS BARRIERS ............................................................................................................ 7

VI. LEACH FIRED SIX SHOTS WITHIN ARM'S LENGTH OF A MOTHER HOLDING HER INFANT DAUGHTER.......................................................................................... 8

CONCLUSION........................................................................................................................ 10

# TABLE OF AUTHORITIES

**Cases**

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113 (2d Cir. 2004) .............................................. 9

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523 (2d Cir. 1985) ................................... 1

*Canton v. Harris*, 489 U.S. 378 (1989) ....................................................................................... 9

*Carroll v. County of Monroe*, 712 F.3d 649 (2d Cir. 2013) ......................................................... 3

*Graham v. Connor*, 490 U.S. 386 (1989) ..................................................................................... 2

*Hoodho v. Holder*, 558 F.3d 184 (2d Cir. 2009)........................................................................... 1

*In re Motors Liquidation Co.*, 957 F.3d 357 (2d Cir. 2020) (per curiam) ..................................... 1

*Tennessee v. Garner*, 471 U.S. 1 (1985)....................................................................................... 9

*Tolan v. Cotton*, 572 U.S. 650 (2014)........................................................................................... 3

*Zellner v. Summerlin*, 494 F.3d 344 (2d Cir. 2007)....................................................................... 3

### INTRODUCTION

Defendants move in limine for qualified immunity for Officer Leach on the theory that Plaintiff made a "judicial admission" that Zyria bit Leach before Leach shot her, and therefore Leach is entitled to qualified immunity as a matter of law. This motion should be denied.

As a threshold matter, the statement Defendants identify is not a judicial admission. But even accepting Defendants' characterization arguendo, their motion fails for at least five independent reasons: (1) qualified immunity is a fact-intensive inquiry that requires jury resolution of disputed facts; (2) a jury in this same Court already found, on materially identical facts in *Dempsey v. City of Rochester*, that an officer who shot a dog had sufficient time and ability to use nonlethal alternatives — even where the dog presented as "offensive aggressive"; (3) the undisputed evidence shows Leach had far more time and opportunity than the officer in *Dempsey* to deploy less-lethal measures before Zyria reached him; (4) Leach was standing in a small apartment filled with household objects he could have used as barriers, yet he chose not to; and (5) Ms. Preston was holding her one-year-old daughter within arm's length of where Leach discharged his firearm six times, making the use of deadly force objectively unreasonable under any standard.

### ARGUMENT

#### I. THE STATEMENT DEFENDANTS IDENTIFY IS NOT A JUDICIAL ADMISSION

A judicial admission is a formal statement of fact that a party makes in a court proceeding, ordinarily for the purpose of dispensing with the necessity of proof. *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985). For a statement to constitute a judicial admission, it must be one of fact—not a legal conclusion—and must be deliberate, clear, and unambiguous. *In re Motors Liquidation Co.*, 957 F.3d 357, 360–61 (2d Cir. 2020) (per curiam); *see also Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) (judicial admissions bind the party throughout

1

the litigation). A party cannot be deemed to have admitted facts merely by citing them in a brief or making a general statement that can reasonably be interpreted as qualified or contextual.

Even assuming Defendants can identify a statement in Plaintiff's papers that uses the word "bit" in connection with Zyria and Officer Leach, that statement does not constitute a judicial admission for at least three reasons. First, any such statement was made in the context of explaining the sequence of events during the incident and does not carry the weight of a formal, deliberate admission. Second, whether Zyria made contact with Leach, and the precise nature, timing, and severity of that contact, are questions of disputed fact that cannot be transformed into judicial admissions simply by extracting language from its context. Third, a dog "biting" an officer and the causation sequence — i.e., whether the bite caused Leach to fear for his safety, or whether Leach provoked the dog through his own conduct — are quintessentially factual matters requiring evidence at trial.

Defendants cannot credibly argue that Plaintiff's description of events during a chaotic encounter in a residential space amounts to a judicial admission of every detail contained therein. To accept this argument would be to convert the pre-trial factual dispute, which is the entire purpose of cross-examination and jury trials, into a matter resolved against Plaintiff as a matter of law. The courts do not lightly infer judicial admissions, particularly where, as here, the "admission" concerns a series of events that occurred during a brief, high-stress incident.

