UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

-----------------------------------------x

ERIN GURSSLIN,

            Plaintiff,

                          Index No.

     - against -          20-cv-6508

CITY OF ROCHESTER,

            Defendants.

-----------------------------------------x

                       Video Conference

                       November 1, 2022

                       2:36 p.m.

     30(b)(6) DEPOSITION of LIEUTENANT PETER NIGRELLI,

Non-Party Witness, taken by Plaintiff, pursuant to

Article 31 of the Civil Practice Law and Rules of

Testimony, and Order, held at the above-noted time and

place, before Saige M. Porcelli, a Stenotype Reporter

and Notary Public within and for the State of New York.

A P P E A R A N C E S:

ROTH & ROTH, LLP
        Attorneys for Plaintiff
        192 Lexington Avenue - Suite 802
        New York, New York 10016

BY: ELLIOT SHIELDS, ESQ.


CITY OF ROCHESTER
        Attorneys for Defendant
        CITY OF ROCHESTER
        30 Church Street - Room 400A
        Rochester, New York 14614

BY: PEACHIE JONES, ESQ.


CITY OF BUFFALO LAW DEPARTMENT
        Attorneys for Non-Party Witness
        CITY OF BUFFALO
        65 Niagara Square - Room 1101
        Buffalo, New York 14202

BY: WILLIAM MATHEWSON, ESQ.

3

3

F E D E R A L   S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the sealing, filing and certification of the within deposition be waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form, are reserved to the time of trial;

IT IS FURTHER STIPULATED AND AGREED that the transcript of this deposition may be signed before any Notary Public, with the same force and effect as if signed before a clerk or Judge of the Court;

IT IS FURTHER STIPULATED AND AGREED that all rights provided to all parties by the F.R.C.P. cannot be deemed waived, and the appropriate sections of the F.R.C.P. shall be controlling with respect thereto.

oo0oo

4

4

P R O C E E D I N G S

THE REPORTER:  The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that, in lieu of an oath administered in person, I will administer the oath remotely.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.  Please indicate your agreement by stating your name and your agreement on the record.

MR. SHIELDS:  Agreed.

MS. JONES:  Agreed.

MR. MATHEWSON:  Agreed.

LIEUTENANT PETER NIGRELLI, having first been duly sworn by the Notary Public, in and of the State of New York, was examined and testified as follows:

THE COURT REPORTER: Please state your name for the record.

THE WITNESS: Lieutenant Peter Nigrelli.

THE COURT REPORTER: Please state your business address for the record.

THE WITNESS: 68 Court Street, Buffalo, New York 14202.

EXAMINATION BY

MR. SHIELDS:

Q   Good afternoon, Lieutenant. My name is Elliot Shields, I represent a woman whose dog, Nina was shot and killed by Rochester Police Department Officers and I am going to ask you some questions today.

A   Okay.

Q   First, some ground rules for the deposition. Will you tell me if you don't understand any of my questions?

A   Yes.

Q   And will you tell me if any of my questions are confusing?

6

Lieutenant Peter Nigrelli                          6

A   Yes, sir.

Q   Please answer all of my questions verbally, not with a head nod or shake.

A   Yes, sir.

Q   Thank you.  And will you tell me if you don't know the answers to any of my questions too?

A   Yes, sir.

Q   If there's anything that I ask you that you don't understand, please just tell me and I will rephrase the question for you, okay?

A   Yes, sir.

Q   Thank you.  This is a virtual deposition that we are doing today, can you tell me where you are doing the deposition from?

A   Buffalo City Hall, the library room on the 11th floor.

Q   Do you have any documents with you that you plan to use to help refresh your recollection?

A   No, sir.

Q   And what kind of device are you using to do the virtual deposition today?

A   It is a City of Buffalo Dell laptop -- it's Mr. Mathewson's laptop, not the City of Buffalo.

Q   But it has a big enough screen that you will be

7

Lieutenant Peter Nigrelli                        7

able to see documents and read them if I put them up?

A   Yes.

Q   I will start with some background questions.  Can you give me an overview of your education?

A   I went to Bishop Timon High School in the City of Buffalo, I graduated in 1991, I attended Erie Community College in Buffalo, I graduated in 1995, I entered the police academy in July 1997, graduated around Christmas time in 1997 and I have been on the patrol force since January of 1998.

Q   Between graduating from Erie Community College and going to the police academy, did you have any other police related jobs?

A   I worked the summer of 1996 and half of 1997 at the Erie County Holding Center as a per diem deputy jail sheriff.

Q   And can you give me an overview of your history with the Buffalo Police Department, just the positions that you have held within the police department?

A   Yes, police officer until January 26th of 2016 and then I was promoted to a lieutenant, December 29th of 2019, I took over as the SWAT commander.  By civil service, I maintained the rank of patrol lieutenant, but the added responsibilities of the SWAT commander.

8

Lieutenant Peter Nigrelli                          8

Q    When did you join the SWAT team?

A    July of 2014.

Q    Since July of 2014, you have been a member of the SWAT team then?

A    Correct.

Q    Prior to taking over as SWAT commander in December of 2019, did you have any other leadership or supervisory roles with the SWAT team?

A    For just about a year in 2019, I was a team leader amongst the 24 members of the team.  There were two leaders at that point and I was one of the two.

Q    So there were two team leaders, was there a commander at that time or was it two people sharing those responsibilities?

A    There was a commander and the two team leaders.

Q    And those two leaders, do you have the same or different responsibilities?

A    At that point and continuing, they share the same responsibilities.

Q    So it's not like there are two different teams?

A    There's an alpha team, which is 11 members and a bravo team which is 11 members, it's the same exact delineation.

Q    On your SWAT team, do you have an entry team and

9

Lieutenant Peter Nigrelli                    9

a sniper team?

A    On our team, we do have a sniper team, but they are comprised of 24 members, they are not separate.  I know some teams carry a sniper team off to the side of their entry team, but we have a sniper team embedded into our group.

Q    So does that mean that anybody on any given day could be assigned to be a sniper or to the entry team?

A    Including myself, there's 8 snipers of the 24. You have to be certificated to be a sniper, so if there's an incident to come up, I would be the last one to be a sniper, but, yes, if there's an incident, than one of the 7 others would be able to do it.

Q    Okay.  I got a little off track with my background questions.  Have you ever testified under oath before?

A    Yes.

Q    And can you estimate about how many times?

A    25 and a half years, sir, including traffic court incidents in Buffalo, probably 1,000 times.

Q    You have testified in criminal cases, right?

A    Yes.

Q    Have you also testified in any civil cases like this?

10

Lieutenant Peter Nigrelli 10

A  I have been deposed in regard to incidents with the City of Buffalo, yes.

Q  Have you testified only at depositions in civil cases or also in trial?

A  Just deposition purposes.

Q  Have you ever previously testified on behalf of the City of Buffalo as the 30(b)(6) witness as you are here today?

A  No, I have not.

Q  I just want to ask you some questions about what you did to prepare for today's deposition, okay?

A  Okay.

Q  Can you tell me what you did to prepare for your deposition today?

A  Yes.

Q  What was done?