## II. EVEN IF THE STATEMENT WERE A JUDICIAL ADMISSION, QUALIFIED IMMUNITY REQUIRES JURY RESOLUTION OF DISPUTED FACTS

The Supreme Court has established that the determination of whether an officer's use of force was reasonable under the Fourth Amendment is a fact-intensive inquiry that ordinarily presents a jury question. Under *Graham v. Connor*, 490 U.S. 386, 396 (1989), the reasonableness of

a use of force must be evaluated based upon the "totality of the circumstances" from the perspective of a reasonable officer on the scene, rather than with the benefit of hindsight. The Court recognized that different officers may reasonably perceive and react to the same circumstances in different ways, which is precisely why these determinations are committed to juries in the first instance.

Where the underlying facts are disputed, qualified immunity cannot be granted as a matter of law. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (per curiam). The Supreme Court has instructed that when a party seeks summary judgment on the basis of qualified immunity, courts must not resolve factual disputes in the non-moving party's favor in the manner typical of summary judgment. Instead, factual disputes material to the qualified immunity determination must be left for the jury. *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007).

Here, despite Defendants' effort to reframe the issues, critical factual questions remain disputed or genuinely contested: When did any contact between Zyria and Leach occur? How severe was it? Did Leach have adequate time to perceive the threat and consider alternatives before shooting? Did he have the time and ability deploy the oleoresin capsicum spray or baton he carried? Did he have the time and ability to attempt to create a barrier using objects in the apartment? Did he attempt to retreat? Did he cause any bite by placing his foot in Zyria's mouth? These are not matters that can be resolved against Plaintiff on a motion in limine based on a claim of judicial admission. These are precisely the sort of fact-intensive questions that juries are designed to resolve.

Moreover, the right at issue — the right to be free from the unreasonable seizure of one's property, including a pet dog — was clearly established at the time the incident occurred. *Carroll v. County of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013). A reasonable officer in February 2020 would have been on clear notice that shooting a dog inside a small apartment, within arm's length of a mother holding an infant, without attempting any less-lethal alternative, violated the Fourth

3

Amendment. Qualified immunity therefore cannot shield Officer Leach from liability as a matter of law and certainly not at pretrial stage.

### III. THE DEMPSEY JURY ALREADY RESOLVED THIS EXACT QUESTION AGAINST THE CITY

In *Dempsey v. City of Rochester*, No. 19-cv-6780 (W.D.N.Y.), a jury in this very District considered a strikingly similar scenario and returned a verdict on January 30, 2026, finding Officer Algarin liable for violating Plaintiffs' Fourth Amendment rights by shooting their dog, Tesla. The Dempsey jury's verdict sheet and special interrogatories is attached as Exhibit 1. At Special Interrogatory (a), the jury was asked whether the dog "presented as offensive aggressive" to Officer Algarin. The jury answered "Yes." Despite this finding, the jury simultaneously answered "Yes" to Special Interrogatory (b), that Officer Algarin had "sufficient time to use a nonlethal method of control," and "Yes" to Special Interrogatory (c), that Officer Algarin had "sufficient ability to use a nonlethal method of control." Exhibit 1 at 8.

This verdict is fatal to Defendants' argument in the present case. In *Dempsey*, the facts were substantially different from, and arguably more favorable to the officer, than the facts here. In *Dempsey*, the dog was running directly at the officer in an outdoor yard, where the officer had limited time and ability to retreat or create barriers. The *Dempsey* jury nonetheless concluded, even under these strenuous circumstances, that the officer still had sufficient time and ability to deploy a baton, pepper spray, or another less-lethal method. Here, by contrast, the facts are significantly more favorable to Plaintiff. Zyria was initially secured in a bathroom. Officer Leach knew the dog was inside the apartment before he entered. He heard Zyria scratching at the bathroom door for the entire duration of his time inside — a period of several minutes, not seconds. He had explicit

advance notice that a dog was in the residence. Yet despite this advance notice and this extended time period, he made no preparations whatsoever for how to handle the dog without lethal force.

After Zyria escaped from the bathroom, she did not run directly at Leach. Instead she first ran toward the door to exit the kitchen to the driveway. Only then did Zyria change directions. During this time, Leach could have reached for his baton or pepper spray, or one of the many objects inside of the apartment to place between himself and the dog to create a barrier, but he chose not to.