A  No, I just went back to the e-mail chain that started back in the spring of 2022 when I was asked by my command to assist the City of Buffalo with the incident and I wanted to make sure that I was here on time and prepared for the Zoom.

Q  You understand that this is a different kind of deposition than what you have done before, right, since you are testifying on behalf of the City of Buffalo, not

Lieutenant Peter Nigrelli                    11

in your individual capacity?

A   Yes, sir.

Q   You understand that the City of Buffalo designated you to testify about all of the topics that were listed in the notice of deposition or in the subpoena?

A   Yes.

Q   Have you reviewed that subpoena and the topics listed in the subpoena?

A   I reviewed it, but not very recently.

Q   I am going to make that Exhibit 1 and go over the topics with you, okay?

A   Okay.

(Plaintiff's Exhibit 1, Subpoena, marked for identification.)

Q   Do you see in this first paragraph here where it says, "you are commanded" -- and we will fast forward to the end, "for consent to testify on your behalf about these matters", do you see that part?

A   Yes.

Q   And so you have consented since you're sitting here today to testify on behalf of the City of Buffalo?

A   Yes, sir.

Q   And when the City of Buffalo reached out to you,

12

Lieutenant Peter Nigrelli                          12

they forwarded you a copy of the subpoena?

A   Yes, sir.

Q   And did you read through all of these four topics listed on the second page?

A   Yes, I went over those.

Q   And so before you got here today, can you tell me everything that you did to prepare to testify about topic number one, which states, "all rules, trainings, policies, regulations, procedures, practices in effect followed between January 1, 2011 and present regarding interactions with K9s, pet dogs, aggressive animals during law enforcement activities"?

A   Departmentally, sir, in my current assignment with the SWAT team and then to a lesser degree to what I do with patrol, since I took over the team in 2019 going onto 2020, I am not on the patrol aspect anymore, but I can tell you as far as our training and stuff for the tactical team, I went over that again.  The stuff that we do is very simple.

Q   So my question is, since it's not you coming here to testify in a case where, for example, you are being sued individually about an incident, but since you are being deposed on behalf of the City of Buffalo, pursuant to Rule 30(b)(6), did anyone from the City of Buffalo

13

Lieutenant Peter Nigrelli 13

sit down with you and prepare you to testify about those things that are listed in that first paragraph?

A No.

Q So basically you didn't do anything to prepare to testify about those things listed in that paragraph?

A Correct.

Q How about paragraph two, the total number of officer involved dog shootings per year since January 1, 2011 to present, can you tell me everything you did to prepare to testify about that?

A That would be off of my knowledge from what I can recall from it, nothing jumped out at me departmentally.

Q So nobody from the City of Buffalo sat down with you, gave you any documents, had you review any lists of officer involved shootings since January 1, 2011?

A Correct.

Q So basically, no one from the City of Buffalo prepared you to testify about the topics listed in paragraph two?

A Correct.

Q How about paragraph three, which says, "all topics discussed in the news article as training expands, BPD shoots fewer dogs" and that's dated November 14th, 2017. Did you do anything to testify

14

Lieutenant Peter Nigrelli 14

about what the information in that article was?

A  I may have pulled up the article upon notice, but we didn't sit down or review this and have a conference about it.

Q  You didn't speak to anyone at the City of Buffalo about testifying about that article?

A  Correct.

Q  And the same one with the fourth topic, this other article, which is an earlier article entitled, "dog shootings by Buffalo PD dropped since WGRZ story", which is dated May 19th, 2015?

A  Correct.

Q  So I am going to ask you as many questions as we can get through, see what information that you may know.

A  Okay.

MR. SHIELDS:  Will, if he can't testify about some of these topics, we're going to have to call him back and the City of Buffalo may have to pay for that because under Rule 30(b)(6), you guys have the duty to prepare your witness to come and testify.

MR. MATHEWSON:  I think there may be some confusion because we did prepare, he has seen the documents that I sent to you.  I didn't tell him

15

Lieutenant Peter Nigrelli                    15

what to say, but I think he's ready to testify. I don't think he's going to remember anything after a discussion with me.

MR. SHIELDS:  One of the important things is going to be, for example, if he can't go through the number of dogs that were shot every year from 2011 until now, how it's increased and decreased, that's an important topic that I want to discuss with him and if you guys didn't prepare to discuss that, we're going to have to come back and do that on another day.

MR. MATHEWSON:  He's prepared, but we don't have a document showing that, so he would have nothing to review.  It would just be based on his knowledge from 25 years on the force.

MR. SHIELDS:  One of the WGRZ stories say that they foil requested that specific information, it was provided to them, they know exactly how many dog shootings took place on various years, how it decreased in response to different training that was implemented and that's really the heart of what I want to talk about.  So you guys have the information, you gave it to the news.

16

Lieutenant Peter Nigrelli                    16

I am going to ask him as many questions as I can, but at this point, since you didn't sit down and discuss the specific information listed in the subpoena, I think we are going to probably have to do this all over again.  I won't sit and ask the same questions the second time around, but I would rather just ask as many questions as I can today, see what he knows and then reconvene and ask the questions that were listed in the subpoena at a later time instead of just busting it now and coming back at a different time since he took the time off from work to be here today.  Does that sound like a plan, Will?

MR. MATHEWSON:  This is our best guy to testify about what has happened over the past two decades in training, we have had other people at the city who are no longer here, so this is who we would provide and I am not aware of any documents that we would review to change his testimony from today to a different day, but we can give it a shot.

MR. SHIELDS:  Just the last point on this and then we can move onto the questions, the city has a duty to gather information and provide it

17

Lieutenant Peter Nigrelli                        17

to the lieutenant prior to him showing up to testify on behalf of the city.

MR. MATHEWSON:  Yeah, he reviewed everything that we sent you in response to the subpoena.

MR. SHIELDS:  You should have told me before we sat down that you don't have information about the number of dogs that were shot in 2011, that's a really important thing that I need to talk to him about.

The City of Rochester has it, they produced it to me as part of this litigation from what the City of Rochester has done and obviously the City of Buffalo has it, you have firearm discharge reports, that's what it says in the WGRZ story. That's the type of stuff that you guys have to go through.  Anyway, I don't want to fight with you about this.

MR. MATHEWSON:  I thought we were good on paper discovery, I didn't realize that you had any outstanding requests.

MR. SHIELDS:  You are supposed to say that you object to this category because you don't have it or whatever, but that didn't happen, so anyway, let's move on.  He's been there for 25

18

Lieutenant Peter Nigrelli                    18

years, he's obviously a very knowledgeable

witness.

We'll make this Plaintiff's 2 and this is the

Buffalo Police Department training class report

for police and dog encounters.

(Plaintiff's Exhibit 2, Document, marked for

identification.)

Q   Lieutenant, do you see the document on the screen
that says, "Buffalo PD training class report for police
and dog encounters" at the top?

A   Yes, sir.

Q   Have you seen this document before today?

A   I can tell you that it's a regular Buffalo Police
file of a training class that we attended.

Q   So this is a document kept in the ordinary course
of business by the City of Buffalo?

A   Yes, sir.

Q   It contains the name, rank, assignment and date
for every individual that took this training; is that
right?