The *Dempsey* jury's verdict establishes that a jury of citizens in this District — applying the law as it exists in this Circuit — has already determined that even when a dog is actively running at an officer and presenting as "offensive aggressive," the officer's use of deadly force is unreasonable when nonlethal alternatives are available and the officer has the time and ability to deploy them. Defendants cannot credibly argue for qualified immunity in the present case, where the facts are even more favorable to Plaintiff than they were in Dempsey.

## IV. OFFICER LEACH HAD ABUNDANT OPPORTUNITY TO USE LESS-LETHAL ALTERNATIVES

Unlike in *Dempsey*, where the officer's encounter with the dog was relatively sudden and occurred in an outdoor yard where the officer had limited options for retreat or barriers, Officer Leach enjoyed extensive advance notice and time to prepare. Leach knew that Zyria was in the apartment before he entered the residence. He heard the dog scratching at the bathroom door for the entire duration of his time inside — a period of several minutes. Crosby Expert Report at 4 (Exhibit 4). During this extended time period, Leach had multiple opportunities to formulate a plan for safely managing the dog. He was equipped with oleoresin capsicum spray (also called "pepper

5

spray") and an expandable baton — standard less-lethal tools carried by law enforcement officers nationwide. Id. at 5. However, Leach deployed neither of these tools.

Dr. James Crosby, Plaintiff's expert on canine behavior and police use of force in animal encounters, has reviewed the entire incident and will testify at trial based on his expert report (Exhibit 4). Dr. Crosby concludes that "Leach did not attempt to deploy any of the less-lethal means of defense directly available to him, those being oleoresin capsicum spray and an expandable baton. He also did not consider or attempt to place any objects between himself and Zyria as a barrier." (Ex. 4, Crosby Report at 5.) This failure is a critical fact that distinguishes this case from situations where an officer acts instantaneously in response to an unexpected and sudden threat.

Dr. Crosby will further testify that officers should never kick a dog during an encounter because kicking will predictably and foreseeably cause the dog to attempt to bite the officer in self-defense. This is common sense and is consistent with expert opinion on canine behavior and police training standards. It is precisely because kicking provokes a defensive bite response that professional police training emphasizes placing a barrier object between the officer and the dog, rather than making physical contact with the dog. The IACP Model Policy on Law Enforcement Interactions with Canines — which represents best practices in police use of force against dogs — recommends that officers "present a target, such as a baton, night stick, or flashlight held sideways, and allow the canine to bite on it while moving away." (Ex. 4, Crosby Report at 10 (quoting IACP Model Policy).) The same policy recommends officers to "[u]tilize commonly available items, such as clipboards, to block or redirect an attack." (Id.)

Even if undisputed evidence were to establish that Zyria did bite Leach at some point during the encounter, that fact would not retroactively justify the use of deadly force. The critical question is whether that bite was a foreseeable and avoidable consequence of Leach's own

6

deliberate failures and poor judgment. A dog that is kicked or confronted without any de-escalation effort will predictably attempt to defend itself by biting. That foreseeable defensive reaction cannot later be used to justify shooting the dog six times. To accept such an argument would reward officers who create the very situations they then claim justify lethal force.

## V. THE APARTMENT WAS FILLED WITH OBJECTS LEACH COULD HAVE USED AS BARRIERS

The photographs of the apartment interior — taken from both body-worn camera footage and crime scene photographs — reveal that Officer Leach was standing in an apartment filled with ordinary household items that could have been used to create distance or establish a barrier between himself and Zyria. These items included:

- An upright vacuum cleaner positioned directly in the kitchen doorway area, within arm's reach of where Leach was standing. (Exs. 6, 7, 8.)

- A full-size Christmas tree standing just inside the living room, immediately adjacent to the doorway between the kitchen and living room. (Exs. 6, 7.)

- A bucket and lampshade on the floor near the doorway. (Ex. 6.)

- Various other household items throughout the kitchen and living room areas. (Exs. 5, 6, 7, 8.)

Dr. Crosby's expert report specifically notes that "Leach did not consider or attempt to place any objects between himself and Zyria as a barrier." (Ex. 4 at 5.) The IACP Model Policy on Law Enforcement Interactions with Canines — the recognized professional standard in this field — specifically recommends that officers "[c]onsider the use of any position, location, or physical object that creates a barrier between the officers and the canine" and "[u]tilize commonly available items, such as clipboards, to block or redirect an attack." (Ex. 4 at 10-11.) A vacuum cleaner, a

7

Christmas tree, a broom, a chair — any of these everyday objects would have provided an effective barrier and provided Leach with time and space to deploy one of his less-lethal tools or to retreat. Instead, Leach chose to draw his firearm and discharge it six times.