A   Yes.

Q   It's an ordinary document that is kept for every
type of training that Buffalo Police Officers have to
take?

19

Lieutenant Peter Nigrelli                                    19

A    Yes, underneath where it says Buffalo PD, the title of the training would change, but the form itself would stay the same.

Q    On this first page here, if we look down, it looks like it's sorted by rank, right?

A    Yes.

Q    So first we have lieutenants.

A    The lieutenants are listed in alphabetical order and than by rank, I should say.

Q    Is this you right here, Lieutenant Nigrelli, Peter C?

A    Yes, sir.

Q    It says that you took this class on January 27th, 2017, right?

A    Yes, sir.

Q    Is that the only time that you have taken this police and dog encounters dog training class?

A    Yes, sir.

Q    Was this a one time training that every officer in the City of Buffalo Police Department had to take or something else?

A    It was a one time in-service training in relation to the police dog encounters class.

Q    Can you tell me everything that you remember

20

Lieutenant Peter Nigrelli                    20

about the training?

A    Most of our trainings that are conducted are conducted at the training academy and they are classroom style with video presentation, power point and discussion.

Q    I do appreciate the general overview of training. Do you remember anything specific about this training?

A    Thinking back, nothing comes back on topic on it.

Q    And part of that would be because no one from the City of Buffalo sat down with you before today and went over any of the specifics regarding this training, right?

A    I wouldn't say that, sir.

Q    Well, prior to today, you didn't go back and review any of the in class training presentation materials from this training, correct?

A    Correct.

Q    You said that the in class training would consist of power points and videos; is that fair?

A    Yes.

Q    Anything else that it would usually consist of?

A    No.  A training like this would be done in the classroom and that would be it.

Q    Do you remember if you watched any videos

21

Lieutenant Peter Nigrelli                          21

specifically related to police and dog encounter
training?

A    I don't recall.

Q    Do you recall at any point during your time with
the Buffalo Police Department when dog encounter
training changed?

A    This was the first dog encounter training that I
recall having.

Q    In 2017?

A    Yes, sir.

Q    Do you know why the training changed for you in
2017?

A    I don't want to speculate, but I believe that the
atmosphere around dogs being discharged, dispatched upon
entries from the SWAT team was an issue locally and our
team at the time started changing some of our methods of
what we would do, so I am guessing that may have been
the reason why, sir, why this was brought forward and
pushed forward.

Q    But you don't remember specifically?

A    Correct.

Q    There's different dates and different years that
people took the training, correct?

A    Yes, sir.

22

Lieutenant Peter Nigrelli                                22

Q   It looks like the training was implemented at least in 2014, right, because that's when John Beyer took it?

A   Yes, sir, by looking at the dates, Lieutenant Beyer would have been one of the first ones who took it in 2014.

Q   Do you know why or do you have any recollection of anything that happened in 2014 that might have been the reason for any change in training?

A   No, sir.

Q   And do you have any idea what the effect of the new training was?

A   Because I wear the two hats from the patrol and tactical side, I would say that the news article that you referred to from WGRZ, it's kind of on the not misinformation side, but a lot of the dogs that were shot prior would have been upon narcotic search warrants or SWAT entries, not so much from a patrol aspect.

So I think with the training and the patrol officers becoming aware of other things that were pushed out for liability sake and the things that go with training, that may have changed some of the tactics of the patrol officer standpoint.

Q   After the training was implemented, were less

23

Lieutenant Peter Nigrelli                                    23

dogs shot in Buffalo?

A    Patrol wise, the amount of dogs get shot patrol wise in the city and I still keep track of department memos and things that come across, we don't have many dogs getting shot in the city and I can tell you as the SWAT end of it, from our entries, since I took over, we have shot one dog in almost three full years.

Q    And can you tell me if that was less dogs that were shot than prior to this training being implemented in 2014?

A    Yes, absolutely.

Q    So it sounds like since the training was implemented, less dogs were shot in Buffalo?

A    Yes, sir.

Q    And, Lieutenant, do you remember anything specific about the training, for example, if it was developed by the City of Buffalo or some other police agency?

A    I don't recall if it was a City of Buffalo training or if they re-sourced it out.

Q    But if you had reviewed the training materials, that would have been something that could have refreshed your recollection about that?

A    It may have.

24

Lieutenant Peter Nigrelli                    24

(Plaintiff's Exhibit 3, Document, marked for identification.)

Q    Lieutenant, do you recognize this document, which at the top says, "10.0 incidents involving animals"?

A    Yes, that's from our Buffalo Police manual of procedure.

Q    Is that like a book of all of the policies and procedures for the City of Buffalo Police Departments?

A    Yes, sir.

Q    Did you review this document prior to coming in and preparing to testify today?

A    I reviewed this for SWAT purposes, so we go over this routinely because like I said, with our tactics, we have totally changed how we work as far as dealing with dogs, so we will go over this time and time with regard to animal bite cases, but in regards to dealing with animals.

Q    You changed how you deal with dogs; is that what you just said?

A    Yes, we started in 2020 -- before I took over, it was changed how we went over our process in technical operations when dealing with dogs.

Q    At first you said in 2020 and then you said before you took over, so you took over in 2019, so it

25

Lieutenant Peter Nigrelli                    25

would have been before 2019?

A   Yes, the previous commander implemented how we do things and I have continued it and we have changed it to ensure as best as possible, the dog's safety.

Q   And the previous commander was Vernon Beaty?

A   Vernon was commander until December of 2016 and then from 2017 to 2019 was Cedric Holloway.

Q   Were these changes begun under Beaty or Holloway?

A   I believe it was at the end of Officer Beaty's term as the SWAT commander, it started and then Holloway continued it until I took over.

Q   You said Beaty was commander until 2016; is that right?

A   Yes, he retired New Years Eve of 2016.

Q   And so these changes with SWAT began you think around 2016?

A   Yes, sir.

Q   Now, are you sure about that or is that based off of your memory?

A   As far as just changing our method?

Q   As far the date when the method changed.

A   Beaty was still the commander, but when it went under full change, it was Detective Holloway.

Q   So my question about dates comes from the fact

26

Lieutenant Peter Nigrelli                              26

that the news stories that I will put up next quote 2014 as the date when things began to change, could it have been earlier, could it have been 2014?

A   I don't believe so because I started on the team in July of 2014, so I don't believe that to be accurate.

Q   Do you have any idea how many dogs were shot by the SWAT team during your first year in the SWAT team?

A   I don't know the number, but it wasn't uncommon for it happen.

Q   How about 2015, did anything change?

A   It would have been around the same number.

Q   2016, do you think it started to change if the policies were implemented?

A   There were a difference in numbers in 2016.

Q   It went down in 2016?

A   Yes, sir.

Q   I am going to have the same questions for 2017 to present.  Are there any years that jump out to you or was the trend that it continued to go down from 2017 to present?

A   It would have been a downward trend continuing from 2017.

Q   Were there more dogs shot in 2017 and 2018 then there were from 2019 to present?

27

Lieutenant Peter Nigrelli                           27

A    Yes, sir.

Q    Because you said from 2019 to present, there has only been one, correct?