## VI. LEACH FIRED SIX SHOTS WITHIN ARM'S LENGTH OF A MOTHER HOLDING HER INFANT DAUGHTER

The photographs and video footage confirm what will be evident at trial: Ms. Preston was in the living room holding her one-year-old daughter when Officer Leach discharged his firearm six times. (Ex. 7 (showing Ms. Preston in the living room); Ex. 4, Crosby Report at 4-5, 13.) The body-worn camera footage and crime scene photographs establish that Leach was in very close proximity to Ms. Preston and her child when he fired his weapon. Dr. Crosby opines that "Leach fired without regard for any potential collateral risk to the persons he knew were present, including Officer Ortiz, Preston, her infant child, and the Child Protective Services workers" and that his actions were "unreasonably dangerous, and a violation of good and accepted police practices, which prohibit firing a weapon at a dog while present in an enclosed space like a living room because of the risk that a person will be struck by a bullet." (Ex. 4 at 13-14.)

The Buffalo Police Department's policy on "Vicious, Wild or Rabid Animals" directly addresses this precise scenario. That policy is set forth in Exhibit 2, the BPD Manual of Procedures, Section 10.4(C). Under Section 10.4(C)(1)(b), titled "EXCEPTION," the BPD policy acknowledges that in rare circumstances, "the officer or another person is in the process of being attacked by an animal and is in imminent danger, the officer may discharge his/her firearm to ward off the attack. However even under these circumstances, no officer shall discharge a firearm where the possibility exists that any person will be struck by a bullet as a result." (Ex. 2, BPD Manual of Procedures, § 10.4(C)(1)(b) (emphasis added.)) This language is clear: even if an officer faces

8

imminent danger from an animal, discharging a firearm where any possibility exists of striking a bystander is prohibited.

The City of Rochester has not adopted a comparable policy restricting firearms discharge in the presence of bystanders during animal encounters. The absence of such a policy is itself evidence of the City's deliberate indifference and failure to train officers on this critical matter. However, the BPD policy is relevant here because it reflects the established and recognized professional standard of care in the law enforcement community within the same state. The Supreme Court has recognized that an officer's "compliance or noncompliance with police regulations or departmental policies" is relevant to the reasonableness inquiry under the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 18-19 (1985); see also *Canton v. Harris*, 489 U.S. 378, 388 (1989). The Second Circuit likewise considers departmental policies and professional standards as part of the totality of the circumstances in evaluating whether an officer's conduct was reasonable. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

The BPD policy — from a peer law enforcement department in the same state — demonstrates that a reasonable officer in March 2022 would have known that discharging a firearm in a small apartment with civilians (particularly a small child) in close proximity is objectively unreasonable. Lt. Peter Nigrelli of the Buffalo Police Department testified at his Rule 30(b)(6) deposition that under BPD policy, officers are categorically prohibited from shooting at a dog in a residence where other people, including children, are present, even if the dog has escaped from confinement and is approaching aggressively. (Ex. 3, Nigrelli Dep. at 12-15.) He explained that the policy applies precisely in the scenario at issue here — an incident in a residential setting with civilians present — and that such incidents occur regularly in urban law enforcement without officers resorting to deadly force.

9

**CONCLUSION**

For all of the foregoing reasons, Defendants' motion in limine for qualified immunity should be denied. At minimum, the disputed issues of material fact — including the timing and circumstances of any contact between Zyria and Leach, Leach's knowledge that the dog was in the apartment and the time he had to prepare, the availability and feasibility of less-lethal alternatives such as oleoresin capsicum spray and baton deployment, the availability of household objects that could have been used as barriers, and the reasonableness of discharging a firearm six times in a small apartment occupied by a mother and her one-year-old daughter — must be resolved by a jury.

Dated: New York, New York
March 24, 2026

Respectfully submitted,

ROTH & ROTH LLP

_____/s/_____
Elliot Dolby Shields
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016
(212) 425-1020
eshields@rothandrothlaw.com
Attorneys for Plaintiff

10