A    There was one that was less lethal and one was lethal, so two dogs.

Q    2019 to present, one dog was shot with a firearm and one dog was shot with a beanbag or something?

A    Correct, sir.

Q    The dog that was shot with the beanbag, do you know if that dog survived or if it died?

A    That dog died the night of the search warrant.

Q    The beanbag gun, is that a shotgun that's fitted to fire beanbag rounds?

A    Correct.

Q    Is that a common weapon that SWAT uses during search warrant executions?

A    Yes, sir.  We have I believe at least six of those weapons on the SWAT team, we carry two of those on entry, so if there are two entry doors to a house, going through each door there's one of those less lethal items.

Q    Do you carry those weapons because they are less lethal, generally, than an ordinary firearm?

A    Yes, sir.

28

Lieutenant Peter Nigrelli                    28

Q    But they do have the potential to be deadly, correct?

A    Yes.

Q    When did the SWAT team begin carrying those beanbag guns?

A    Fall of 2020 and then we implemented an in-service training for the team so each member could be qualified to carry that for SWAT purposes.

Q    Was that to reduce the number of dogs that were shot and killed or in general to reduce the harm of people and dogs?

A    Both persons and dogs.

Q    Are there any other weapons or technology that the SWAT carries that could be used as a less lethal form of controlling a dog?

A    The SWAT team carries, each member has pepper spray, we have members on the team that carry the less lethal TASERS, we have not used pepper spray or TASERS on dogs, those things, if need be, could be used. Obviously pepper sprays are carried by mail persons throughout the country and those carriers have deployed pepper sprays on dogs, but we have not.

The one item that we do carry, sir, we have a couple of them and they are the dog snares.  It's a long

29

Lieutenant Peter Nigrelli                    29

pole and it has the cable at the end of it, so you can get the dog's head and secure it and escort the dog to where you want to, whether it's in the bathroom or have a SWAT officer take the dog and hold onto it, that seems to be an item and tool that we use that works out pretty good.

Q   Not every member of the entry team would carry a catcher pole or snare, correct?

A   Correct, we would have one assigned to two entry points, each entry team would have one assigned to them.

Q   So each entry team has one catch pole or snare for every entry?

A   Yes, sir.

Q   Is there a written policy for the SWAT team that requires that?

A   No, that was a tool that was afforded to us and we now have at least three of them.

Q   I guess what I am saying is you said that you have three of them, let's say that you have three of them, but you need to execute a warrant, would it be a violation of Buffalo Police Department to execute a warrant without a catch pole?

A   If the devices were non-useable, I would call for the city animal control officer to come out with us and

30

Lieutenant Peter Nigrelli                    30

we have done this where we know we are going to houses

with multiple dogs and they bring the big trucks.  I

would make every means possible to have that happen.

Q   So you're saying if I understand you correctly

that you wouldn't under any circumstance execute a

warrant without having a catch pole available?

A   Correct.

Q   And would that be whether or not you know for a

fact that there's a dog in the location where you're

executing the search warrant?

A   Yes, it's a tool that we take out with us on

everything that we do.  When we do a community event and

show the tools, it's one of the tools that is secured to

our vehicle and people ask us all the time what it's

for.

Q   Did you start using the catch poles before or

after you took over as the commander?

A   It was before me, it was under Detective Beaty

and then Holloway and then to my leadership.

Q   When that policy started, did the number of dogs

that were shot and killed go down?

A   Dramatically.

Q   Before you execute a search warrant at a

location, do you do any kind of information gathering to

31

Lieutenant Peter Nigrelli                                    31

determine whether or not there is in fact a dog that resides at that residence?

A   Yes, sir.

Q   Can you tell me what that would consist of generally?

A   The different units in the department that we do work for, I would get the information from the detective or the lead officer of the case and one of the first questions that I ask outside of the threats of the search warrants would be are there cameras in the house, Ring doorbells, barricades, dogs or animals on site for that matter and then besides that, when we do our own visible recognizance of the structure, that's one of the things that we look for and then there are times where we are able to put up a drone device to get a better look of the structure and it's another way to look at it.

Q   So before you execute a search warrant, just to summarize your testimony, there's multiple different things that you do to determine whether or not there's a dog on site and other hazards that you could encounter?

A   Correct.

Q   Including a drone?

A   Yes.

32

Lieutenant Peter Nigrelli                    32

Q    The use of the drone is more recent, right?

A    Yes, sir.

Q    When you say visible recognizance, does that mean someone stakes out the residence and looks and watches people enter and leave?

A    It could be surveillance from a fixed position, it could be walking by the structure, driving by the structure, getting as close as possible to get the information that we are looking for.

Q    Some of the information that you're looking for includes whether or not there's a dog that resides there, right?

A    Yes.

Q    It's something that you require your officers to figure out before you execute a search warrant?

A    Yes.

Q    Getting back to the document that we marked as Exhibit 3, in general, can you tell me what this document says about whether or not Buffalo Police Department Officers are able to shoot a dog?

A    The portion showing at 10.0, for incidents involving animals, it gives the policy, it shows animal bite cases, it shows response required and the last thing on my screen is "members of the police department

33

Lieutenant Peter Nigrelli                                33

will cooperate fully with personnel of the health departments" and then it goes under dog control violation summons, which number two it states, "if firearm is used, it shall be reported via blue team."

Q   Does this look like to you that it's a full document or that it might be missing a page between 10.3 and then it skips to 10.5?

A   It looks like it might be out of order.

Q   This 10.3 looks different than the 10.3 above; is that right?

A   Yes, this is the first time that I am seeing this screen.

Q   From your knowledge of this specific police department policy, do you know if this contains any specific guidance about whether or not officers are allowed to discharge their firearms at dogs?

A   At the bottom it starts covering what the supervisor's role would be.

Q   That would be under 10.4C; is that what you're referring to?

A   Yes, sir.

Q   So you're saying the supervisor shall take whatever action is necessary to minimize danger to the officers and to the public?

34

Lieutenant Peter Nigrelli                           34

A   Yes, sir.

Q   Would it be fair to say that this document states that the only time an officer can fire their weapon without supervisor approval at a dog is to ward off an attack; is that fair to say?

A   Yes, sir.

Q   But at the same time, they have to ensure that there's no possibility that a stray bullet can strike a person?

A   Yes, sir.

Q   Let's say there's a circumstance where there's a dog running at an officer, but there are people in that same room or yard where the officer is being charged by a dog, would it be a violation of policy for the officer to discharge a firearm in that circumstance?

A   If there are persons nearby, it's close to the MOP, but how you're describing it, it would be a violation of the policy.

Q   Let's say it's a backyard and there are two officers in the backyard and the owner enters the backyard with the dog, the dog sees the officers and runs at them and the officers discharge their firearm and the owner of the dog is downrange from the direction where they are shooting at the dog, would that be a

35

Lieutenant Peter Nigrelli                     35

violation of the Buffalo Police Department policy?

A    Under 10.4C 1B, that would be a violation under the policy.

Q    Let's say officers are inside of a house or an apartment and the dog had been put into a bathroom and officers are speaking with the person in the apartment trying to get them to voluntarily leave for an arrest and while they are speaking to that person, the dog escapes the bathroom and the officers fire the weapon while inside of the house with the person there, under this policy would that be a violation?

A    The description that you just gave, sir, yes.

Q    The reason is because it's unsafe, right, because someone can potentially be shot; is fair to say?

A    Yes, any time that we fire our weapon, we are responsible for that round, no matter what.

Q    You agree that officers are never allowed to unnecessarily endanger members of the public?

A    Correct.

Q    If there are two choices that can be made, the officer always has to choose the safer option?

A    Correct.

Q    Are there any other portions of this specific policy regarding discharging a firearm at a dog?

36

Lieutenant Peter Nigrelli                    36

A    I believe it's all covered up to this point.

Q    "If a firearm is used, it shall be reported via blue team", can you tell me what blue team is?

A    The reporting system that we use for all use of force incidents of the City of Buffalo Police Department.

(Plaintiff's Exhibit 4, Article, marked for identification.)

Q    I am going to put up Exhibit 4 and then ask you some questions about that.

A    Okay.

Q    Can you see that article on your screen, sir?

A    Yes.

Q    I will have you read the entire article.

A    Okay.

Q    This article is dated November 14th, 2017; is that right?

A    Yes.

Q    One thing the article said is that members of the narcotics and members of the SWAT team receive extensive aggressive animal training, is there any additional training that the SWAT team receives other than what we spoke about regarding aggressive animals?

A    We have a couple of different methods when we are

Lieutenant Peter Nigrelli                                37

working in a training environment and normally we work out of a closed down school or old buildings and we have training targets that are dogs and we refer to those as a shoot, no shoot type of target. If it's an aggressive posture, we will give a scenario of what the team can use. Even in the training environment, sir, we will have the dog snare at the training and the officer will call and say they need the snare and they will simulate using the snare on the paper target.

Q   Do you ever train with real dogs?

A   No, we don't.

Q   Do you use any simulation based training?

A   As of yet, we have not used it for our team, but there is.

Q   So you don't use any simulation training whatsoever for the SWAT team?

A   Correct.

Q   Do you know what kind of training simulator the Buffalo Police Department has?

A   I do not.

Q   When it comes to training for the police department, is that done in house or is there one training center for all police departments?

A   The Buffalo Police Department has their own

38

Lieutenant Peter Nigrelli 38

training academy and staff, but we also do partake in trainings bridged out by Erie County.

Q For example, with the police academy, are Buffalo Police Officers trained only with other Buffalo Police Department Officers or do they go to the training academy with other officers from other departments?

A We send our recruits to the county academy.

Q But then after the academy, if you have your own in-service training, that's done at your own training center, at the Buffalo Police Department?

A Yes.

Q Do you know what simulator the Buffalo Police Department has?

A No, it's assigned to the range.

Q Is it at the shoot range?

A The police range falls at the academy and their office is at 68 Court Street, yes.

Q Have you used the simulator?

A Not the current one, but the previous one.

Q What would you do on the simulator?

A It was utilized for shoot, no shoot scenarios, weapon discipline.

Q Were there any types of scenarios that didn't involve the use of a firearm that you used the simulator

39

Lieutenant Peter Nigrelli                        39

for?

A    Not in that simulator, sir.

Q    Do you know if they are in the new simulator?

A    I am not aware.

Q    For example, you don't know if there's deescalation training that doesn't involve use of a weapon?

A    I am not aware.

Q    Do you have any idea if it involves shoot, no shoot scenarios involving a dog?

A    I don't.

Q    You described with the training for the SWAT team in the closed down school building, one thing you look for is aggressive posture with the dog; is that right?

A    Yes, a couple of the paper targets or metal targets, it appears where the dog is charging at an aggressive manner and there's other targets where the dog is sitting in a less aggressive manner.

Q    And you said since 2019, there have been no dogs that were shot, but during the training, are those postures indicative of different scenarios where officers would be permitted to shoot a dog?

A    Yes, based on the scenarios that we give, they could fire a round at the dog.

40

Lieutenant Peter Nigrelli                    40

Q    Just to back up for a second, the prior policy that prohibits firing a weapon at a dog except when it's charging at you, but it still prohibits shooting a dog if there's a person in the room that can be hit, does that apply to the SWAT team also?

A    Yes.

Q    In determining whether a dog has an aggressive posture, how do officers know, is there any training that you received about dog behavior and whether or not you can recognize the dog's posture as being aggressive?

A    Not through training.  I take a very apprehensive approach to any dog, so I would treat any dog, be weary because you might get bit.  It's also good to ask someone before you pet someone's dog.

Q    The article states, "recruits in the academy also receive aggressive animal encounter as they embark on their new careers, for example, they watch videos derived by the US Department of Justice about how to read a dog's body language and other "use of force" considerations.  The training took effect in late 2014 as 2 On Your Side has previously reported", do you remember ever taking that training that is referenced in that paragraph?

A    I don't.  I am not sure if it's the Erie County

41

Lieutenant Peter Nigrelli                              41

academy or when they graduate and come back to Buffalo

before they go on the street.

Q   Do you know if the training received in the

academy would be different than what you took previously

in 2017 and that all members of the Buffalo Police

Department had to take?

A   If this was provided by the department, from

reading this again, it sounds like it might be from Erie

County, but I am not aware.

Q   Do you think it's possible that the training that

you received might have included those videos that are

referenced there?

A   It could have been, sir.

Q   I just want to know if you have any independent

recollection of these videos, so I am going to play one

of these Department of Justice videos and see if it

refreshes your recollection of if you've ever seen it

before, okay?

A   Okay.

Q   On the top it says "police dog encounters, an

overview, assessing the situation".

A   Yes, sir.

        MR. SHIELDS:   I'm going to play the video.

        At the bottom it says, "COPS, community oriented

42

Lieutenant Peter Nigrelli                    42

policing services, U.S. Department of Justice. This video was developed and funded by the National K9 Research Counsel and Safe Humane Chicago and with their permission, is being made available by the U.S. Department of Justice, office of community oriented police and services as a resource for law enforcement agencies nationwide".  I don't need to read the rest of it.

Q    Just looking at that first screen, does this look like a video that you may have seen before?

A    It doesn't ring a bell.

Q    Would it be fair to say that 34 seconds into the video, what we see is a Chicago Police Department vehicle stopping on the street and officers exiting the vehicle?

A    Yes, sir.

MR. SHIELDS:  For the record, the video is 10 minutes and 6 seconds long.

Q    It is fair to say that they are approaching a fenced in yard at a house at 43 seconds?

A    Yes, sir.

Q    One minute and 33 seconds into this video, after watching that beginning portion of the video, does that

43

Lieutenant Peter Nigrelli                    43

refresh your recollection if you have seen this video?

A    I have seen this video, yes.

Q    Can you tell us when you saw this video, if you remember?

A    I believe this is the video from the training provided by the department because I remember the circumstance of the officers pulling up and I remember the officers exiting their vehicle, putting their hats on and opening the gated fence.

Q    I am going to represent to you that this video is one video in a series of five videos that were put out by the U.S. Department of Justice.  Do you have any recollection if at your training, you also watched the other four videos in the series?

A    I don't recall.

Q    Do you remember if you watched more than one video or if it was just that one?

A    I don't recall.

Q    I am going to play the other four videos, okay?

A    Okay.

       MR. SHIELDS:  For the record, the second video is for 10 minutes and 12 seconds in length.

Q    If it starts to play and I haven't paused it, you can say that you recognize the video, if that's the

44

Lieutenant Peter Nigrelli                    44

case, okay?

A    Okay.

MR. SHIELDS:  For the record, when we hit play and pause three seconds into the video, it has the same initial screen that states, "COPS community oriented policing services" and has the same paragraph as the first video which starts with, "this video was developed and funded by the National K9 Research Counsel and Safe Humane Chicago and with their permission, is being made available by the U.S. Department of Justice office of community oriented police and services as a resource for law enforcement agencies nationwide".  I don't need to read the rest of it.

Q    Just looking at the first screen, does this look like a video that you might have seen before?

A    It doesn't ring a bell.

Q    Okay.  I'm going to hit play so we can watch it for a minute or two.

A    Yes, sir.

Q    Do you recognize that video at all?

A    I do, but I can't say 100 percent that this was from the training or if I had seen this separately in

45

Lieutenant Peter Nigrelli                          45

another atmosphere.

Q   So you have seen it at some point?

A   Yes, I remember the officers that they interviewed.

Q   It could have been at that training or somewhere else?

A   At some point along through work, yes.

Q   It would have been a video that you watched with the Buffalo Police Department?

A   Correct.

Q   It would have either been at that 2017 training or a different training?

A   Yes, sir.

Q   When you do a training like that generally, are there records that the Buffalo Police Department would keep about what videos would be shown at the training and other materials used at the training?

A   Yes, I believe the academy keeps a file of what training they -- what was put out and what resources they used to service the training.

Q   So we should be able to get the records that were used at the training that you received in 2017, correct?

A   Yes, sir.

Q   So we don't have to guess here, we can figure it

Lieutenant Peter Nigrelli                        46

out by getting records that will show whether or not you saw that video at that training or some other training, correct?

A   Correct.

MR. MATHEWSON:  I believe he testified that he believes so.

MR. SHIELDS:  I see what you did there, Will.  I will follow-up with you in writing, Will, about trying to get records regarding what videos and other materials were shown in that training.

MS. JONES:  Elliot, I will say, I am agreeing with Mr. Mathewson.  I think you are misconstruing his original testimony and you kind of led him down to testifying that it was somehow at a training or another training.  That's not where he started from.

MR. SHIELDS:  He has his own attorney that can represent him perfectly well at this deposition, Peachie, so I object to you making objections.

MS. JONES:  Thank you for objecting to my objection, I still object.

Q   For the record, am I right that you said that you

47

Lieutenant Peter Nigrelli                    47

viewed that video at some point during your time with the BPD?

A   Yes, sir.

Q   And it could have been at that 2017 training or something else?

A   Yes, sir.

Q   Since we are unsure if we can get videos or records, I will do the same thing with the other three videos.  This one is a total of ten minutes and 11 seconds long.

A   Okay.

Q   Do you see the black screen?

A   Yes, sir.

MR. SHIELDS:  For the record, first screen is the same as the other two videos.

Q   The second screen which came up about 11 seconds into the video, it says, "legal considerations, liability reporting and documentation", correct, Lieutenant?

A   Yes, sir.

Q   I am going to pause 1 minute and 29 seconds into that video.  Do you recognize that video as a video that you have seen before?

A   Yes, sir.

48

Lieutenant Peter Nigrelli                    48

Q   Do you have a recollection of where you have previously watched that video?

A   I recognize it, I am not sure if it was from the January of 2017 training, but I have seen that within the last 25 years of working.

Q   So you have seen it at some point with your time at the Buffalo Police Department?

A   Yes, sir.

MR. SHIELDS:  This fourth video is a total of 10 minutes and 10 seconds in length.

Q   For the record, this first screen is the same as the prior three videos.  The second screen is the same other than the title in the middle, which says, "tactical considerations", correct, Lieutenant?

A   Correct.

Q   Is this a video that you recognize as having seen?

A   Yes, sir.

Q   Do you remember if it was part of that 2017 training or something else?

A   I don't recall if it was the 2017 training or a different one, but I saw it.

Q   In that scene that was just depicted on the screen and the dog approaching the officers, according

49

Lieutenant Peter Nigrelli                                    49

to BPD, would they have been permitted to shoot that dog?

A    In that short clip that we saw that the dog was off to the left side corner, correct?

Q    Correct.

A    In that instance, no.

Q    Can you say why?

A    From that short clip of the video, the dog comes out from the side room and the dog didn't go charging after the officers, I get it's a staged video, but they have to do the best that they can do, that in my opinion of the implementation, that would not have been a good shot of a dog.

Q    Because it would have been unnecessary to shoot a dog in that instance?

A    Correct.

Q    It would have been unnecessary because the officers wouldn't have been in fear of their lives?

A    Correct.

Q    Okay.  One more video, do you see the black screen?

A    Yes.

Q    The first screen is the same with the policing services, paragraph and the second screen is the same

50

Lieutenant Peter Nigrelli                                    50

and it says, "use of force considerations", correct,

Lieutenant?

A   Yes, sir.

Q   Is this a video that you recognize?

A   Yes.

Q   Do you remember if it's a video that you watched

at the 2017 training or not?

A   I am not sure if it's from 2017, but I have seen

the video.

Q   You have seen the video at your work with the

Buffalo Police Department?

A   Correct.

Q   Other than that 2017 training, do you have a

specific recollection of other trainings involving dog

encounters where you might have watched those videos?

A   I am not sure if somewhere along the lines there

was another training that we went to, but it could have

been the 2017 training, sir.

Q   Do you know if there's any kind of required

annual training about dog encounters?

A   Not to my knowledge.

Q   Other than the prior document that we looked at,

which was entitled the MOP Section 10; is that right?

A   Yes.

51

Lieutenant Peter Nigrelli                    51

Q   Are you aware of any other policies or procedures other than that document of the Buffalo Police Department regarding discharge of a firearm at the dog?

A   It would be in the manual procedures.

Q   If it existed?

A   Yes.

Q   Are there any other written policies or procedures of the BPD, other than what's contained in the MOP?

A   The training guidelines, MOP, that's where everything is listed.

Q   The first portion of what you just said, the training guidelines, that's contained within the MOP?

A   Any training orders or updates departmentally in the MOP would be consistent with your question.

Q   It's all contained in the MOP or there might be stuff in another place?

A   There's manual procedures and training updates that we have also.

Q   If there's a training update in the middle of the year, that would be appended to the back or something and then there would be a new complete version that would include that later?

A   It would be a general order and those are set out

Lieutenant Peter Nigrelli                          52

for department numbers to review.

Q    At a later date, is the MOP updated?

A    The MOP gets revised or updated from time to time.

Q    If you're looking for procedures, you have to look at MOP and then the updates?

A    Yes.

MR. MATHEWSON:  Do you know whether those orders are included in the revised MOP annually?

THE WITNESS:  Normally, they would be included, but there are also general orders, which are available to all members.

(Plaintiff's Exhibit 5, Article, marked for identification.)

Q    Lieutenant, do you see that article on your screen?

A    Yes, sir.

Q    I am going to scroll down and let you read the article and you let me know when you're ready for me to scroll up.

A    Okay.

Q    "Buffalo Police have shot 112 dogs since 2011, the incidents have declined since the department implemented new training", that was an accurate read,

53

Lieutenant Peter Nigrelli                                    53

right, Lieutenant?

A    Yes.

Q    The article is dated May 19th, 2015; is that right?

A    Yes.

Q    Did you read that report before today, I mean, have you read this news article?

A    I read the news article, I am aware of it.

Q    And in general, do you agree with what is said in the article, is there any misstatement or fact?

A    No because it seems that they are quoting department records for this news article, so in relation to information that they are siting for BPD, it looks like they are going off of records that were filed.

Q    It says that in this article that the number of dogs that were shot by police immediately dropped; is that fair to say?

A    Yes, sir.

Q    That would be immediately dropped after this new training was implemented in 2014?

A    Yes.

Q    It said between January 1, 2011 and September of 2014, one officer had shot 26 dogs, did you read that part?

54

Lieutenant Peter Nigrelli                                54

A    Yes.

Q    Do you know who that officer was?

A    I don't, but it's possible that that was an officer that worked in the narcotics unit, which at the time used to perform their own warrant service unless it was a high risk elevation and then SWAT would have done it.

Q    Are you thinking of a specific officer or those units because they would have encountered dogs more often?

A    That was not a street patrol officer, I can tell you that.  Someone with that many discharges, it would have been someone from narcotics or someone from the SWAT team, but I don't have a name for that officer.

Q    But now, any search warrants are executed by the SWAT team and not narcotics?

A    Correct.

Q    Do you know why that change was made?

A    The reasons why the department went the angle of using the tactical team, it has to do with a lot of the incidents that happened local and national with search warrants, which unfortunately, there were some incidents that were negative nationwide, so the idea is having 24 members who are the most highly trained in the

55

Lieutenant Peter Nigrelli                          55

department.

Q    That's 2020, so before 2020, do you know if the narcotics team when they were still executing warrants, if the number of dogs that they shot also dropped?

A    I don't recall their numbers, but they were still serving their own search warrants up until about April of 2020.

Q    Going back to the training that you took in January of 2017, do you know if that was a training that every officer in the entire department was required to take?

A    That would have been something to start with the patrol division would have been mandated, but yes, everyone from the department.

MR. SHIELDS:  Can we take a five-minute bathroom break?

MR. MATHEWSON:  Sure.

(A recess was taken.)

Q    Lieutenant, did you know an officer named Brendan Kiefer?

A    Yes.

Q    Did you work with Officer Kiefer in the SWAT team?

A    Yes.

56

Lieutenant Peter Nigrelli                         56

Q    There were a few incidents where Officer Kiefer had shot dogs, were you aware of that?

A    Yes.

Q    Were you aware of a lawsuit called Brook Thurber against the City of Buffalo where he was sued for a dog related shooting incident?

A    I don't recall the name of the person suing the city, but I knew the attorney.

Q    That attorney is Matthew Albert?

A    Yes, sir.

Q    Do you know what the impacts were of the city?

A    I think some of the media attention may have steered the department and the city towards modifications of the training.

Q    So the lawsuits led to media attention; is that fair to say?

A    Yes, sir.

Q    And the media attention as a result of the lawsuits led to the policy changes implemented by the city?

A    I believe so.

Q    I am going to put up a deposition transcript from that case and he testified to a few things from the training, which you already answered and they were the

Lieutenant Peter Nigrelli                      57

same, but I had a couple of questions of things that he said, okay?

A    Okay.

MR. SHIELDS:  We will mark this as Exhibit 6.

(Plaintiff's Exhibit 6, Transcript, marked for identification.)

Q    This is the deposition of the case, Brook Thurber versus the City of Buffalo and it doesn't have the index number on it, but this deposition transcript is dated July 3rd, 2019 and it says, "The Examination Before Trial of Brendan Kiefer"; is that a fair reading of the first page, Lieutenant?

A    Yes, sir.

Q    It says the plaintiff who was represented by Matthew Albert and the City of Buffalo was represented by Maeve Huggins.  I just have a few questions written down.

We are at page 10 of the transcript and I am going to start reading at line 14.  "If you could describe the nature of that training" and Kiefer says, "there's a video that I believe was produced in Chicago that was geared towards police officers and how to deal with vicious dogs."  My question is do you think that

58

Lieutenant Peter Nigrelli 58

was the same video that we viewed previously?

A Yes, sir.

Q You answered my question better than Kiefer did, so I am not going to ask it.

A Okay.

Q I was going to ask about plans made when you execute a search warrant and whether or not you have to identify if there's a dog in the house prior to executing the warrant, but you covered that earlier, correct?

A Correct.

Q Now, I fast forward to page 20, line 17. Here the question by Mr. Albert was, "okay fair to say, you never received any sort of training, whatsoever in terms of animal behavior, dog behavior, anything of that nature, correct" and the witness says, "no, I told you, we watched the video from Chicago."

Lieutenant, is that consistent with your understanding of any training received by officers in the Buffalo Police Department that it mostly consists of the training video?

A Yes, sir.

Q Is there anything else that has changed since this deposition testimony in 2019, any additional

59

Lieutenant Peter Nigrelli                      59

training about animal behavior?

A   No, sir.

Q   Officer Kiefer is no longer with the Buffalo Police Department?

A   Correct, he retired.

Q   Just because it was the end of his career or do you have any other idea if there was a reason that he retired?

A   No, he retired with service time to pursue other ventures in life.

Q   Just a few more questions.  Let's say that the dog is shot during the course of a warrant execution or other SWAT incident, what's the procedure to review the incident afterwards?

A   Internally, not only does the department have body worn cameras, but also on the team, we have helmet body cameras.  The cameras would be reserved and the video would be reviewed and team wise, we would go that route and then you have to do all the forms of paperwork that goes with discharging a weapon, use of force, the internal P73 memo from the conduct from the individual person and would have to review all of the facts and move it forward and for my purpose, my direct line of supervision from the SWAT aspect is the deputy

Lieutenant Peter Nigrelli                    60

commissioner of operations, so if something like this would happen tomorrow morning when we go out, I would notify the deputy that there were shots fired involving SWAT and enamel.

Q   You said that all Buffalo Police Department Officers, different from SWAT wear a regular body worn camera; is that right?

A   Yes, they have their camera on their vest, SWAT is on our helmets.

Q   Are they a different kind of camera or they are the same?

A   It's from Axon, which is the same provider for the body.  It's a size of a lipstick file, so it's on the left or right side.

Q   So they are on the side pointing near your ear?

A   Yes, sir.

Q   When did the City of Buffalo require patrol officers to wear body cameras?

A   SWAT started wearing them in 2020, so it has been about three or four years by now.

Q   First, patrol started wearing the cameras and then SWAT starting wearing cameras?

A   Correct.

Q   You were the commander, correct, when SWAT

61

Lieutenant Peter Nigrelli                      61

started wearing cameras?

A    Yes, sir.

Q    Was that a decision that you made or something else?

A    That was the decision from the commissioner in accordance with the Department of Policy.

Q    Now, the Department of Policy required that SWAT officers wear cameras; is that what you're saying?

A    Yes.

Q    First there was a policy saying that all patrol officers were to wear cameras and then SWAT also?

A    Yes, sir.

Q    Was there any pushback from either you or anyone else on the SWAT team about wearing body cameras?

A    The only pushback that I gave was the time considerations, what the camera would capture.  Our policy for what we wear it from when they are on is very good for both evidence purposes, both for the law enforcement side and the defense side and it's very open ended, it works for everyone.

Q    So in general, it sounds like it's a positive thing that your SWAT officers wear the body cameras?

A    Absolutely.

Q    You said one of the reasons is for evidence of

62

Lieutenant Peter Nigrelli                          62

crimes that had been committed?

A    Yes.

Q    And another reason would be to review what happened during the operation?

A    Correct.

Q    And basically to make your officers better, to be able to review, see what happened and implement positive changes?

A    Yes, sir.

Q    Have you ever reviewed a video and seen that one of your officers did something wrong and had to give training, for example?

A    Yes.

Q    Have there been situations where you were able to review incidents and without the video, you wouldn't have known that something happened?

A    Nothing jumps out.

Q    But it's helpful to review what happened afterwards, correct?

A    Yes, sir.

Q    Do you automatically review any all body worn cameras of warrant executions and other SWAT activities or only in certain circumstances?

A    It's usually case by case we will review it or if

63

Lieutenant Peter Nigrelli                63

someone wants to take a look to see, like a self

critique of themselves.

Q   Can individual officers access their on body worn

cameras?

A   I have the access to open it and we can view it

and go over it or if someone says that they went left,

maybe they should have went right, can we look at the

video.

Q   Is that different from an ordinary patrol officer

and their access to their own body worn camera footage?

A   They can access it, but also the first line

supervisors, they all can access it.

Q   A patrol officer can review their body camera

footage; is that fair to say?

A   Yes, they can review it and preserve it for

incident.

Q   For your SWAT officers, they have to ask you

before they can review it; is that right?

A   No, they can review it.  I misspoke.

Q   Is there like a specific location where they have

to go to review their own body worn camera?

A   They have access through their department

computer system that acts as an app on their phones for

members to review.

64

Lieutenant Peter Nigrelli                64

Q    You said that you got the body worn cameras in spring of 2020?

A    Yes.

Q    Since they were first implemented, have you had the same cameras or have they been upgraded at all?

A    We had the same as the patrol officers were wearing and then we updated to the smaller size camera and then I believe in 2023, we will get another newer update.

Q    Okay.  If there was a different police department whose SWAT team did not utilize body worn cameras, would you recommend that they make the change to use the cameras during SWAT operations?

A    Yes.

Q    For all of the reasons that we talked about before?

A    Yes, sir.

Q    Anything else that you want to add about the benefits of the SWAT team using cameras?

A    I think in 2022 it comes out to benefit all parties involved, it gives full explanation and it shows what transpired before, during and after their actions.

Q    What's the policy about having the body worn camera activated during a search warrant execution, when

65

Lieutenant Peter Nigrelli                          65

do they activate the camera and when do they turn it off?

   A   We will turn the cameras on a minute to a minute and a half off target and the cameras stay on until we are off site.  If someone is standing off site, if they are doing nothing but just standing guard, they are allowed to put their cameras in buffering mode, if someone is standing with a prisoner or someone who is detained, the cameras have to stay on, if there's evidence, if there's money, if there's anything that we need preserved, it needs to stay on.  The only time the cameras go off are if they are not engaging the public or anything that will be crucial to a criminal case.

   Q   Can you just describe what buffering mode is?

   A   It's putting the camera on pause.

   Q   To un-pause it, you would have to physically un-touch it?

   A   Yes, a double tap on the helmet on the pad.

   Q   I know you testified about there only having been one or two dog shootings with SWAT since 2019, correct?

   A   Correct.

   Q   Do you have any idea how many dog shootings on the whole for the entire department there has been since 2019?

66

Lieutenant Peter Nigrelli 66

A    There's not a lot, it's extremely reduced in numbers across the board.

Q    Firearm discharge reports would be the document that we would request to see the information?

A    Yes, sir.

Q    Do you call it that, a firearm discharge report or something else?

A    We call it BPD-1.

Q    Is that just specific to the discharge of a firearm?

A    Yes, the discharge of a firearm.

Q    Have you ever been contacted by any other police departments about how to reduce dog shootings?

A    No, sir.

Q    So you have never worked with any other police departments about how they might reduce the number of dog shootings in their department?

A    Correct.

Q    Would you be willing to help other police departments, like the Rochester Police Department to reduce the number of dog shootings in that department?

A    Yes.

MR. DOLBY-SHIELDS:  Great.  Thank you so much.  I have no further questions for you today.

67

Lieutenant Peter Nigrelli                    67

I think that Will and I will talk about our discussion in the beginning, perhaps we can figure out a different way than calling you back to testify again, like written deposition questions to get the rest of the answers or documents.  Does that sound like a good plan, Will?

MR. MATHEWSON:  Yeah, to the extent that what you're looking for is specific numbers, hopefully that can be something like a certified business record because that's kind of clean cut. I don't think we'll need his impression on that.

MR. SHIELDS:  Okay.  Great.  But I do reserve my right to call you back for a second conversation about this stuff.  It was very informative and I appreciate your time, Lieutenant.

MS. JONES:  I have one question.

EXAMINATION BY

MS. JONES:

Q   I'm not sure I heard the name properly, earlier you were talking about a Commander Vernon Petey or Beaty?

A   It's Vernon Beaty, B-e-a-t-y.

68

Lieutenant Peter Nigrelli                    68

MS. JONES:  Thank you, Lieutenant.

THE WITNESS:  Thank you.

THE COURT REPORTER:  Counselor, would you like a copy of today's transcript?

MS. JONES:  Yes.

(Time noted:  5:00 p.m.)

LIEUTENANT PETER NIGRELLI

Subscribed and sworn to

before me this        day

of                  , 20__

Notary Public

69

69

                           INDEX


WITNESS              EXAMINATION BY              PAGE
LIEUTENANT           MR. SHIELDS                  5
PETER NIGRELLI
                     MS. JONES                    67


                     EXHIBITS
NUMBER               DESCRIPTION                 PAGE
1                    Subpoena                     11
2                    Document                     18
3                    Document                     24
4                    Article                      36
5                    Article                      52
6                    Transcript                   57

70

CERTIFICATION

STATE OF NEW YORK    )

                     )  ss

COUNTY OF SUFFOLK    )


        I, SAIGE M. PORCELLI, a Shorthand Reporter and

Notary Public within and for the State of New York, do

hereby certify:

        THAT the foregoing transcript is a true and

accurate transcript of my original stenographic notes.

        IN WITNESS WHEREOF, I have hereunto set my hand

this 1st day of November, 2022.




                        SAIGE M. PORCELLI